IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 2:05-cr-119-MEF |
| | * | |
| PAUL MICHAEL HAMRICK | * | |

### MOTION IN LIMINE TO BAR EVIDENCE AND ARGUMENT THAT MR. HAMRICK DEPRIVED THE STATE OF ALABAMA OR THE PUBLIC OF HIS OWN HONEST GOVERNMENTAL SERVICES BYACTS ALLEGEDLY COMMITTED WHEN HE WAS A PRIVATE CITIZEN

Counts One, Two, and Ten through Fourteen charge Mr. Hamrick, in part, with committing mail and wire fraud by depriving the State of Alabama of his own honest governmental services.[1]  These counts allege that he did so by committing five listed acts of "official power, action, and influence."  *Second Superseding Indictment* ¶ 30(g).

This motion is about one of those acts – the alleged "influenc[e]" exercised on "the Cherokee County Commission in favor of Clayton 'Lanny' Young's business interests."  The evidence produced in discovery shows that, if Mr. Hamrick did anything, he did it when he was a private citizen.

Private citizens do not owe the State or the public a duty to render honest governmental services.  The Court therefore should bar evidence or argument that Mr. Hamrick deprived the state of his own honest governmental services with respect to this alleged act.

---

[1]  18 U.S.C. §§ 1341 and 1343 punish mail and wire fraud respectively.  18 U.S.C. § 1346 provides that fraud under those two statutes can include depriving another "of the intangible right of honest services."

## I. ARGUMENT

### A. Honest Governmental Services

In *United States v. deVegter*, 198 F.3d 1324, 1328-30 (11th Cir. 1999), the Eleventh Circuit recognized two kinds of honest services mail/wire fraud – honest governmental services (or "public official malfeasance") and honest commercial services (or "private sector misconduct").

> In this case, it is not alleged that [the defendant] deprived the *public* of honest *governmental* services. Rather, the indictment alleges that he deprived [a contracting party]² of honest *commercial* services by providing corrupted financial advice. Thus, the § 1346 violation charged in this case concerns the defrauding of honest services in the private sector.

198 F.3d at 1328 n.3. The Court explained:

> The meaning of the "intangible right of honest services" has different implications . . . when applied to public official malfeasance and private sector misconduct. Public officials inherently owe a duty to the public to make governmental decisions in the public's best interest. "If the official instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest – the official has defrauded the public of his honest services."
>
> *   *   *   *   *   *   *   *   *   *
>
> On the other hand, such a strict duty of loyalty ordinarily is not part of private sector relationships. Most private sector interactions do not involve duties of, or rights to, the "honest services" of either party. Relationships may be accompanied by obligations of good faith and fair dealing, even in arms-length transactions. These and similar duties are quite unlike, however, the duty of loyalty and fidelity to purpose required of public officials. For example, "employee loyalty is not an end in itself,

---

² In that case, the contracting party to whom the defendant owed a duty of honest commercial services happened to be the government of Fulton County, Georgia.

>it is a means to obtain and preserve pecuniary benefits for the employer. An employee's undisclosed conflict of interest does not necessarily pose the threat of economic harm to the employer." A public official's undisclosed conflict of interest, in contrast, does by itself harm the constituent in the end for which the official serves – honest government in the public's best interest. The "intangible right of honest services" must be given an analogous interpretation in the private sector. Therefore, for a private sector defendant to have violated the victim's right to honest services, it is not enough to prove the defendant's breach of loyalty alone. Rather, as is always true in a breach of loyalty by a public official, the breach of loyalty by a private sector defendant must in each case contravene – by inherently harming – the purpose of the parties' relationship. . . . Thus, a private sector violation of § 1346 honest services fraud involves a breach of fiduciary duty and reasonably foreseeable economic harm.

198 F.3d at1328-30 (citations omitted).[3]

### B. The Honest Governmental Services Charges Against Mr. Hamrick

The charge against Mr. Hamrick is honest governmental services fraud. The prosecution charges Mr. Hamrick and Governor Siegelman with "devis[ing] a scheme and artifice to defraud the State of Alabama of its right to the honest and faithful *services of themselves as public officials and employees of the State of Alabama.*" *Second Superseding Indictment* ¶¶ 28, 61 (emphasis supplied). It says that they did so by employing "their official power, actions, and influence" on five different occasions:

- "[B]etween August 1997 and September 1997," by "[i]nfluencing passage of legislation allowing sale of alcoholic beverages each day of the week, including Sunday, at a motor speedway"

- "[B]etween 11/3/98 and 1/31/99," by "[i]nfluencing the Cherokee County Commission in favor of Clayton 'Lanny' Young's business interests"

---

[3]     The court held that a private citizen – rendering *commercial* services to the Fulton County government – could be held liable under 18 U.S.C. § 1346, but *only under the private sector standard. Id.* at 1330-31.

3

- "[B]etween July 1998 and 7/15/99," by "[i]nfluencing a waste disposal business represented by Clayton 'Lanny' Young to continue paying for his services, and influencing regulation of waste disposal fees and taxes at a facility at Emelle, AL"

- "[B]etween 7/1/00 and 11/2/00," by "[i]nfluencing the *de facto* Director of the Alabama Development Office to advance a business represented by Clayton 'Lanny' Young on the list of the companies eligible for industrial tax-free bond issues"

- "[B]etween September 2001 and May 2001," by "[i]nfluencing the award of a construction management contract to a company controlled by Clayton 'Lanny' Young to build warehouses for the Alabama Department of Economic and Community Affairs and the State of Alabama Alcoholic Beverage Control Board."

*Id.* ¶ 30(g).

### C. The Cherokee County Charge

The evidence produced in discovery shows that, if Mr. Hamrick did anything with respect to the Cherokee County Commission, he did it when he was a private citizen. Mr. Hamrick was a private citizen during the period from May 8, 1998 through January 19, 1999, during the Siegelman gubernatorial campaign and transition. *Second Superseding Indictment* ¶ 1(d).

Mr. Young testified that his "business interests" before the county commission arose in the fall of 1998 and that the commission made its decision on December 1, 1998:

> Q. Now, I want to back up again a little bit – we have a series of events that have happened somewhat at the same time – and ask you, in late 1998, did you have any business interests in Cherokee County, Alabama?
>
> A. Yes. I'm sorry. Late 1998?
>
> Q. Yes. In late 1998, did you have any business interests – and I'll be more specific – in a landfill? I'm talking about in the fall of 1998.

A.  The reason I ask you that, at some point we sold that to Waste Management so – but I would still have a – they had not paid everything in full, so I guess yes.

Q.  Okay. So you had business interests that ran up in that area. In other words, did you have an opportunity to possibly make money based on activity that might occur in Cherokee County surrounding a landfill up there?

A.  Yes, to complete an acquisition that we had signed a contract with. That's true.

Q.  Okay. And if you would, let me ask you. Is it true that you had basically, starting back in and around 1994, been trying to create a landfill that would actually exist in Cherokee County but would be able to take waste streams from other areas?

A.  Yes.

Q.  And had you sold your interest in that landfill to USA Waste Management?

A.  It was just USA Waste at the time. It was prior to the acquisition.

Q.  Okay. But what ultimately became USA Waste Management?

A.  Yes, that's correct.

Q.  And was the contract one of these contracts that was contingent – in other words, they would pay you certain amounts based on other events occurring?

A.  Yes.

Q.  Is it true that you stood to make an extra $3 million from USA Waste Management if the Cherokee County Commission agreed to increase the area from which the waste stream would come – i.e., more counties, even more counties from other areas – and if they would alter the royalties that had to be paid, if the county commission would alter those, and if the county commission – well, are those things – were they in play – in other words, if you could get those things done or if those things occurred, you stood to make more money than you'd already made off the sale of this landfill?

>    A.    Yes.
>
>    Q.    And that would have been two payments of a million dollars and $2 million?
>
>    A.    Yes.
>
>    Q.    So you wanted the – would it be safe to say that it was in your business interest and that you wanted the Cherokee County Commission to do those things that I've just outlined?
>
>    A.    For $3 million, I certainly did.
>
>    Q.    Okay. And, in fact, on December the 1st of 1998 they did it, didn't they?
>
>    A.    They did.
>
>    Q.    Did you have occasion in 1998 to ask Mr. Siegelman and Mr. Hamrick to help you or to support your efforts to get that done?
>
>    A.    Yes. I talked to them.
>
>    Q.    What did you ask them to do?
>
>    A.    I think I asked them to make some phone calls to a commissioner or the county attorney at the time up there.
>
>    Q.    Okay. And did they make those phone calls?
>
>    A.    To my knowledge, they did. Yes.

*Young Federal Grand Jury Testimony* 35/11 – 38/4 (October 19, 2005).[4]

The chairman of the Cherokee County Commission testified to only one conversation with Mr. Hamrick about Mr. Young's interests. He said that it occurred during the gubernatorial transition, while Mr. Hamrick was a private citizen.

---

[4] The grand jury transcript is not attached to this motion due to the sensitive nature of grand jury materials. Mr. Hamrick will provide the Court with a copy upon request.

Mr. Jordan testified:

Q.   Okay. Is there anything in particular? Is there a point in time when you met with Paul Hamrick or saw Paul Hamrick where he asked you about Lanny or suggested to you that you might want to help Lanny?[5]

A.   There was one time. I don't remember the exact date, but I can give you a time frame.

Q.   Okay.

A.   It was between the time Don Siegelman was elected governor and him taking office, because they were set up in the Alabama Sheriffs Association building. You know, during that same time his transition was going on as well as the reorganizing of the senate and taking kind of it out from under the lieutenant governor's control, and that was going on in the sheriffs association building at the same time.

Q.   So it was your understanding that when you went down to the sheriffs association that not only was Mr. Siegelman planning his transition into the governor's office, but he was also participating in an effort to strip power away from the lieutenant governor?

A.   I knew that Siegelman was set up there and I knew that the Democrat faction of the senate was set up there. What was going on between the two, no, I didn't know.

Q.   I see.

A.   But I know there was some of both there. And myself and some other probate judges just were in town, knew that they were there, dropped in hoping to catch maybe the governor-elect or some of the state senators there.

Q.   Okay.

A.   And while I was there Hamrick asked me to come back into an office with him, and it was just a very small office. And we went

---

[5]   As noted elsewhere, while not the subject of this motion, this sort of leading question will be entirely improper at trial.

> in and he closed the door, and he told me that anything that we
> could do up in Cherokee County to help Lanny with him getting
> his project approved, you know, the sale, the reduction of host
> government fees and the expanded service area, that he would
> appreciate it and we would be taken care of.

*Jordan Federal Grand Jury Testimony* 20/25 – 22/17 (September 20, 2005).[6]

### D.  The Law

Private citizens, even those closely connected to government operations, cannot be charged or convicted under § 1346 for depriving the public of their own honest *governmental* services.  *United States v. Murphy*, 323 F.3d 102, 113-18 (3d Cir. 2003); *United States v. Warner*, 292 F. Supp.2d 1051, 1063 (N.D. Ill. 2003); *United States v. Adler*, 274 F. Supp.2d 583, 587 (S.D.N.Y. 2003).  Private citizens owe no duty of honest governmental services to the public in the first place, and thus cannot be charged with or convicted of violating such a duty.  *Id.* These principles and the Eleventh Circuit's reasoning in *deVegter* and in *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) compel the conclusion that the prosecution cannot charge Mr. Hamrick with honest governmental services fraud for the alleged conversations regarding the Cherokee County landfill.  He was a private citizen when the issue arose in "the fall of 1998" and when it concluded on December 1, 1998.  The only conversation specifically identified occurred when he was a private citizen.

In *United States v. Murphy*, 323 F.2d 102 (3d Cir. 2003), a county Republican party chairman effectively controlled decisions by the county commission on county contracts.  The

---

[6]  The grand jury transcript is not attached to this motion due to the sensitive nature of grand jury materials.  Mr. Hamrick will provide the Court with a copy upon request.

prosecution alleged that he solicited bribes in exchange for his decisions and influence, and thus violated his duty of honest governmental services to the public. The Third Circuit held that, as a private citizen, he owed no such duty:

> [T]he Government cannot identify any clearly established fiduciary relationship or legal duty in either federal or state law between Murphy and Passaic County or its citizens. In other words, it cannot point to an established "right" of honest services that Murphy owed to the County or its citizens[.][7]. . . Without any legal basis for determining whether Passaic County or its citizens had a right to Murphy's honest services, we conclude that it was improper for the District Court to allow the jury to conjure such a duty out of a fog of assumptions.

*Id.* at 117.

In *United States v. Warner*, 292 F. Supp.2d 1051 (N.D. Ill. 2003), the defendant was a "close confidant of a high-ranking Illinois Secretary of State Office official." 292 F. Supp. at 1053. He performed a number of tasks for the Secretary of State Office, including serving on a transition team. *Id.* But he remained a private citizen. The prosecution alleged that his influence was such that he controlled various decisions by the Secretary of State Office. It charged him with violating his duty to render honest governmental services to the public by soliciting bribes in exchange for his exercise of that control. *Id.* at 1052-56. The Northern District of Illinois dismissed that portion of the indictment, holding that the defendant owed no such duty:

> Given the concerns expressed in this and other Circuits regarding [§ 1346's vagueness if the duty is not properly defined], the court reluctantly concludes that Warner cannot be charged with defrauding the public of his

---

[7] The Third Circuit rejected the notion that the general New Jersey Bribery Act imposed such a duty. 323 F.3d at 117. "We cannot endorse this methodology because all criminal activity would breach a duty to the public not to break the law that could then form the basis for a mail fraud conviction." *Id.*

> own honest services because he was a private citizen who did not owe such a fiduciary duty to the citizens of Illinois or to the SOS Office. . . . [T]he court finds that there is insufficient basis for treating public and private individuals the same way for purposes of "honest services" mail fraud.

292 F. Supp.2d at 1063.

Both *Murphy*, 323 F.3d at 113-18, and *Warner*, 292 F. Supp. at 1059-60, rejected a pre-*McNally*[8] Second Circuit opinion, *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982). The Second Circuit had held that a county Republican party chairman who allegedly exercised a "vise-like grip over" governmental decisions, *id.* at 116, so that "everything went through his hands," *id.* at 118, dictating everything relating to hiring, salaries, and promotions, and controlling lucrative insurance matters, could be charged with honest services fraud, for depriving the public of his honest governmental services. 688 F.2d at 124-28. The *Margiotta* court held that the jury could infer a duty of honest governmental services, because the defendant had de facto control over county government decisions. *Id.*

The Northern District of Illinois in *Warner* put the question as "whether a *Margiotta* theory of mail fraud remains viable" after *McNally*. 292 F. Supp.2d at 1058. It held that such a theory is *not* viable, given the circuits' expressed need to root a private citizen's duty in something more substantial than an inference based on a de facto relationship. "The court is not persuaded . . . that such general agency principles are sufficient to charge Warner, a private individual, with defrauding the public of his 'honest services.'" 292 F. Supp. at 1059. It quoted the *Margiotta* dissent with approval, for the proposition that "there is 'no logical rationale for treating private party officials in the same manner as public officials since such a loose

---

8   *McNally v. United States*, 483 U.S. 350 (1987).

interpretation of the mail fraud statute creates a catch-all political crime which has no use but misuse.'" *Id.* at 1059-60.

The Third Circuit in *Murphy* reached the same conclusion. After noting that the *Margiotta* panel "approved a gestalt approach" that "allowed the jury to derive a fiduciary duty" based on whether others relied on the defendant because of his "special relationship" with the government and whether he had de facto control of governmental decisions, 323 F.3d at 112, the Third Circuit held that a private person's post-*McNally* honest services duty must have more substantial roots. While it declined the defendant's request to hold that the duty must be rooted in state law, the Third Circuit held that it must have *some* clear root – that "either state or federal law [must] clearly establish[] a fiduciary relationship." 323 F.3d at 117. Because the prosecution could not point to any such duty, the honest services charge could not stand. *Id.*

More recently, the Southern District of New York, in *United States v. Adler*, 274 F. Supp.2d at 587, held that *Margiotta* no longer is good law in the Second Circuit or anywhere else.[9]

> The problem presented by prosecution for fraud of intangible rights is serious and has been, long before *McNally* or *Handakas* or *Rybicki*.[10] This

---

[9] Even if *Margiotta* were still good law – which it is not – Mr. Hamrick could not be charged for acts during the period he was a private citizen. There is no allegation or evidence – nor could there be – that Mr. Hamrick, when he was a private citizen, had the "special relationship" or "de facto control" over governmental decisions that the defendants in *Margiotta*, *Murphy*, and *Warner* allegedly had.

[10] The court here referenced the decisions in *McNally v. United States*, 483 U.S. 350 (1987), *United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002), and *United States v. Rybicki*, 287 F.3d 257 (2d Cir. 2002). It cited those opinions in an earlier portion of its

11

>Court agrees that *Margiotta* was wrongly decided and is no longer good law in this Circuit or anyplace, as found by the Third Circuit in *Murphy*. Mr. Adler was not a person who owed a duty to the public and neither was *Margiotta*. His sole obligations were to the Democratic Party members, in connection with the recruiting and nominating of candidates, the collection of contributions to fund campaigns, and resolving issues of party platform.

In both *deVegter* and *Lopez-Lukis*, the Eleventh Circuit made clear its view that honest governmental services cases are about public officials and their official acts. *DeVegter* described honest governmental services fraud as "public official malfeasance" and said that a violation occurs when a public official, who "inherently owe[s] a duty to the public to make governmental decisions in the public's best interest, . . . instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest[.]" *Lopez-Lukis* used the same language:

>When a government officer decides how to proceed in an official endeavor – as when a legislator decides how to vote on an issue – his constituents have a right to have their best interests form the basis of that decision. If the official instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest – the official has defrauded the public of his honest services.

---

>opinion that discussed the continuing difficulty under § 1346 of defining the honest services duty with sufficient precision so that the statute is not unconstitutionally vague as applied. *Handakas*, for example, held that the statute was unconstitutionally vague as applied to the operator of a construction company that violated New York wage rate contract provisions for public improvements, holding that there was no duty of "honest services" between that operator and the city. The definition of the duty likewise is of critical importance in this case, and is the subject of Mr. Hamrick's motion regarding the honest services charges covering the period he was a public official.

102 F.3d at 1169.[11]

### E. The Prosecution's Concession

As Mr. Hamrick noted in his reply brief on his motion to dismiss, the prosecution has conceded that it may not charge him with depriving the state of his own honest governmental services for alleged acts committed when he was a private citizen. In its response to that motion to dismiss, the prosecution stated: "[a private] defendant may not owe an independent duty to the State or citizenry." *Response* at 6.

### II. CONCLUSION

Mr. Hamrick therefore respectfully requests that the Court bar evidence or argument that his alleged actions with respect to the Cherokee County Commission (if they occurred at all)

---

[11] As Mr. Hamrick has noted in his motion to dismiss the honest services charges for the period he was a private citizen (p. 5, n. 4), and elsewhere (his reply brief on that motion), in some circumstances, courts hold that private citizens may be guilty of a § 1346 violation for depriving the public of a *public official's* duty of honest services – as when a private person bribes the public official or helps him conceal a material conflict of interest. *See, e.g., United States v. Lovett*, 811 F.2d 979 (7th Cir. 1987) (bribing a mayor); *United States v. Rauhoff*, 525 F.2d 1170 (7th Cir. 1975) (bribing a Secretary of State); *United States v. Hasner*, 340 F.3d 1261 (11th Cir. 2003) (helping a county housing authority chairman conceal a material conflict of interest); *Lopez-Lukis*, 102 F.3d at 1165-66 (dealing with the public official, but noting that a private lobbyist had paid her for her votes and influence); *United States v. Sawyer*, 85 F.3d 713, 721 (1st Cir. 1996) (private lobbyist who "paid for meals, rounds of golf, and other entertainment," including a trip to Puerto Rico, for Massachusetts legislators could be guilty of violating § 1346 by depriving the state of the legislators' honest services, but *only* if he paid them in exchange for their official acts – not if he simply violated the Massachusetts gift statute). There is no conceivable basis for the prosecution to argue that it has so charged Mr. Hamrick here, as a separate motion in limine points out.

amounted to a deprivation of his own honest governmental services. The procedure in the courtroom should be as follows. If the prosecution intends to call Mr. Jordan, or to ask Mr. Young about Cherokee County, the Court should hold a brief hearing outside the presence of the jury before the questions begin. The Court should require the prosecution to articulate some valid charge to which this evidence actually is relevant. If it cannot do so, the Court should bar testimony on this subject altogether.

        Respectfully submitted,

        s/T. Jefferson Deen, III
        T. Jefferson Deen, III
        T. Jefferson Deen, III, P.C.
        P.O. Box 2705
        Mobile, Alabama 36652
        Phone: (251) 433-5860
        Fax:    (251) 433-0703
        E-mail: TJeffDeen@deenlawpc.com

        s/Michel Nicrosi
        Michel Nicrosi
        Miller, Hamilton, Snider & Odom, L.L.C.
        P.O. Box 46
        Mobile, Alabama 36601-0046
        Phone: (251) 432-1414
        Fax:    (251) 433-4106
        E-mail: michelnicrosi@mhsolaw.com

**CERTIFICATE OF SERVICE**

 I certify that on April 3, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

          s/Michel Nicrosi
          Michel Nicrosi
          Miller, Hamilton, Snider & Odom, L.L.C.
          P.O. Box 46
          Mobile, Alabama 36601-0046
          Phone: (251) 432-1414
          Fax: (251) 433-4106
          E-mail: michelnicrosi@mhsolaw.com