IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 2:05-cr-119-MEF |
| | * | |
| PAUL MICHAEL HAMRICK | * | |

**MOTION IN LIMINE TO BAR EVIDENCE
AND ARGUMENT REGARDING ALLEGED PAYMENTS
MADE BY MR. YOUNG TO MR. HAMRICK**

This motion is about what the term "honest services" means when applied to a public official. The Eleventh Circuit has said it means the public official cannot take a bride or conceal a material conflict of interest. The discovery shows that, at least with respect to Mr. Young's $6,000, $15,000, and $25,000 payments to him, Mr. Hamrick did neither of those things.

To hold Mr. Hamrick liable for honest services fraud based on these payments, the Court would have to define "honest services" more broadly than the Eleventh Circuit, or any other circuit, ever has. The Eleventh Circuit, like other circuits, has been very precise about its definition. Imprecision on the definition, as the courts have noted, renders §1346 unconstitutionally vague. Defining "honest services" to forbid these payments from Mr. Young to Mr. Hamrick would do just that.

The Eleventh Circuit rule, in this context, is that "honest services" forbids specific payments for specific official acts. It does not forbid payments made because of an official's position or because of his performance of official acts generally. Mr. Young does not say he made these payments for specific official acts by Mr. Hamrick. He says he made the $6,000 and the $15,000 payments because of a general "understanding" he had requesting Mr. Hamrick and others, that "I would provide money for them personally if they needed that money for whatever

– whatever purpose. But their – my understanding was that when I needed something, that I wanted them to deliver it." *Young Federal Grand Jury Testimony* 19/9-13 (October 19, 2005)[1]. He said he made the $25,000 payment pursuant to this understanding (if you believe his grand jury testimony) or because of private – not official – acts Mr. Hamrick performed, as a private citizen (if you believe a statement he made to the Attorney General's office while in jail in Scottsboro, AL). *Young Interview*, Alabama Attorney General's Office, Investigative Division, Interview Form, File #27460-001 (February 18, 2005).

## I. ARGUMENT

### A. Definition of "Honest Services"

1. History and Debate

Federal mail and wire fraud prosecutions, based on alleged deprivations of "honest services," began with a 1909 amendment to the mail fraud statute.[2] Over the years, the circuits came to agree generally that such deprivations fell into four categories: (1) public officials who defraud the public of their own honest services;[3] (2) elected officials and campaign works who

---

[1]  The grand jury transcript is not attached to this motion due to the sensitive nature of grand jury materials. Mr. Hamrick will provide the Court with a copy upon request.

[2]  *Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130.* The circuits believed this act expanded the mail fraud statute's scope beyond deprivations of money or property. *See, e.g., United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir. 1984).

[3]  *See, e.g., United States v. Holzer*, 816 F.2d 304 (7th Cir.) (county trial judge), *vacated in light of McNally*, 484 U.S. 807 (1987); *United States v. Silvano*, 812 F.2d 754 (1st Cir. 1987) (city budget director); *United States v. Barber*, 668 F.2d 778, 784 (4th Cir.) (alcoholic beverage control commissioner), *cert. denied* 459 U.S. 829 (1982); *see generally McNally v. United States* 483 U.S. 350, 362-63 & n.1 (1987) (Stevens, J. dissenting) (collecting cases). This set of cases included some in which private persons were convicted of conspiring with a public official to deprive the public of the public official's honest services. *See, e.g., United*

falsify votes and thus defraud the electorate of its right to an honest election;[4] (3) private actors who violate fiduciary duties to private employers by, for example, taking kickbacks;[5] and (4) private actors who deprive other private persons of intangible rights like privacy.[6]

But, within that general agreement, there was considerable disagreement about what "honest services" actually meant.[7]

The circuits' disagreement was over what the source of the duty to render honest services must be.  Must the defendant's duty to render honest services be rooted in state law or could the federal courts impose upon a defendant the obligation to render honest services to a state?  The en banc United States Court of Appeals for the Fifth Circuit explained the nature of this pre-1987 disagreement as follows in *United States v. Brumley,* 116 F.3d 728, 733-34 (5th Cir. 1997):

---

*States v. Lovett,* 811 F.2d 979 (7th Cir. 1987) (bribing mayor); *United States v. Rauhoff*, 525 F.2d 1170 (7th Cir. 1975) (bribing Secretary of State).  A proper reading of the second superseding indictment makes plain that the charge against Mr. Hamrick here is that he deprived the public of his own honest governmental services, including during the periods in which he was a private citizen.

[4] *See, e.g., United States v. Girdner*, 754 F.2d 877 (10th Cir. 1985) (candidate for state legislature); *see generally McNally v. United States*, 450 U.S. 350, 363-64 & n. 2 (1987) (Stevens, J. dissenting) (collecting cases).

[5] *See, e.g., United States v. Boffa*, 688 F.2d 919, 925-26 (3d Cir. 1982); *United States v. Curry*, 681 F.2d 406 (5th Cir. 1982); *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980); *see generally McNally v. United States*, 450 U.S. 350, 363-64 & n. 3 (1987) (Stevens, J. dissenting) (collecting cases).

[6] *See, e.g., United States v. Condolon*, 600 F.2d 7 (4th Cir. 1979); *United States v. Louderman*, 576 F.2d 1383 (9th Cir.), *cert. denied* 439 U.S. 896 (1978); *see generally McNally v. United States*, 450 U.S. 350, 363-64 & n. 3 (1987) (Stevens, J. dissenting) (collecting cases).  *United States v. Rybicki*, 354 F.3d 124, 138-39 n. 13 (2d Cir. 2003) expressed some doubt about whether *Condolon* and *Louderman* actually represent a separate line of cases or were "honest services" cases at all.

[7] *Brumley*, 116 F.3d at 733 (listing cases applying the doctrine differently).

3

> A close look at these [pre-1987] cases uncovers two uncertainties regarding the draw by this federal statute upon state law, specifically in defining the statutory element of honest services. First, must the services be owed under state law? Second, must the breach of a duty to provide services rooted in state law violate the criminal law of the state?

This debate was briefly put on hold in 1987 when, in *McNally v. United States,* 483 U.S. 350, 358-59 (1987), the United State Supreme Court held that the circuits' original premise was wrong. The Supreme Court held that the 1909 amendment to the mail fraud statute did not extend its scope beyond deprivation of money or property. *Id.* There was no longer a basis for honest services charges of any kind.

Congress quickly responded to *McNally* by enacting, in 1988, 18 U.S.C. §1346, which defines, "scheme or artifice to defraud" in §§ 1341 and 1343 to include "a scheme or artifice to deprive another of the intangible right of honest services." Congress's action resurrected the debate about the meaning of "honest services." That debate now occurs in the context of statutory interpretation of § 1346 instead of application of the pre-1987 judge-made doctrine.

The crux of the debate is the effort to find a definition that is sufficiently knowable that § 1346 is not unconstitutionally vague. Must the definition be rooted in a state statute? Or at least a federal statute? Or can federal courts supply their own definition of honest services without reference to a state or federal statute? And, if they supply their own definition, how can that definition be made sufficiently precise to give defendants the constitutionally-required fair warning that their conduct might violate it?

Judge Posner, writing for the Seventh Circuit, explained:

> It can be argued that tying the concept of fraud in the mail fraud statute to state law and to federal statutes expressly creating fiduciary duties would allay the persistent concerns about the

>breadth and vagueness of the statute. Against this it can be argued
>that a uniform albeit judge-made federal concept of fiduciary duty
>might do the trick as well or better – but the riposte is that a
>century of interpretation of the statute has failed to still the doubts
>of those who think it dangerously vague.

*United States v. Martin,* 195 F.3d 961, 967 (7th Cir. 1999).

The Fifth Circuit insists that, at least for prosecution of state officials for honest governmental services fraud, the definition and the duty be rooted in state law.

>We find nothing to suggest that Congress was attempting to garner
>to the federal government the right to impose a federal vision of
>appropriate services – to establish, in other words, an ethical
>regime for state employees. Such a taking of power would sorely
>tax separation of powers and erode our federalist structure. Under
>the most natural reading of the statute, a federal prosecutor must
>prove that conduct of a state official breached a duty respecting the
>provision of services owed to the official's employer under state
>law. Stated directly, the official must act or fail to act contrary to
>the requirements of his job under state law. This means that if the
>official does all that is required under state law, alleging that the
>services were not otherwise done honestly does not charge a
>violation of the mail fraud statute. The statute contemplates that
>there must first be a breach of a state-owed duty.

*United States v. Brumley,* 116 F.3d at 734.

The Third Circuit, in *United States v. Murphy,* 323 F.3d 102 (3d Cir. 2003) did not require that the definition and the duty be rooted in state law. But it did require that the defendant's actions violate "a clearly established fiduciary relationship or legal duty in either federal or state law."
*Id.* at 117.

The Seventh Circuit, as Judge Posner noted in *Martin,* opts for a judge-made standard. Its decisions make clear that "honest services," for public officials, means that they not take bribes or kickbacks. In *United States v. Bloom,* 149 F.3d 649, 655 (7th Cir. 1998), the Seventh

5

Circuit noted that "[i]n almost all of the intangible rights cases this circuit has decided (before *McNally* or since § 1346), the defendant used his office for private gain, as by accepting a bribe in exchange for official action."  *See also, e.g., United States v. Genova,* 333 F.3d 750 (7th Cir. 2003) (upholding mail fraud convictions of city mayor and city prosecutor who engaged in kickback scheme involving payments by the city for legal services provided by prosecutor's law firm).

Despite their differences about the proper source and precise nature of the definition of "honest services," the courts agree that the definition must be clear enough for a defendant to know that his conduct violates it  – or § 1346 will be unconstitutionally vague as applied to him. The Northern District of Illinois, in *United States v. Warner,* 292 F. Supp. 2d 1051 (N.D. Ill. 2003) put it well.  After noting the "vagueness concerns" raised by the Fifth Circuit in *Brumley* and the Seventh Circuit in *Martin*, the court held that a defendant must have "fair warning that his conduct . . . violate[s] § 1346."

2. Eleventh Circuit Definition of "Honest Services"

The Eleventh Circuit opts for a judge-made definition, but is very precise about what the definition is.  In 1997, it stated that a public official violates his honest services duty by (1) taking a bribe or (2) concealing a material conflict of interest.

> When a government officer decides how to proceed in an official endeavor – as when a legislator decides how to vote on an issue – his constituents have a right to have their best interests form the basis of that decision.  If the official instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest – the official has defrauded the public of his honest services.

*United States v. Lopez-Lukis,* 102 F.3d 1164, 1169 (11th Cir. 1997).  In late 1999, in *United*

*States v. DeVegter,* 198 F.3d 1324, 1328-30 (11th Cir. 1999), the Eleventh Circuit reiterated that formulation. *DeVegter's* reiteration of the *Lopez-Lukis* rule is particularly important here. After *Lopez-Lukis,* but before *DeVegter,* the United States Supreme Court decided *United States v. Sun-Diamond Growers,* 526 U.S. 398 (1999). The Court there cabined the federal definition of bribery (in 18 U.S.C. § 201), holding that it must involve a specific payment linked to a specific act. A gift given simply because of "official acts in general" or because of an official's position is not illegal. The Court based its decision on the requirement in § 201 that a bribe must be given "for or because of any official act performed or to be performed" by the public official.

> It seems to us that this means "for or because of some particular official act of whatever identity" – just as the question "do you like any composer?" normally means "Do you like some particular composer?" It is linguistically possible, of course, for the phrase to mean 'for or because of official acts in general, without specification as to which one" – just as the questions "Do you like any composer?" could mean "Do you like all composers, no matter what their names or music?" But the former seems to us the more natural meaning, especially given the complex structure of the provision before us here . . . . The insistence upon an "official act," carefully defined, seems pregnant with the requirement that some particular official act be identified and proved.

526 U.S. at 406. The Eleventh Circuit must have been aware of *Sun-Diamond* when it reiterated its "bribe" formulation of the honest governmental services duty in *DeVegter*.

For the Eleventh Circuit's judge-made definition of "honest services" to have the clarity the Constitution requires, "bribe" must have a precise definition. As the Eleventh Circuit has opted not to root its definition in state law, the only other logical source of that definition is the federal bribery prohibition in 18 U.S.C. § 201.

That is especially so here. The prosecution does not contend, in the honest services charges against Mr. Hamrick, that by accepting payments from Mr. Young, Mr. Hamrick

violated Alabama bribery laws or any other state statute. It simply contends that he committed honest services fraud. "Honest services" in this context must mean something as applied to Mr. Hamrick.

## B. Payments by Mr. Young to Mr. Hamrick

The prosecution charges that Mr. Young paid Mr. Hamrick "approximately $46,000." Mr. Young's sworn grand jury testimony establishes that the $46,000 consists of three payments or sets of payments – $6,000, $15,000, and $25,000. None of these payments was for a particular official act, as the Eleventh Circuit definition, informed by *Sun-Diamond* requires. Young says nothing more than that they were part of his continuing general "understanding."

He testified as follows about the $6,000 payment:

Q. Now, there is a check that you have provided to us and/or that we've gotten from your bank accounts in the amount of $6,000 that you wrote to Paul Hamrick on September 25th.

MR. FEAGA: Is that the right date, Mr. Perrine?

MR. PERRINE: Yes, sir. Yes, sir.

Q. September the 25th of 2000. There's a check for $6,000 that you wrote to him. Would you tell the ladies and gentlemen of the grand jury why you wrote a $6,000 check to Paul Hamrick in September of 2000?

A. Yeah. He had called me and said that he was – there was some stock dealings with Anthony Fant, and Trevor Williams, I think, was his stockbroker. He did a lot for all of us. And anyway, he needed $6,000 to buy either Anthony's stock or some stock they thought Anthony was going to buy or something. So he needed to cover a check that he had written to the brokerage firm.

Q. Okay. And did you give him $6,000 in response to his request for it?

A. Yes.

Q. And was that part of your continuing agreement with these gentlemen?

      A.      It was.

*Young Federal Grand Jury Testimony* 46/10 - 47/7 (October 19, 2005).

      Mr. Young cannot even say when he gave Mr. Hamrick the $15,000, or identify any specific checks, much less say what the payments were for:

      Q.      Mr. Young, let me ask you something. You indicated earlier on in your testimony that you had provided cash to Mr. Hamrick in and around the lieutenant governor's race time frame in '94. Did you continue, over the course of your relationship with Paul Hamrick, to, when he asked you to do so, provide him with cash?

      A.      Yes. I mean, my entire relationship with Paul was cash for one thing or the other.

      Q.      You – can you give us a minimum amount without – I mean, we, you know, obviously gone over with you your bank records, and you cashed a lot of checks. Do you remember with specificity which times you would have cashed any one of those checks and you would have given money to Paul Hamrick in cash?

      A.      I mean there were multiple occasions.

      Q.      Okay. If we can, then, can you give us a floor amount? Can you say – is there an amount you can say, look, I can guarantee you that in cash – not talking about the 6,000 and the 25,000 that were checks – the amount of cash that I gave to Paul Hamrick, I know it was at least this much over the time that my arrangement, my agreement and understanding with he and Mr. Siegelman and Mr. Hamrick existed?

      A.      I'd say, you know, above 15,000.

      Q.      Above 15,000?

      A.      Yeah.

*Young Federal Grand Jury Testimony* 55/23 – 56/23 (October 19, 2005).

      Mr. Young testified as follows about the $25,000:

      Q.      I want to drop back to a time frame again in 1999 – and I apologize to you for bouncing around – but while we're talking about Mr. Hamrick and money that you provided to him.
During the first six months of the Siegelman administration, during the time

> Q. frame that you were pursuing this revenue ruling and Mr. Hamrick was going to dinner with you and Mr. Siegelman was showing up for dinners and Mr. Siegelman made the statement he made to you – during that time frame, in approximately March of 2000, did you have occasion to give Paul Hamrick $25,000?
>
> A. To him or to Brewbaker BMW.
>
> Q. Okay. And did you do that in response to Mr. Hamrick's request for the $25,000?
>
> A. Yes.
>
> Q. And was that part of your agreement with him, that when he asked you to do things you would do them and when you asked him to do things he would do them?
>
> A. Something that had been going on for years and continued to go on.

*Young Federal Grand Jury Testimony* 48/9 – 49/3 (October 19, 2005).

The discovery indicates that Mr. Young had a different version of events about the $25,000 when he spoke to the Attorney General's Office while he was in jail in February 2005. At that time, he tied the $25,000 to Mr. Hamrick's help with the Three Corners or Cherokee County landfill:

> Young stated that Paul Hamrick helped him with the Three Corners Landfill. Hamrick called officials and asked for help for Young with the landfill. For Hamrick's help in the landfill, Hamrick was to get a 5% interest in the ownership of the landfill. Young stated Hamrick also had helped him by making introductions and had done legal work in connection with the landfill. When Young discussed giving the 5% ownership to Hamrick, Hamrick said he didn't want to take it because he was afraid it would come out. Young gave Hamrick $25,000 and other things because Hamrick did not take the 5% interest in the landfill.

*Young Interview,* Alabama Attorney General's Office, Investigative Division, Interview Report Form, File #27460-001 (February 18, 2005).

As Mr. Hamrick's separate motion in limine regarding the Cherokee County landfill

10

makes clear, the only act the prosecution charges him with regarding that landfill occurred when he was a private citizen. If he did anything, it was a private act, not the "official act" that the Eleventh Circuit definition, informed by *Sun-Diamond*, requires.

## II.  CONCLUSION

For at least these reasons, Mr. Hamrick respectfully requests that the Court bar all evidence and argument relating to the alleged payments by Mr. Young to him.

Respectfully submitted,

s/T. Jefferson Deen, III
T. Jefferson Deen, III
T. Jefferson Deen, III, P.C.
P.O. Box 2705
Mobile, Alabama 36652
Phone: (251) 433-5860
Fax:    (251) 433-0703
E-mail: TJeffDeen@deenlawpc.com


s/Michel Nicrosi
Michel Nicrosi
Miller, Hamilton, Snider & Odom, L.L.C.
P.O. Box 46
Mobile, Alabama 36601-0046
Phone: (251) 432-1414
Fax:    (251) 433-4106
E-mail: michelnicrosi@mhsolaw.com


## CERTIFICATE OF SERVICE

I certify that on April 3, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

s/Michel Nicrosi
Michel Nicrosi
Miller, Hamilton, Snider & Odom, L.L.C.

          P.O. Box 46  
          Mobile, Alabama 36601-0046  
          Phone: (251) 432-1414  
          Fax: (251) 433-4106  
          E-mail: michelnicrosi@mhsolaw.com