IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 2:05-CR-119-MEF |
| DON EUGENE SIEGELMAN | ) | |
| PAUL MICHAEL HAMRICK | ) | |
| GARY MACK ROBERTS, and | ) | |
| RICHARD M. SCRUSHY. | ) | |

## NOTICE OF FILING OF EXHIBITS

COMES NOW the United States of America, by and through Louis V. Franklin, Sr., Acting

United States Attorney for the Middle District of Alabama, and Andrew C. Lourie, Acting Chief of

the Public Integrity Section of the Criminal Division of the United States Department of Justice, and,

pursuant to this Court's Order of March 20, 2006, files the attached Exhibits upon which the United

States intends to rely at the hearing scheduled for April 10, 2006.

Respectfully submitted this the 10th day of April, 2006

LOUIS V. FRANKLIN, SR.
ACTING UNITED STATES ATTORNEY

ANDREW C. LOURIE
ACTING CHIEF, PUBLIC INTEGRITY SECTION

/s/ Louis V. Franklin, Sr.
Acting United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7560
Email: louis.franklin@usdoj.gov

/s/ J.B. Perrine
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7135
Email: jb.perrine@usdoj.gov
ASB-9077-E31J

/s/ Jennifer Garrett
Special Assistant United States Attorney
Assistant Attorney General
Office the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-8494
Fax:     (334)242-4890
Email: jgarrett@ago.state.al.us
ASB-4600-T77J

/s/ Stephen P. Feaga
Assistant United States Attorney
One Court Square, Suite 201
Montgomery, AL 36104
Phone: (334)223-7280
Fax:     (334)223-7560
Email: steve.feaga@usdoj.gov
ASB-7374A60S

/s/Richard C. Pilger
Department of Justice, Criminal Division
Public Integrity Section
10th & Constitution Ave, NW
Bond Building - 12th Floor
Washington, DC 20530
Phone: (202)514-1412
Fax:     (202)514-3003
Email: richard.pilger@usdoj.gov

/s/ Joseph L. Fitzpatrick, Jr.
Special Assistant United States Attorney
Assistant Attorney General
Office of the Attorney General
11 S. Union
Montgomery, AL 36130
Phone: (334)353-4839
Fax:     (334)242-4890
Email: j.fitzpatrick@ago.al.state.us

**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | |
| | **)** | |
| **v.** | **)** | |
| | **)** | **CRIMINAL NO. 2:05-CR-119-MEF** |
| **DON EUGENE SIEGELMAN,** | **)** | |
| **PAUL MICHAEL HAMRICK,** | **)** | |
| **GARY MACK ROBERTS, and** | **)** | |
| **RICHARD M. SCRUSHY** | **)** | |

<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that on Aiprl 10, 2006, I electronically filed the foregoing with the Clerk of the Court  using the CM/ECF system which will send notification of such filing to all counsel of record.

                        Respectfully submitted,

                        LOUIS V. FRANKLIN, SR.
                        ACTING  UNITED STATES ATTORNEY

                        /s/ J.B. Perrine
                        Assistant United States Attorney
                        One Court Square, Suite 201
                        Montgomery, AL 36104
                        Phone: (334)223-7280
                        Fax:    (334)223-7135
                        Email: jb.perrine@usdoj.gov
                        ASB-9077-E31J

# EXHIBIT A

# REPORT OF EXPERT WITNESS

## IN THE UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

UNITED STATES OF AMERICA,    )
                            )
vs.                           )        CR. NO. 05-119-MEF
                            )
DON EUGENE SIEGELMAN,    )
PAUL MICHAEL HAMRICK,    )
GARY MACK ROBERTS, and    )
RICHARD M. SCRUSHY    )

## (I)   BACKGROUND

Defendants Siegelman, Hamrick, and Scrushy (hereinafter, "Defendants") have been charged in a second superseding indictment filed in this Court on December 12, 2005. On January 27, 2006, Defendant Scrushy filed a Preliminary Motion to Dismiss the Indictment and Challenge to the Composition of Petit Jury Pools in the Middle District of Alabama (hereinafter, the "Motion"). Defendants Siegelman and Hamrick joined in this Motion. Defendants claimed a violation of the Jury Selection and Service Act (the "JSSA"), the Fifth and Sixth Amendments to the United States Constitution, and the Plan of the United States District Court, Middle District of Alabama, for the Random Selection of Grand and Petit Jurors (hereinafter, the "Plan").

In the Motion, Defendants are raising issues akin to those this Court addressed in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001). In fact, Defendants have hired Dr. James Gundlach for the purpose of identifying similarities between the Court's present implementation of the Plan and the practices identified in Clay. In particular, Dr. Gundlach is focusing on whether African-Americans were properly represented on the 2001 and are properly represented on the 2005 Qualified Jury Wheels (hereinafter, the "QJWs"),

1

whether the Court has been using a disproportionate number of previously deferred jurors, and what impact the deferred jurors had on the racial composition of the District-wide pools selected from the 2001 QJW. In his report, Dr. Gundlach concludes that the Court's implementation of the Plan has produced repeated violations of the Plan's rule not to use more than 15% of previously deferred jurors in any pool (the "15% limit") and that this violation of the Plan has led to the systematic underrepresentation of African-Americans on the QJW and District-wide pools. See Gundlach Report, at 30.

## (II)  OBJECTIVES

We were engaged to utilize the financial and forensic accounting experience and expertise our firm has amassed over its 22–year history to satisfy three  primary objectives:

1.    To provide an independent opinion as to whether the  implementation of the Plan resulted in  the 2001 and 2005 QJWs being comprised of a randomly selected fair cross-section of the jury-eligible population in the Middle District of Alabama, as required by the JSSA;

2.    To provide an independent opinion as to compliance with the key provisions of the JSSA and the Plan, and whether the randomness of the jury selection process and the absolute disparity standard  were compromised;

3.    To refute Dr. Gundlach's opinions, where appropriate.

## (III) QUALIFICATIONS

I am Stephen A. Elmore, a Certified Public Accountant for 29 years and the Senior Consultant with the firm of SMILEY-SMITH & BRIGHT, CPAs. The firm specializes in forensic accounting and professional litigation support services. I have performed the gamut of accounting, auditing, financial and consulting services for companies in many different industries. I have extensive knowledge of and experience with statistical sampling techniques and evaluation of sampling results, generally accepted auditing standards, generally accepted accounting principles, and detailed financial analyses.

2

I spent the first seven years of my career with an international accounting firm providing auditing services to clients in the real estate and financial services industries. When I left the international accounting firm as an audit manager in 1980, I spent the next 22 years directing a corporate internal audit and consulting division of over 100 people for a Fortune 200 multi-national financial institution. My auditing experience was very useful in this present engagement, as I utilized my knowledge of statistical and random sampling to analyze the processes used by the Clerk of the Court and evaluate the randomness of those processes. I was also well-equipped to review and analyze the controls designed within the automated applications used by the Clerk's Office.

I also spent two years as the Director of Finance for an agency of the State of Georgia that provided financing to cities and counties throughout the State for water, sewer, and energy projects. In this position, I managed a $1 billion loan portfolio, the credit underwriting and financial analysis of borrowers, the administration of the Agency's debt, and the investment, accounting, financial planning and budgeting functions. A curriculum vitae outlining my experience is attached as Exhibit I.

Financial and statistical analysis, together with an accurate evaluation of results, has been a pivotal area of my experience as an auditor for over 30 years. The Principals in the firm of SMILEY-SMITH & BRIGHT have more than 50 years of experience in the forensic accounting arena. They have provided their expertise to this engagement in pertinent areas, advised and consulted with me in planning and evaluating the analytical tasks relative to this engagement, and contributed their efforts to the work product as needed. However, I sponsor the sum total of the conclusions reached in this report as evidenced by my signature at the end of this report narrative.

3

## (IV) OUR SCOPE OF REVIEW

In order to provide expert opinions relative to the objectives outlined above, I examined and analyzed the following additional information:

1. Defendant Scrushy's Preliminary Motion to Dismiss & Challenge to Composition of Petit Jury Pools in the Middle District of Alabama, filed January 24, 2006

2. Defendants Siegelman's and Hamrick's Preliminary Motion to Dismiss & Challenge to Composition of Petit Jury Pools in the Middle District of Alabama, filed January 30, 2006

3. United States' Response to Defendants' Preliminary Motions to Dismiss & Challenge to Composition of Petit Jury Pools in the Middle District of Alabama & Motions for Discovery of Jury Records, filed February 1, 2006

4. Defendant Siegelman's Motion for Discovery of Jury Records, filed January 27, 2006

5. Defendant Scrushy's Motion for Discovery of Jury Records, filed January 24, 2006

6. Defendant Hamrick's Motion for Discovery of Jury Records, filed January 30, 2006

7. Defendant Scrushy's Second Motion for Discovery of Jury Records, filed February 22, 2006

8. Defendant Scrushy's Third Motion for Discovery of Jury Records, filed March 5, 2006

9. Teleconference Transcript from February 23, 2006, involving Magistrate Judge Coody and counsel regarding Defendants' discovery requests

10. Court's Order Granting Defendant's Discovery Request, filed February 3, 2006

11. United States' Response to Defendant's Second Motion for Discovery of Jury Records, filed March 1, 2006

12. Defendant Scrushy's Fourth Motion for Discovery of Jury Records and Motion for Immediate Compulsion Order or Order to Show Cause, filed March 1, 2006

13. Report of James H. Gundlach, Ph.D., on the Operation of the Jury Selection System of the Middle District of Alabama, dated March 29, 2006

14. Report of James H. Gundlach, Ph.D., on the Operation of the Jury Selection System of the Middle District of Alabama, filed February 13, 2006, in United States v. Carmichael, NO. 2:03-CR-259-T (M.D. Ala. 2003)

4

15. Deposition of Dr. James H. Gundlach, dated March 13, 2006

16. The Plan of the United States District Court, Middle District of Alabama, for the Random Selection of Grand and Petit Jurors, dated November 1, 2001

17. Deposition of Wanda Robinson, former Jury Administrator, dated March 10, 2006

18. Deposition of Melissa Myers, Jury Administrator, dated March 10, 2006

19. Deposition of Debra Hackett, Clerk of the Court, dated March 13, 2006

20. Depositions of Dr. James H. Gundlach, Volumes I & II, taken in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), dated November 17, 2000, and November 29, 2000, respectively

21. Report of Dr. James H. Gundlach in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001)

22. Deposition of Yvette Smiley-Smith, CPA, Expert for the Government, taken in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), dated December 13, 2000

23. Depositions of Dr. Donald Wayne Bogie, Volumes I & II, taken in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), dated December 13, 2000, and December 15, 2000, respectively

24. Recommendation of the Magistrate Judge in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), filed February 5, 2001

25. Order issued by the United States District Judge in United States v. Clay, 159 F. Supp. 2d 1357 (M.D. Ala. 2001), filed September 7, 2001

26. The Jury Selection and Service Act of 1968, as amended (the "JSSA")

27. Relevant registered voter information from the Elections Division of the Alabama Office of the Secretary of State for the counties of the Middle District

28. Voluminous Jury Wheel data for the 2001 and 2005 Master Jury Wheels (MJWs) and QJWs from the Office of the Clerk of the Court, including but not limited to:

    a. The JS-12 Report prepared in April 2002, with questionnaire sampling results as of January 2002, and using voter registration data as of October 2000

    b. Various Source List Race/Gender Reports related to the 2001 and 2005 Jury Wheels, including the MJWs and QJWs

    c. The Jury Selection Reports for all District-wide pools drawn from the 2001 and 2005 QJWs

    d. Background, detailed history and/or transaction data on all District-wide jury pools, as well as pertinent data on the 17,230 participants added to the 2001 QJW over the life of the Wheel; and pertinent data on the 27,860 participants added to the 2005 QJW as of February 2006

    e. The Jury Management System User's Manual.

29. Relevant case law, including the following cases:

    a. <u>United States vs. Aguero</u>, 248 F. Supp. 2d 1150 (S.D. Fla. 2003)

    b. <u>United States vs. Holstick</u>, 875 F. Supp. 795 (M.D. Ala. 1994)

    c. <u>United States vs. Johnson</u>, 790 F. Supp. 269 (M.D. Ala. 1992)

    d. <u>United States vs. Green</u>, 742 F. 2d 609, 611 (11th Cir. 1984)

    e. <u>Swain vs. Alabama</u>, 380 U.S. 202 (1965)

    f. <u>Hamling vs. United States</u>, 418 U.S. 87 (1974)

    g. <u>United States vs. Gometz</u>, 730 F. 2d 475, 479 (7th Cir. 1984)

## (V)    CONCLUSIONS

We render the following overall opinions, consistent with our professional analyses and independent evaluations:

**OPINION #1: Based on our analyses of the data provided by the Court, and contrary to the assertions of Dr. Gundlach, the process of creating the 2001 and 2005 MJWs and QJWs resulted in a random sample that is representative of a fair cross-section of the jury-eligible population in the Middle District of Alabama, as required by the JSSA, and the Plan. A comparison of the percentage of African-Americans on the 2001 and 2005 QJWs to the percentage of African-Americans on the relevant voter registration lists shows an absolute disparity much lower than 10%, which is entirely consistent with our conclusion that the Court's implementation of the Plan comports with the fair cross-section provisions of the JSSA.**

**OPINION #2**: Contrary to Dr. Gundlach's assertions, the key provisions of the JSSA pertaining to randomness of the jury selection process were not compromised though this District committed technical violations in its implementation of the Plan.

**OPINION #3**: We acknowledge that the 15% limit on eligible deferred jurors has been compromised by at least two separate types of functional operations within the purview of the Office of the Clerk of the Court. However, we conclude that, in spite of these technical violations of the Plan, there was virtually no impact on the overall racial composition of the 2001 and 2005 QJWs or the District-wide pools over the life of the 2001 and 2005 QJWs. Equally as important, we found no breach of the key provisions of the JSSA.

**OPINION #4:** None of the technical violations of the Plan regarding the use of eligible deferred jurors has occurred in the implementation of the Plan in creating and maintaining the 2005 QJW.

(VI)     <u>RESPONSE TO DEFENDANTS' ALLEGATIONS</u>

A.  *Comparisons to* <u>United States vs. Clay</u>, 159 F. Supp. 2d 1357 (M.D. Ala. 2001)

Defendants raise many of the issues this Court examined in <u>Clay</u>.

Both Magistrate Judge Coody's "Recommendation of the Magistrate Judge" (hereinafter "Recommendation") and Judge Thompson's Order discussed several alleged violations of the JSSA. The Court evaluated each violation in terms of whether it was a <u>substantial</u> violation.

> "In determining whether a violation is substantial, the alleged
> violation must be weighed against the underlying principles of the

Act. These principles are (1) random selection of jurors and (2) determination of disqualifications, excuses, exemptions, and exclusions on the basis of objective criteria only." (Recommendation, at 20.)

In <u>Clay</u>, the Court concluded:

"However, the court concludes that the combined effect of the Clerk's practice of liberally granting undue hardship deferments to any juror who requests one, placing temporarily deferred jurors en masse at the top of the summons lists, and excluding K jurors from the coding process which purges the summons lists of excess jurors is a non-random process of creating final venire lists which is a substantial violation of the JSSA. An unfortunate consequence of this non-random process is that the predominantly white K jurors have priority for inclusion on the venire list at the expense of the predominantly African-American TZ jurors. Because the record clearly indicates that the Clerk's methodology of constructing venire lists introduces a significant element of nonrandomization into the selection of the District's jury venires that is not only a technical violation, but a substantial violation of the Plan and the JSSA, Clay's motion for a new trial is due to be granted." (Recommendation, at 19.)

The violation of the <u>randomness</u> principle in the selection of the jurors led the Court to find a substantial violation.

"The Court . . . is compelled to conclude that the practice of using K jurors in a manner which virtually insures their inclusion on venires is a nonrandom manner of constructing venire lists which affords room for discrimination." (Recommendation, at 29.)

"In sum, the court finds that the District's manner of using K jurors which insures that they will comprise all or a part of a venire is a non-random process which violates the District's Plan and the JSSA. Because the process affects the random selection of jurors in a manner which creates opportunity for discrimination, it is a substantial violation which warrants relief regardless of whether it is shown to exclude any cognizable group." (Recommendation, at 36-37.)

Only the convergence of three independent practices of the Clerk's Office, namely, its liberal deferral policy, complete discretion over the use of eligible deferred jurors in the selection process, and intentional stacking of eligible deferred and non-deferred jurors on the venire lists, compelled the Court to hold that the Court's implementation of the Plan was a substantial violation of the JSSA.

> "Arguably, then, when the clerk almost always granted deferrals to jurors, essentially permitting selected jurors to opt in or out of a trial term at will, the practice introduced a non-random element into the jury-selection process.
>
> However, even if this practice introduced a non-random element, the practice, standing alone, frustrated none of the purposes of the JSSA....By itself, then, the clerk's policy of granting deferrals was not a substantial violation of the JSSA.
>
> An additional non-random element was introduced into the jury-selection process by the jury administrator's arbitrary selection of the number of K jurors to include on summons sheets. The evidence is undisputed that the clerk's office had no predetermined manner of choosing the number of K jurors to include on a summons list and that the jury administrator was free to include as many or as few such jurors as she determined was desirable. . . .
>
> . . . These two practices, when combined with the clerk's practice of placing K jurors en masse at the top of the divisional summons lists, substantially violated the Act. The evidence is undisputed that the pool of K jurors differed materially from the pool of available jurors in the qualified wheels, and that this difference was consistent over time. The clerk's practice of placing an arbitrary number of jurors from the K pool on the summons list above the jurors selected directly from the divisional wheels, as stated, assured them a place on the final venire. This violated the JSSA because it provided a clear opportunity for the jury administrator to control substantially the proportion of African-Americans on criminal juries." (Order, at 28-30.)

The same convergence of factors found in Clay is not present in this case. Of the three factors discussed in Clay, only the Clerk's liberal deferral policy remains in this District's jury selection process. The Plan now caps the use of eligible deferred jurors at 15% of any given pool, and requires the random distribution of eligible deferred and

non-deferred jurors in constructing a pool. Though the District's implementation of the Plan has deviated from some of its provisions, these isolated instances of noncompliance did not affect the random selection of jurors. Therefore, Dr. Gundlach is simply incorrect in claiming that a "very similar combination of processes" found in Clay is present in this case. See Gundlach Report, at 26.

## B. Jury-Eligible Population

### Defendants' Allegation

Based on data from the 2000 U.S. Census, 30.466% of the jury-eligible population in the Middle District of Alabama was African-American.

### Response

The "names of jurors shall be selected at random from the voter registration lists of the Counties that comprise the District." See The Plan of the United States District Court, Middle District of Alabama, for the Random Selection of Grand and Petit Jurors at Section 5, Section 9. The JSSA clearly states that the voter registration lists are to be the basic source of juror names.

Following are several reasons cited in House Report No. 90-1076 for the preferred use of voter lists.

- Voter lists easily provide a large number of potential juror names.
- Voter lists insure that potential juror names are selected regardless of race, wealth or other discriminating criteria that are unlawful.
- Voter lists provide the largest cross-section of the community of any list available.

---

[2] The JS-12 Report is a standardized Government form, prepared by the Clerk of the Court, to report on the operation of the Plan for a particular District. It documents the sampling results of the mailing of qualification questionnaires by race and by sex. It also documents the sampling results of the QJW by race and by sex.

- Voter lists have built-in screening criteria that help eliminate people who are not qualified to vote, and therefore not qualified to serve on a jury.

Along with the reasons given for the use of voter registration lists in the jury selection process, the House Report also states that census data are not appropriate as a source of potential jurors, because, among other reasons, census data quickly becomes outdated. Also, census data does not have distinguishing criteria built in, as voter registration lists do, to "weed out" those persons unqualified to vote or serve on juries.

Noticeably, Dr. Gundlach, in his report in Clay, stated that "[t]he definition of the population eligible for jury service is eligible voters." In this case, however, Dr. Gundlach changes his opinion and claims that the U.S. Census data is a better source of information than the voter registration lists.

Because the Plan and the JSSA require the Court to use the voter registration lists to create the MJW, we used voter registration data to calculate the percentage of African-Americans in the jury-eligible population for comparison with the percentage of African-American representation on the 2001 and 2005 QJWs.

The Elections Division of the Alabama Office of the Secretary of State provided to us the relevant voter registration lists. The data is broken down by county and includes numbers for White, Black, Other, Total Active, Total Inactive and Voting Age Population. (See Exhibits II & III.) According to the Secretary of State, the Total Voting Age Population includes all persons of voting age (age 18), but has no other specifying criteria. The Total Voting Age Population is thus akin to census data, which is not the preferred basis for measurement. Total Active and Total Inactive together constitute all those persons who are <u>eligible</u> to vote. These persons meet the qualifications to vote as set out by statute. For one to vote, a person must meet the same criteria as required for a person to be eligible to serve on a jury. (The qualifications for jury service, which are the same or similar to those used as qualifications for registration of voters are: (1) U.S. citizen age 18 or over who has

11

resided for one year within the judicial district; (2) able to read, write and understand English language satisfactorily; (3) able to speak English; (4) without physical or mental infirmity to satisfactorily be involved in jury service; and (5) no felony convictions.)

Using the 23 counties in the Middle District of Alabama, we calculated the percentage of Active Black Voters to Total Active and Total Inactive Voters. The number of Active Black Voters was divided by the combined Total Active and Total Inactive Voters for January 2002 (the same month as the JS-12 Report[2] for the 2001 Wheel) and for February 2006 (the same month as the QJW Report for the 2005 Wheel). That calculation revealed that 25.48% and 27.83% of the voting and jury-eligible population was African-American in January 2002, and in February 2006, respectively. (See Exhibits II and III.)

### C. *Absolute Disparity Standard*

#### Defendants' Allegation

Dr. Gundlach's report estimates the percentage of African-Americans in jury pools created from the 2001 QJW to be well below 19.9%, thereby providing an absolute racial disparity of over 10% when compared with 30.466% African-Americans in the population of voting age citizens living in the 23 counties that make up the Middle District, according to the U.S. Census data for 2000.

#### Response

The Clerk provided a copy of a JS-12 Report for the 2001 QJW as of January 2002. (See Exhibit IV.) This report shows the composition of the QJW, by race and sex, soon after the creation of the 2001 QJW, and shows that African-Americans represented 20.74% of the QJW. The JS-12 Report is the best measurement of the racial

composition of the QJW because it reveals the racial make-up of the QJW soon after its creation.

A comparison of the percentage of African-Americans per the voter registration data (25.48%), with the percentage of African-Americans on the 2001 QJW as provided by the Clerk (20.74%) shows an absolute disparity of only 4.74%.

This same calculation was performed for the 2005 QJW. The voter registration data, in February 2006, for African-Americans was 27.83% compared to the QJW, as of February 2006, of 21.18%. (See Exhibit V where the <u>Source List Race/Gender Report as of February 23, 2006</u> shows the racial composition of the 2005 QJW).The absolute disparity for the 2005 QJW is 6.65%.

Thus, for the 2001 and 2005 QJWs, the absolute disparity standard of 10% was not close to being surpassed, and in fact, was not even threatened.

### D. *Qualified Jury Wheel*

#### **Defendants' Allegations**

1. Supplemental mailings of qualification questionnaires, the deferral process, and excusing of potential jurors cause the composition of the QJW to fluctuate over time. Therefore, the QJW is not static.
2. The use of 20.74% as the percentage of African-Americans in the 2001 QJW for the entire life of the QJW is inappropriate because the number of eligible jurors is not static.
3. The August 2005 "Qualified List Report" showed 20.66% African-Americans in the 2001 QJW. This report included all names that had been added to the QJW over its four-year course. The report did not accurately reflect the composition of the QJW on the date of its preparation because the QJW at this time likely had a lower percentage of African-Americans.

13

4.  The last 43 pools used from the 2001 QJW had 19.93% African-American compared to the 20.74% reported in the JS-12 report.

5.  The remainder of the 2001 QJW after the last pool was drawn in 2005 was less than 18% African-American.

**Response**

Dr. Gundlach incorrectly assumes "eligible" is synonymous with "qualified" when discussing the QJW. He asserts that the QJW should be reduced by the number of participants in a deferred or excused status. Based upon our discussions with representatives of ACS, the vendor for this system, this is not an accurate understanding of how the system works. According to ACS, once a participant is "qualified," he retains that qualified status throughout the life of the wheel, unless he is "disqualified."[3] In other words, a juror can be in a deferred status, an excused status, or may have served on a jury within the last 24 months and is not eligible to be selected, but is still a member of the QJW.

The Clerk of the Court is Appropriately operating under the premise that, as long as the MJW is randomly selected from the voter registration lists, and the selection processes (from the mailing of the qualification questionnaires, to the creation of the QJW, to the selection of the venire for a jury) are carried out on a random basis, there is no requirement or need to reevaluate the disparity ratio or the racial composition of individual jury pools. Hamling, 418 U.S. at 137 supports the position that once the QJW is properly compiled, its validity remains intact throughout its life until the QJW is once again "completely updated at the time of each refilling."

---

[3] Members of the QJW could become "disqualified" if they subsequently: (1) lose their ability to read, write, or speak the English language; (2) lose their ability to render satisfactory jury service due to mental or physical infirmity; or (3) have been convicted of a felony and have not had their civil rights restored.

14

In order to determine the extent to which the randomness of the jury selection process has been maintained during the life of the 2001 QJW, I examined all steps of the jury selection process. First and foremost, when the MJW is initially created, the computer assigns a number, in sequential order, to each participant. This number stays with the participant for the remaining life of the MJW and the QJW.

I initially looked at the process for creating each MJW. Based on discussions with the Clerk and ACS representatives, I determined that the Clerk receives an electronic copy of the voter registration lists from the Elections Division of the Alabama Office of the Secretary of State for the counties of the Middle District soon after a Presidential election. The Clerk provides a copy to Sutera Data Systems, who then constructs the MJW based on a <u>random starting point and selecting from the registered voter lists on a random basis, using an interval that will yield the desired number of participants for the MJW.</u>

The participants chosen to receive the qualified questionnaires are also <u>selected by computer using a random starting point and selecting from the MJW on a random basis using an interval that will yield the desired number of participants for the mailings.</u> As the mailings are returned and processed, they are scanned into the Jury Management System. The QJW is developed from these mailings.

As the mailings are returned and processed, they are scanned into the Jury Management System. The questionnaires are evaluated using a combination of machine-readable processing and manual processing for the ones rejected by the machine. The machine rejects a questionnaire if it is unreadable or completed in a manner that does not allow the computer to make the decision on qualification. In the case of the questionnaires in the initial mailing for the 2001 QJW, 14,324 of the 25,000 were returned. (See Exhibit IV.) This is **14.3% of the MJW** from which they were selected. Therefore, even though the return rate was 57%, this was an adequate sample.

The final stage of the sampling process results in the creation of the QJW. For the 2001 QJW, 9,860 of the 14,324 individuals who returned a questionnaire were qualified to serve on a jury.

Based on the random sampling process carried out by the Court, we conclude that the 2001 QJW is a representative sample of a fair-cross section of the jury-eligible population of the Middle District of Alabama.

I reviewed the Jury Management System Reference Manual and discussed the functioning of the system with ACS representatives to obtain sufficient knowledge of how the computerized system uses a random selection process for jury pool creation.

When a pool is created, the computer makes a "random" selection of potential jurors from the QJW, as follows:

- Random selection of 85% of the pool from the non-deferred members of the QJW[4] (the "85% draw")

- Random selection of not more than 15% from the eligible deferred jurors[4]

- Disperse the 15% eligible deferred jurors randomly among the 85% non-deferred jurors, and assign each juror a sequence number.[6]

---

[4] See Section E, Response at 3 re: inadvertent return by the Clerk's Office of Previously Deferred Jurors to the Qualified Jury Wheel, whose deferred period had expired, without counting them in the 15% ceiling established by the Plan. Response discussion details why this technical violation was not considered a substantial violation of the JSSA.
The rule was inadvertently violated in four of the last five District-wide jury pools. That is explained further in the section entitled *Use of Previously Deferred Jurors and Its Impact on Racial Composition of Pools*, allegation #3 and Exhibit VI. However, even though the 15% was exceeded in four of the last five pools, the selections were still random and thus no substantial violation was created.

[6] There were three isolated instances during the life of the 2001 QJW where the pools were created by making two selections from the QJW. In these cases, the eligible deferred jurors selected by the second "15% draw" were placed together in sequential order on the Jury Selection Report. This only happens when there are multiple selections for one pool, and the Clerk has represented to us that only three District-wide pools from the 2001 QJW were created using two selections. (See Exhibit XI for an analysis of the pools Dr. Gundlach alleges have "clustering" of deferred

Obviously, the computer system plays a vital role in maintaining the randomness of the selection process.[7]

### E. *Use of Previously Deferred Jurors and Its Impact on Racial Composition of Pools*

**Allegations**

1. Dr. Gundlach alleges that the Clerk violated the 15% limit in all 44 of the last 44 pools. Dr. Gundlach seeks to depict this violation of the 15% limit with the bar graphs on page 12 of his report.

2. Dr. Gundlach has identified three occurrences (i.e., August 2003, October 2003, and March 2004) during the life of the 2001 QJW where the Jury Administrator removed the eligible deferred status of approximately 1,081 jurors. The Clerk's action in this regard made these jurors eligible for selection via the 85% draw rather than by the 15% draw for eligible deferred jurors. (See Exhibit V.) Dr. Gundlach's report claims that the Clerk removed the deferred maintenance status of 2,173 jurors. See Gundlach Report, at 23. Notably, however, 1,080 of those 2,173 jurors were removed as a result of the Clerk purposefully and properly emptying the 2001 QJW prior to the creation of the 2005 QJW. Consequently, these eligible deferred jurors, contrary to Dr. Gundlach's

---

jurors. We have adjusted his numbers for misclassifications, and you can see the three pools with two draws). However, it is important to note that the selection of the jurors remained random.

[7] In only three isolated instances were the system controls ineffective in randomly distributing the eligible deferred jurors among the non-deferred jurors on the pool selection reports because the system was not properly programmed to randomly distribute eligible deferred and non-deferred jurors selected after the first draw from the QJW. Critically, the Court does not employ a practice of creating pools using two or more draws from the QJW. Indeed, the Court used two draws in creating only three of the 93 District-wide pools selected from the 2001 QJW, and has not used any multiple draws in creating pools from the 2005 QJW. Moreover, the Court created, in a single draw, the District-wide pool for the special grand jury that returned the indictments in this case.

assertion, <u>see</u> Gundlach Report, at 23, were available to be selected for a pool until the termination of the 2001 QJW.

3. In four of the last five District-wide pools drawn from the 2001 QJW, the percentage of the pool drawn from the eligible deferred population amounted to 20.9%, 24.5%, 24.0%, and 24.5%. These percentages exceed the 15% limit established in the Plan. (See Exhibit VI, showing the selection of eligible deferred jurors for all 92 District-wide pools.)

### *Response*

1. Dr. Gundlach prepared an analysis, dated February 2006, of the last 44 District-wide pools created from the 2001 QJW as part of his report in a similar case. Exhibit VIII shows his reporting of previously deferred jurors in that case. He also indicated in that February 2006 report that **27 of the last 44** (not 44 out of 44) District-wide pools had exceeded the 15% limit on use of previously deferred jurors. His methodology in that report was to include any participant who had any deferrals in his history prior to the date of the applicable pool for which he was chosen.

We have received three different bar graphs and sets of numbers from Dr. Gundlach since February 2006. Each set of numbers is based on a different methodology. See Exhibit XVI which shows the three different sets of numbers (in percentages) as we have attempted to track the evolution of his numbers.

In his current report, Dr. Gundlach does not explain why his calculation of previously deferred jurors has changed, and why his bar graph is very different from the one in his February 2006 report. Despite Dr. Gundlach's failure to explain his changes, we have attempted to deduce his variations from his February 2006 report.

It appears that Dr. Gundlach is now including all "excused" jurors in his numbers. Without Dr. Gundlach revealing his new methodology, we cannot confirm our hypothesis. In his February 2006 report, however, Dr. Gundlach stated:

"Under the Jury Plan, the limit of 15% applied to the combination of previously excused and deferred jurors combined. However, as the excused jurors did not impact the racial composition of the jury pools, I have limited the analysis to the deferred jurors." Apparently, Dr. Gundlach has now changed his position and included excused jurors in his analysis.

I disagree with the inclusion of all excused jurors when evaluating compliance with the 15% limitation in the Plan. Section 14(d)(ii) of the Plan does include **temporarily** excused and deferred jurors as part of the 15% limitation. However, it does not include jurors receiving an excuse because they appeared for jury service and were later excused by the Court as unneeded. According to the Plan, these persons are returned to non-deferred status after a year, whereas deferred jurors remain in the deferred maintenance pool until selected as part of the "15% draw." Also, jurors excused from jury service receive a 24-month deferment and are treated like the other occupational classes or groups.

2. A number of District-wide pools selected from the 2001 QJW exceeded the Plan's 15% limit on the use of eligible deferred jurors. The first 48 District-wide pools, which were selected from June 2001 to August 2003, did not exceed the 15% limit. Not until September 2003, did a District-wide pool exceed the 15% limit. These technical violations of the Plan, however, **had no effect on the randomness of the selection process or on the racial composition of the District-wide pools.** (See Exhibits IX and X).

In reaching this conclusion, we considered the following key results:

a. A comparison of the racial composition of the first 48 District-wide pools as a group (20.1% African-American), to the racial composition of the last 44 District-wide pools (19.9% African-American) shows that the excess use of eligible deferred jurors had no, or virtually no, impact on the random selection of jurors and thus the racial composition of the District-wide pools over time. (See Exhibit X for this calculation).

b. The Clerk's removal of the eligible deferred status for certain jurors had inconsequential impact on the racial composition of the last 44 District-wide pools. African-Americans represented 19.9% of the last 44 jury pools and would have represented 20.5% of these jury pools without the excess use of eligible deferred jurors -- only a .6% difference. (See Exhibit IX for this calculation.)

c. A review of the relevant racial composition data shows: (1) the percentage of African-Americans on the 2001 QJW as of January 2002 (the date of the JS-12 Report) was 20.74%; (2) the average percentage of African-Americans summoned over the life of the 2001 QJW for the 92 District-wide pools was 19.97%[10]; the percentage of African-Americans on the QJW when the 2001 Wheel was retired in August 2005 was 20.66%; and (4) the percentage of African-Americans on the 2005 QJW, in February 2006, is 21.18%.

3. Dr. Gundlach has incorrectly inflated the number of eligible deferred jurors for many of the 44 District-wide pools created after September 2003. He incorrectly assumes that any juror who has ever been "deferred" or "excused" for a jury pool is a "deferred" juror. However, any deferrals after the date of the pool in question are not legitimate deferrals for that pool. In addition, if a juror had an eligible deferred status, then later was selected via the "15% draw", and served on a jury, this juror is no longer a "deferred" juror. In other words, the

---

[10] Dr. Gundlach arrived at essentially the same calculation. He determined the racial composition of the population summoned to 91 District-wide pools as 19.966% African-American. Gundlach Report, at 6.

juror is not a "current deferred" juror. Our analysis shows that, after adjusting for the misclassifications, the last 44 District-wide pools averaged only 17.67% eligible deferred jurors. Consequently, the use of eligible deferred jurors exceeded the 15% limitation by only 2.67%. (See Exhibit VIII for a schedule that shows the "deferred" jurors as reported by Dr. Gundlach, the eligible deferred jurors as adjusted for his misclassified jurors, and the number of eligible deferred jurors over the 15% limit mandated by the Plan.) See Exhibit XIV which shows that the deferreds drawn for all of the pools from the 2005 QJW are less than the 15% limit.

As a result of determining that Dr. Gundlach's numbers for "deferred" jurors are inflated, we reviewed, in detail, the history records for all jurors classified by Dr. Gundlach as "deferred" (i.e., any member of the last 44 District-wide pools who had a deferral at any time in his history – 1,369 members) from September 2003 to September 2005 to identify his misclassifications. We found 173 members (or a 12.64% error rate) who Dr. Gundlach had inappropriately classified as "deferred." (See Exhibit VIII for a schedule of deferreds, by pool, for the 2001 QJW. Also see Exhibit XII for an analysis of deferreds for the grand juries.)

4. Dr. Gundlach is correct that the selection from the eligible deferred or deferred maintenance population exceeded 15% for four of the last five District-wide pools. This technical violation of the Plan, however, had no effect on the randomness of the selection process for these pools.

We looked at the selection process and how the Jury Administrator uses the Jury Management System to select from the eligible deferred jurors to ensure compliance with the 15% limit. We found that the selection of eligible deferred jurors from the QJW, using the 15% parameter built into the Jury Management System for eligible deferred jurors, for 88 of the 92 District-wide pools was within the 15% limit mandated by the Plan. (See Exhibit VI.)

The Clerk's Office and ACS, the vendor of the Jury Management System, are attempting to determine why the 15% limit was exceeded in the selection of the eligible deferred jurors from the deferred maintenance pool in the particular District-wide pools. As of the date of this report, no explanation has been found. The deposition of the ACS representative indicates any number of reasons, such as computer malfunction, operator error, etc. None has been verified at this point.

5. Dr. Gundlach is also correct in his assertion that the Clerk's Office returned eligible deferred jurors to non-deferred status by removing their "deferred" status so that they became eligible for selection as part of the "non-deferred" selection process. This mainly occurred on three occasions over the life of the 2001 QJW. Two of these occasions were technical violations of the Plan , and the other occasion was a proper emptying of the 2001 QJW. In all three occasions, however, **there was no effect on the randomness of the selection process or racial composition of the jury pools.**

We then identified all 1,081 jurors who had been removed from a "deferred" status as a result of the jury administrator making a maintenance change in the Jury Management System. (See Exhibit V,) Once we had identified those jurors, we then matched that list of potential jurors with a list of the jurors in each of the last 44 jury pools. (Since the first maintenance change did not occur until August 2003, we matched the list with the pools created after that date). We determined that 545 of the 1,081 jurors were included in the last 44 District-Wide pools. The other 536 jurors were either selected for civil jury pools or remained in the eligible pool of jurors when the QJW was retired in 2005.

6. Exhibits IX and X show that the inclusion of these 545 jurors in the 44 District-wide pools had very little impact on the racial composition of these pools. Three basic reasons explain why these 545 jurors had virtually no impact on the

22

jury pools. First, they represented only 8% of the population of summonsed jurors (545 out of a total of 6,767 jurors). Second, only a 6% difference existed between the total number of African-Americans in the pools and the African-Americans included in the 545 re-designated jurors. The third reason, which is very significant in evaluating the impact of these actions on the jury pools, is that the computer system randomly dispersed these 545 jurors from the 2001 QJW to a particular District-wide pool. Therefore, the pools resulting from the selection process continued to approximate the racial composition of the 2001 QJW. At all times, moreover, the "randomness" of the selection process was maintained.

## F. Special Grand Jury Pool

### Defendants' Allegations

1. Dr. Gundlach alleges that the Clerk's Office violated the 15% limit in creating the Special Grand Jury pool (number "201040604") related to this case. He asserts that 34 of the 100 participants in this pool were "previously excused or deferred."

2. Dr. Gundlach alleges that there were an additional 25 persons on the summons list for the Special Grand Jury pool who had two consecutive summonses in their histories with no transactions between these summonses. He believes that these consecutive summonses behaved like excuses because of the time lapse between them. He further states that, if this is true, the number of "previously excused or deferred jurors" increases from 34 to 59.

3. Dr. Gundlach alleges that the Special Grand Jury pool demonstrated a pattern of nonrandom placement of the "deferred" persons.

### Response

We have reviewed the history records for all 100 participants selected for this pool. Although 34 jurors within the pool had a deferral at some point in their history, 13 of

those jurors received their particular deferrals **after** being summonsed for the Special Grand Jury pool or another pool subsequent to it. Of the remaining 21 persons, i.e., those who had received a deferral prior to the Special Grand Jury pool, nine out of the 100 (9%) were randomly selected from the deferred maintenance pool via the "15% draw", in compliance with the Plan. Four additional pool members should not be counted as eligible deferred jurors because their histories show that: (1) one juror came into the Special Grand Jury pool after having been court-excused for two years; (2) one juror came into the jury pool after a two-year reprieve from service because he had previously appeared and/or served pursuant to a prior summons; and (3) two jurors came into the jury pool after prior summonses for other pools approximately 1 ½ and 2 years before. Only eight jurors, therefore, were eligible deferreds who were randomly selected via the "85% draw," contrary to the Plan. The status of those eight jurors who were eligible deferreds were changed by the Jury Administrator at some point before they were randomly selected for this Special Grand Jury pool via the "85% draw." (See supra *Use of Previously Deferred Jurors* for a more detailed discussion of this factor.)

After adjusting Dr. Gundlach's incorrect calculation of eligible deferred jurors, we have determined that the Special Grand Jury Pool contained only 17 eligible deferred jurors, not 34 as Dr. Gundlach claims. As noted above, nine of these 17 eligible deferred jurors were randomly selected through the "15% draw". Eight of these 17 eligible deferred jurors were randomly selected from the "85% draw." Thus the Special Grand Jury pool had only two excess eligible deferred jurors, resulting in 17% eligible deferred jurors in the pool -- 2 % over the 15% limit.

Dr. Gundlach's claim regarding the consecutive summonses behaving like excuses is not a valid assumption for two reasons. First, our extensive review of thousands of participant histories and information from the Clerk's Office revealed that any court excuse that was granted was noted in the participant histories as a transaction. Also, a more logical explanation of why a participant history shows two consecutive summonses is that the juror was summonsed but did not ask for a deferral or excuse and did not appear on the required date. Although the time lapse between summonses may

24

seem to behave like, or appear to be, an excuse, it is not coded as such in the histories. Therefore, no basis exists for treating such circumstances as an excusal.

Dr. Gundlach's opinion that the Special Grand Jury pool demonstrated a pattern of placement of the eligible deferred jurors is not accurate. As mentioned earlier, nine jurors were selected pursuant to a "15% draw," from deferred maintenance (9%). An analysis of those nine participants and their placement on the Jury Selection Report shows that they were randomly dispersed. None of them follow each other on the list. Even when all 17 eligible deferred participants in this pool are analyzed via the Jury Selection Report, there is no pattern of placement. (See Pool 201040604 as shown in Exhibit XI) Even in those instances where an eligible deferred participant does follow another eligible deferred person on the list, there can be no determination that this placement constitutes a pattern. Unlike in Clay, the eligible deferred jurors are not in one large grouping or cluster, but rather are scattered throughout the entire pool of 100 participants. The reason for this scattering is obvious -- the computer program, in accordance with the Plan, randomly selects and disperses all jurors, including the eligible deferred jurors, throughout the pool.

Importantly, an analysis of the racial composition of the Special Grand Jury pool shows that African Americans made up 24% (24/100) of those summonsed. (See Exhibit XII). This percentage is in line with the 25.48% per the voter registration data and is higher than the 20.74% measured by the JS-12 Report for the 2001 QJW. Moreover, 12 of the 45 participants (26.67%) who actually appeared on the summons date were African-American. Of the 24 jurors selected for the grand jury, six (or 25%) were African-American. The consistency of the percentage of African-Americans from the QJW level down to the selected grand jurors testifies to the random nature of all the selection processes involved in the implementation of the Plan.

## G. Grand Jury Pools in 2001 Wheel

25

In addition to the Special Grand Jury Pool, we also reviewed and analyzed the remaining six grand jury pools in the 2001 QJW. In particular, the majority of these pools was at or below the 15% limit for eligible deferred jurors. In fact, four of the seven pools had less than 10% eligible deferred jurors. The average of eligible deferred jurors for the entire group of grand jury pools was 12.89%. (See Exhibit XII) Two pools had an overage of two eligible deferred jurors each, due to the Clerk's Office's error in changing the status of those eligible deferred jurors from deferred maintenance to non-deferred status, thus making them available for random selection by the "85% draw." As discussed supra, one of those pools was the Special Grand Jury Pool, which contained a total of 17% eligible deferred jurors.

Despite their slight overage of eligible deferred jurors, these two pools had a racial composition of 26.7% and 24% African-American, which was still in line with the average of 23.2% African-American for the total seven grand jury pools. (See Exhibit XIII) Therefore, the excess use of eligible deferred jurors in two of the grand jury pools did not affect the overall racial composition for the grand jury pools.

### H. Scattering Violation

#### Defendants' Allegation

Dr. Gundlach alleges a pattern of non-random placement of what he refers to as "previously deferred jurors" during the 2001 QJW. He claims that there was "bunching up" of the "deferred" jurors and lists certain individual pools from the 2001 QJW.

#### Response

We have analyzed the deferred juror placement in the ten pools (which includes the Special Grand Jury Pool) referenced in Dr. Gundlach's report. We have concluded that the primary reason for Dr. Gundlach's assertion of non-random placement is his

incorrect treatment of previously deferred participants. He treats a participant as eligible deferred if that juror had a deferral at any point in his history. The correct way to categorize a participant is to determine whether that participant was chosen from deferred maintenance, via the "15% draw", at the time of his placement into the respective pool. (See narrative at page 16 in the section entitled *Qualified Jury Wheel* for a more detailed discussion of how eligible deferred jurors are selected for pools via the "15% draw" from deferred maintenance.)

We have gone through the ten pools referenced by Dr. Gundlach as containing non-random placement of previously deferred jurors. When the jurors selected by the "15% draw" are correctly identified and categorized, the majority of the pools shows no significant patterns of non-random placement. Exhibit XI details any grouping of three or more eligible deferred jurors as shown on the Jury Selection Reports for each of the ten pools in question. Adjustments were made to those groupings if the histories showed that the participant did not in fact come to the pool through the "15% draw," but through the non-deferred selection process for the 2001 QJW. The net calculations show that the majority of the pools had a minimal number of eligible deferreds grouped together. "Bunching up" was not even observed when the analysis was expanded to include the eligible deferred jurors randomly selected for the pools via the "85% draw." A review of each individual pool shows that the computer program randomly dispersed the eligible deferred jurors throughout each pool. Although some participants who were selected by the "15% draw" may be listed after other such jurors on the Jury Selection Reports, all who were chosen from the "15% draw" were not "clustered" in one solid grouping as in Clay. This is true for seven of the ten pools that Dr. Gundlach identified.

Only three pools had a significant number of eligible deferred jurors grouped together. Those three pools (201021004, 201040901 and 201050601) were identified by the Clerk as having had two draws for their creation. This occurrence of two draws explains the grouping of eligible deferred jurors in these pools. (See narrative at page 16 in the section entitled *Qualified Jury Wheel* for further explanation of two draws

and the jury pool creation process and their effect on the jurors' placement on Jury Selection Reports.)

Dr. Gundlach is simply incorrect in his assertion that "bunching up" routinely occurred in the creation of District-wide pools. Only thirty-six eligible deferred jurors were grouped together in a total of three pools, and this grouping is designated by the Jury Selection Reports indicate that this grouping did not occurr until well into the selection process of each of the three pools. In other words, the "bunching up" was not at the top of the Report; rather, it was toward the end of the list. The reason for this grouping is that these three pools were created using two draws, rather than a single draw, and the "bunching up" occurred at the top of the second draw. In no way did a review of the jury data reveal a pattern or practice of "bunching up" or "clustering" of eligible deferred jurors in the creation of pools from the 2001 or 2005 QJWs, as occurred in Clay.

## I. *Regression Analyses*

### Defendants' Allegations

1. A strong inverse relationship exists between the percentage deferred and the percentage African-American during the last 16 pools of the 2001 QJW. Dr. Gundlach calculated a regression analysis to show this correlation and alleges that selecting large portions of pool members from the eligible deferred jurors substantially increased racial disparity in these pools.

2. Dr. Gundlach hypothesizes a "causal relationship" by suggesting that the Clerk's Office purposely increased the use of eligible deferred jurors to cause a reduction in the percentage of African-Americans in a particular pool.

3. Dr. Gundlach also suggests that one explanation for the Clerk's increased use of eligible deferred jurors was that the Clerk's Office could have been running out of QJW members who had not been previously deferred.

**Response**

1. Defendant alleges that there is a pattern in pools 49 through 76 that is in complete contrast to the pattern for pools 77 through 92. One could just as easily see three distinct patterns within pools 49 through 76, even as graphed by Dr. Gundlach: one pattern for pools 49 through 53, another pattern for pools 54 through 63, and another pattern for pools 64 through 76. A review of these three patterns in relation to pools 77 through 92 could support regression analyses that produce results very different from Dr. Gundlach's analysis. These four patterns would show two downward cycles between two upward cycles and would, therefore, not support his conclusion of a different pattern of administrative activity by the Clerk's Office. (See Exhibit VIII where the last column is marked to show 5 different patterns.)

2. With respect to the last 16 pools, Defendant's leap to a "causal relationship" by suggesting that the Clerk's Office has purposely increased the use of eligible deferred jurors to **cause** a reduction in the percentage of African-Americans in these pools is without merit. While Dr. Gundlach's analysis shows a **correlation** between the increased use of eligible deferred jurors and the reduction in the percentage of African-Americans, the association of these two variables does not necessarily indicate that one is the cause of the other. The real reason for the increased use of the eligible deferred jurors may relate to a factor having nothing to do with the number of African-Americans in that group. Dr. Gundlach even states that, "one possible explanation for the Clerk's increased use of the previously deferred members of the wheel is that they simply may have been running out of qualified wheel members who were not previously deferred" Gundlach's Report, at 17. The point is that **correlation does not, by itself, equate to causation.**

3. Even Dr. Gundlach admits that he would need to question the Clerk and Jury Administrators, and reconstruct the QJW using additional data to answer the question of whether or not the administrative practices of the Clerk's Office

differed in a way that impacted the racial composition of the pool. (See Gundlach Report, at 15 & 16.) Therefore, without additional evidence and analysis, Dr. Gundlach can only reveal his correlation. He has offered no proof that the correlation translates into any causation.

### J. Liberal Deferral Policy

#### Defendant's Allegations

Dr. Gundlach alleges that the Clerk has not moved to a less liberal deferral policy of awarding deferments since Clay.

#### Response

We agree that the Clerk has continued to liberally grant deferrals for jury service. However, Judge Thompson's Order in Clay was clear about how this affects compliance with JSSA. He said:

> "Arguably, then, when the clerk almost always granted deferrals to jurors, essentially permitting selected jurors to opt in or out of a trial term at will, the practice introduced a non-random element into the jury-selection process. However, even if this practice introduced a non-random element, the practice, standing alone, frustrated none of the purposes of the JSSA. By itself, then, the clerk's policy of granting deferrals was not a substantial violation of the JSSA" (Emphasis added.)

Magistrate Judge Coody wrote in his Recommendation, "After carefully reviewing the briefs filed in support of and in opposition to the motion and the supporting and opposing evidentiary material, the court concludes that Clay's allegations of a substantial violation of the Plan and the JSSA resulting from what he characterizes as the Clerk's usurpation of authority in determining the standards for granting temporary excuses and deferments, failure to obtain valid addresses for returned or undeliverable jury summonses, and failure to properly maintain the appropriate number of names in the MJW and QJW are not substantial violations of the JSSA warranting a new trial" (Recommendation, at 18-19.)

Only the convergence of three independent practices of the Clerk's Office, namely, its liberal deferral policy, complete discretion over the use of previously deferred jurors in the selection process, and intentional stacking of previously deferred and non-deferred jurors on the venire lists, compelled the Court to hold that the Court's implementation of the Plan in Clay was a substantial violation of the JSSA.

There is a significant difference in this case as compared to <u>Clay</u> with respect to the randomness of the selection process and stacking of previously deferred and non-deferred jurors on the venire lists. The randomness of the selection process is not compromised in spite of the liberal deferral policy because, unlike in <u>Clay</u>, the computer is selecting the jurors from the QJW in two different categories, eligible deferred and non-deferred. In addition, the computer is mixing the two categories and assigning each juror a number before placing these jurors on the venire lists. Jurors have been, and are being, selected randomly from the 2001 and 2005 QJWs, respectively, and the overall racial composition of all District-wide pools shows that the Plan provides a jury selection process that produces a fair cross-section of the District in accordance with the policy of the JSSA despite any occasional aberrations or technical violations in the implementation of the Plan.

Respectfully Submitted,

[signature] Sr., CPA

EXHIBIT I

Resume'

Of

Stephen A. Elmore, Sr.
Certified Public Accountant

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

115 Shady Brooke Walk
Fairburn, Georgia 30213

## EDUCATION:

CUM LAUDE graduate of Morehouse College,
      Atlanta, Georgia
Bachelor of Arts Degree in Economics
      with a concentration in Accounting

## PROFESSIONAL CERTIFICATIONS:

1977 – Certified Public Accountant
      State of Georgia, Certificate No. 3923

1985 – Certified Bank Auditor
      Certificate No. 1653

## PROFESSIONAL ASSOCIATIONS:

American College of Forensic Examiners Institute
American Institute of Certified Public Accountants
Georgia Society of Certified Public Accountants
National Society of Certified Bank Auditors
National Association of Black Accountants, Inc.

## PROFESSIONAL LITIGATION SUPPORT EXPERIENCE:

April, 2004 – Present:     **SMILEY-SMITH & BRIGHT**
                      Certified Public Accountants
                      (*Practice Limited to Forensic Accounting & Litigation Consulting,*

**SMILEY-SMITH & BRIGHT,** Certified Public Accountants offers expert witness testimony in civil and criminal litigation proceedings on the gamut of financial and accounting issues and quantifications.  Building on over three (3) decades of experience as financial expert witnesses in litigated utility regulatory proceedings, the Firm performs the detailed analyses and quantifications necessary to present expert testimony on financial, accounting and economic issues, including, but not limited to:

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

- Damage evaluations and quantifications
- Financial analyses and assessments
- Audit and investigatory examinations
- Numeric compilations and findings
- Economic capacity loss calculations
- Inflation adjusted, present value quantifications
- Punitive damage assessments and quantifications

## MR. ELMORE'S PARTICIPATION AS EXPERT WITNESS IN CRIMINAL LITIGATION PROCEEDINGS:

2005: IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF ALABAMA; CASE NO. 2:05-CR-129-A THE UNITED STATES OF AMERICA, Plaintiff vs. TERESO RODRIQUEZ LOPEZ, Defendant.

Defendant's vehicle was stopped for a traffic violation and Defendant was arrested after a search of his vehicle. Defendant alleges violation of the Equal Protection Clause based on racial profiling; violation of the Fifth Amendment by interrogating under the guise of routine questioning; and, no Fourth Amendment justification for the subsequent search of his vehicle.

2004: IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA; October Term, 2004, CRIMINAL INDICTMENT against TERRY HARRIS, Defendant. Prosecuted by THE ALABAMA SECURITIES COMMISSION.

Indictment alleges the offer and/or sale of nonregistered securities; non registration as an agent or broker; and non registration as an investment advisor.

2004: IN THE CIRCUIT COURT OF JEFFERSON COUNTY, ALABAMA; April Term, 2004, CRIMINAL INDICTMENT against TERRY HARRIS, Defendant. Prosecuted by THE ALABAMA SECURITIES COMMISSION.

Indictment alleges the offer and/or sale of nonregistered securities; non registration as an agent or broker; non registration as an investment advisor; providing false statements to investors; receiving consideration from investors for advising as to the purchase or sale of securities; and employing a scheme to defraud investors.

S‎TEPHEN A. ELMORE, SR., C.P.A., C.B.A

**MR. ELMORE'S PARTICIPATION AS CUSTODIAN APPOINTED BY THE COURT:**

2005: IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA; CASE NO. CV 2005-913, SLEEP CENTER OF MONTGOMERY, INC. and DENIZ AYRAL, Plaintiffs vs. CHRISTOPHER S. HOLLIS, ET AL, Defendants.

Determine the financial status of the corporation (assets, liabilities, etc.), and provide a report to the Court with a recommendation as to disposition of litigation proceedings.

**MR. ELMORE'S PARTICIPATION AS EXPERT WITNESS IN CIVIL LITIGATION PROCEEDINGS:**

2004: IN THE COMMON PLEAS COURT OF HURON COUNTY, OHIO; CASE NO. CVE 2002-432, JOHN L. MAENLE, ET AL, Plaintiffs vs. FIRST UNION NATIONAL BANK OF DELAWARE, ET AL, Defendants.

Suit alleges damages due to fraudulent and illegal loan underwriting practices, inadequate consideration received, and willful, reckless, malicious and negligent conduct.

2004: IN THE CIRCUIT COURT OF GREENE COUNTY, ALABAMA; CASE NO. CV-98-094, McCLUNG CONTRACTING COMPANY, Plaintiffs vs. CTX MORTGAGE COMPANY, ET AL, Defendants.

Suit alleges damages due to nonpayment for services rendered in constructing a house, negligence in exercising due care regarding permanent lender guidelines, intentional concealment, and false representation.

2004: IN THE UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF MISSISSIPPI, JACKSON DIVISION: CASE NO 3:03CV335WS, DELPHI AUTOMOTIVE SYSTEMS, LLC, Plaintiff vs. LEXTRON CORPORATION, Defendant.

Suit seeks Replevin and declaratory judgment for recovery of property, and alleges damages for wrongful detention and breach of contract.

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

**2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 03-083, THOMAS LEE PARKER AND RUBYE C. PARKER, Plaintiffs vs. HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL, Defendants.**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 03-084, LAURETTA WARREN, Plaintiff vs. HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 04-009, PAMELA EVANS, Plaintiff vs. HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004: IN THE CIRCUIT COURT OF SHARKEY COUNTY, MISSISSIPPI: CASE NO. 04-0044, DeELLA WATTS, Plaintiff vs. HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004: IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CASE NO. 03-137, MARIE WILLIAMS, Plaintiff vs. HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies

Stephen A. Elmore, Sr., C.P.A., C.B.A

**2004:** **IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CASE NO. 03-138, MERDIS ANDERSON, Plaintiff vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation regarding rate of return and vanishing premium, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004:** **IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CASE NO. 03-464, WILLY AND EMMA WHEELER, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004:** **IN THE CIRCUIT COURT OF HUMPHREYS COUNTY, MISSISSIPPI: CASE NO. 04-0024, BETTY NUNALEY, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

**2004:** **IN THE CIRCUIT COURT OF SUNFLOWER COUNTY, MISSISSIPPI: CASE NO. 04-0432-CI, JEANETTE AND AUTREY BOLDEN, Plaintiffs vs. <u>HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL</u>, Defendants**

> Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

Stephen A. Elmore, Sr., C.P.A., C.B.A

2004: IN THE CIRCUIT COURT OF JEFFERSON COUNTY (moved from Holmes County), MISSISSIPPI: CASE NO. 04-0024, ARVIN AND BARBARA TENNER, Plaintiffs vs. HORACE MANN LIFE INSURANCE COMPANY, HORACE MANN EDUCATORS CORPORATION, ET AL, Defendants

Suit alleging damages due to fraud, breach of contract, negligent misrepresentation, conspiracy, suppression/omission, and unfair trade practices involving the sale of insurance policies.

MR. ELMORE HAS ASSISTED VIA ANALYSES IN THE PREPARATION OF TESTIMONY IN THE FOLLOWING CIVIL LITIGATION CASES:

2003: IN THE CIRCUIT COURT OF HOLMES COUNTY, MISSISSIPPI: CIVIL ACTION NO. 2002-292, MARK HODGES, ET AL, Plaintiffs, vs. GREATER CANTON FORD MERCURY, INC., FORD MOTOR COMPANY, RAY L. FAYNE, KATRINA FAYNE, Defendants.

Suit alleging damages due to fraud, negligent misrepresentation, breach of contract, emotional distress, and civil conspiracy in connection with employment contracts governing commissions on sales, etc.

2003: IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF BOLIVAR COUNTY, MISSISSIPPI: CIVIL ACTION NO. 2000-1, DELTA AND PINE LAND COMPANY, Plaintiff, vs. MONSANTO COMPANY (now known as PHARMACIA CORPORATION), Defendant.

Suit alleging damages due to breach of contract, and tortuous interference with prospective business relations as a result of a failed merger.

2003: IN THE CIRCUIT COURT OF HUMPHREYS COUNTY, MISSISSIPPI: CASE NO. 02-0201, ABRAHAM GATES, Plaintiff vs. THE PROGRESSIVE CORPORATION, PROGRESSIVE CASUALTY INSURANCE COMPANY, ET AL, Defendants.

Suit alleging damages due to breach of contract, misrepresentation, emotional distress, and consumer fraud involving the sale of insurance policies.

**STEPHEN A. ELMORE, SR., C.P.A., C.B.A**

**2002:** **IN THE CIRCUIT COURT OF JONES COUNTY, MISSISSIPPI, SECOND JUDICIAL DISTRICT: CIVIL ACTION NO. 2002-163-CV5, JERRY ROSE AND TERESA ANN BOWMAN, Plaintiffs vs. <u>STERLING LIFE INSURANCE COMPANY, OLYMPIC HEALTH MANAGEMENT SERVICES, INC., OLYMPIC HEALTH MANAGEMENT SYSTEMS, INC., AND AON CORPORATION</u>, Defendants.**

**Suit alleging damages due to fraud, breach of fiduciary relationship, and breach of contract involving the sale of insurance policies.**

_____

\*      **The Firm's client is designated by underlining, and dates shown reflect the date retained.**

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

## OTHER PROFESSIONAL EXPERIENCE:

| | |
|---|---|
| 2003 – Present | **STEPHEN A. ELMORE, SR., CPA, CBA**<br>*Business and Financial Consulting* |

Conduct training for community banks in auditing, risk assessment, financial statement analysis, and regulatory compliance. Also provide management and financial consulting to small businesses, to include cash flow projections, financial analyses, debt restructurings, and analyses of operations to improve profitability.

| | |
|---|---|
| 2001 – 2003 | **GEORGIA ENVIRONMENTAL FACILITIES AUTHORITY**<br>*Finance Director* |

Managed all financial matters of the Authority, including the accounting and financial reporting, budgeting and financial planning, investment activities, credit underwriting and financial analysis of potential borrowers, debt administration, and maintenance of the application systems' databases. The Authority had a loan portfolio of over $700 million and total assets in excess of $1 Billion.

| | |
|---|---|
| 1987 – 2001 | **WACHOVIA CORPORATION**<br>*SVP and Deputy General Auditor of Wachovia Corp. (1987 – 2000)*<br>*General Auditor of Wachovia Bank of Georgia, N.A. (1987 – 1997)* |

As a member of senior audit management, responsible for managing the department's infrastructure, including preparation and monitoring of a $6 million budget and annual audit plan of 100,000 man-hours, training and professional development, preparation of board materials for quarterly Audit Committee meetings, and quality assurance reviews.

| | |
|---|---|
| 1980 – 1987 | **FIRST ATLANTA CORPORATION**<br>*General Auditor (1983 – 1987)*<br>*Deputy General Auditor (1980 – 1983)* |

As a member of senior management, directed a staff of professional accountants in executing a risk-based audit plan designed to monitor enterprise risks while facilitating accomplishment of the corporate goals and objectives. Performed financial analyses of acquisition targets, and served as a consultant on steering committees for new products and services. Managed the relationship with the regulators and external auditors to achieve examination efficiencies

STEPHEN A. ELMORE, SR., C.P.A., C.B.A

**1973 – 1980**     **ARTHUR ANDERSEN & CO.**
*Audit and Assurance Manager*
*Real Estate and Financial Services Division*

Provided accounting, financial reporting, and audit services to clients in numerous industries, including insurance, banking, brokerage, mortgage banking, real estate, and not-for-profit organizations. Assisted clients in complying with generally accepted accounting principles, and the reporting requirements of the SEC and other regulatory agencies

## SELECTED CAREER ACCOMPLISHMENTS:

- As Chairman of the Audit Committee of a publicly-held bank holding company, work with the internal and external auditors to ensure on-going compliance with the Sarbanes-Oxley Act.
- Successfully developed a finance department responsible for all accounting, budgeting, financial analysis, financial reporting, investments, cash management, credit underwriting, debt administration, third party contract administration, banking and external audit relationships, project administration and database maintenance.
- Researched and identified for a client company a list of "target" companies for acquisition or merger based on financial analyses.
- Assisted in the securitization of a $150 million portfolio of credit card receivables.
- Assisted a client in affecting a quasi-reorganization and conversion to corporate form, after operating as a "debtor-in-possession" under Chapter XI of the Federal Bankruptcy Laws.
- Served as the risk management consultant on a project team to establish a "Section 20" investment company to underwrite equities and corporate debt.

## OTHER PROFESSIONAL AFFILIATIONS

### ---Present---
Citizens Bancshares Corporation, Director and Audit Committee Chairman
One Hundred Black Men of Atlanta, Inc., Member
University Community Development Corporation, Director and Treasurer
Leadership Atlanta Alumnus, Class of 1996
Morehouse College Business Department, Executive Mentor

### ----Past----
One Hundred Black Men of Atlanta, Inc., Treasurer and Vice President of Finance
Atlanta-Fulton County Zoo, Inc., Founding Board Member and Treasurer
American Diabetes Assoc., Georgia Affiliate, Board Member
National Assoc. for the Advancement of Colored People, Atlanta Chapter, Board Member

# ALABAMA VOTER REGISTRATION     EXHIBIT II

## JANUARY 2002

| COUNTY | WHITE | BLACK | OTHER | TOTAL ACTIVE | VOTING AGE POPULATION | TOTAL INACTIVES |
|--------|-------|-------|-------|--------------|----------------------|-----------------|
| Autauga | 18,813 | 4,128 | 254 | 23,195 | 31,177 | 3,057 |
| Barbour | 8,352 | 5,750 | 53 | 14,155 | 21,655 | 2,173 |
| Bullock | 1,702 | 3,890 | 9 | 5,601 | 8,656 | 1,741 |
| Butler | 7,133 | 4,271 | 40 | 11,444 | 15,645 | 2,326 |
| Chambers | 12,411 | 6,378 | 26 | 18,815 | 27,566 | 2,940 |
| Chilton | 18,539 | 2,346 | 41 | 20,926 | 29,428 | 1,964 |
| Coffee | 16,633 | 3,230 | 635 | 20,498 | 32,809 | 3,324 |
| Coosa | 4,266 | 2,082 | 24 | 6,372 | 9,311 | 853 |
| Covington | 15,974 | 1,841 | 93 | 17,908 | 28,771 | 3,577 |
| Crenshaw | 5,751 | 1,710 | 10 | 7,471 | 10,293 | 962 |
| Dale | 17,208 | 3,471 | 482 | 21,161 | 36,082 | 4,093 |
| Elmore | 24,185 | 4,491 | 262 | 28,938 | 48,950 | 4,036 |
| Geneva | 10,680 | 1,161 | 57 | 11,898 | 19,581 | 3,119 |
| Henry | 6,319 | 3,134 | 30 | 9,483 | 12,385 | 1,193 |
| Houston | 32,839 | 8,016 | 452 | 41,307 | 65,801 | 7,099 |
| Lee | 52,829 | 12,743 | 1,803 | 67,375 | 88,290 | 4,763 |
| Lowndes | 2,395 | 6,349 | 19 | 8,763 | 9,405 | 1,265 |
| Macon | 1,700 | 10,710 | 86 | 12,496 | 18,024 | 3,178 |
| Montgomery | 60,166 | 46,197 | 1,124 | 107,487 | 165,864 | 11,980 |
| Pike | 10,173 | 5,263 | 98 | 15,534 | 22,394 | 665 |
| Randolph | 9,581 | 2,179 | 79 | 11,839 | 16,760 | 2,195 |
| Russell | 12,957 | 8,853 | 861 | 22,671 | 36,562 | 4,021 |
| Tallapoosa | 17,730 | 5,395 | 124 | 23,249 | 31,438 | 3,569 |
| **Total** | **368,336** | **153,588** | **6,662** | **528,586** | **786,847** | **74,093** |

% of Blacks to Total Active & Inactive  =  153,588 / 602,679                25.48%

# ALABAMA VOTER REGISTRATION     EXHIBIT II

## OCTOBER 2000

| COUNTY | WHITE | BLACK | OTHER | TOTAL ACTIVE | VOTING AGE POPULATION | TOTAL INACTIVES |
|--------|------:|------:|------:|-------------:|----------------------:|----------------:|
| Autauga | 20,994 | 4,618 | 290 | 25,902 | 24,124 | 1,822 |
| Barbour | 9,609 | 6,573 | 65 | 16,247 | 17,953 | 2,362 |
| Bullock | 2,204 | 4,945 | 12 | 7,161 | 7,661 | 680 |
| Butler | 8,161 | 5,239 | 47 | 13,447 | 15,301 | 1,602 |
| Chambers | 13,003 | 6,546 | 26 | 19,575 | 27,244 | 6,498 |
| Chilton | 20,589 | 2,529 | 31 | 23,149 | 23,771 | 646 |
| Coffee | 19,616 | 3,909 | 772 | 24,297 | 29,913 | 5,798 |
| Coosa | 4,934 | 2,325 | 24 | 7,283 | 8,181 | 500 |
| Covington | 19,184 | 2,309 | 115 | 21,608 | 27,241 | 7,028 |
| Crenshaw | 6,122 | 1,804 | 12 | 7,938 | 9,991 | 1,147 |
| Dale | 20,741 | 4,284 | 627 | 25,652 | 35,757 | 5,007 |
| Elmore | 27,409 | 5,083 | 286 | 32,778 | 36,418 | 3,996 |
| Geneva | 8,985 | 1,352 | 60 | 10,397 | 17,757 | 6,393 |
| Henry | 7,209 | 3,511 | 30 | 10,750 | 11,273 | 1,198 |
| Houston | 37,561 | 9,600 | 576 | 47,737 | 58,858 | 7,084 |
| Lee | 48,211 | 11,799 | 1,651 | 61,661 | 68,058 | 14,794 |
| Lowndes | 2,732 | 7,208 | 19 | 9,959 | 8,263 | 833 |
| Macon | 1,942 | 13,187 | 108 | 15,237 | 18,286 | 5,535 |
| Montgomery | 62,473 | 47,779 | 1,107 | 111,359 | 151,701 | 23,056 |
| Pike | 11,506 | 5,884 | 123 | 17,513 | 20,729 | 1,054 |
| Randolph | 11,085 | 2,586 | 95 | 13,766 | 14,696 | 3,589 |
| Russell | 15,284 | 9,541 | 1,004 | 25,829 | 34,380 | 1,715 |
| Tallapoosa | 20,090 | 6,000 | 140 | 26,230 | 28,899 | 4,039 |
| **Total** | **399,644** | **168,611** | **7,220** | **575,475** | **696,455** | **106,376** |

% of Blacks to Total Active & Inactive = 168,611 / 681,851          24.73%

# ALABAMA VOTER REGISTRATION     EXHIBIT III

## FEBRUARY 2006

| COUNTY | WHITE | BLACK | OTHER | TOTAL ACTIVE | VOTING AGE POPULATION | TOTAL INACTIVES | TOTAL VOTERS |
|---|---|---|---|---|---|---|---|
| AUTAUGA | 20,708 | 4,428 | 409 | 25,545 | 34,944 | 3,718 | 29,263 |
| BARBOUR | 7,886 | 5,980 | 71 | 13,937 | 21,687 | 1,995 | 15,932 |
| BULLOCK | 1,781 | 4,205 | 16 | 6,002 | 8,530 | 1,193 | 7,195 |
| BUTLER | 6,902 | 4,029 | 52 | 10,983 | 15,684 | 2,222 | 13,205 |
| CHAMBERS | 11,164 | 6,135 | 52 | 17,351 | 27,125 | 4,138 | 21,489 |
| CHILTON | 19,348 | 2,288 | 97 | 21,733 | 31,359 | 2,027 | 23,760 |
| COFFEE | 17,719 | 3,352 | 847 | 21,918 | 34,471 | 2,444 | 24,362 |
| COOSA | 4,906 | 2,488 | 38 | 7,432 | 8,822 | 48 | 7,480 |
| COVINGTON | 16,326 | 1,854 | 100 | 18,280 | 28,641 | 1,299 | 19,579 |
| CRENSHAW | 5,839 | 1,768 | 24 | 7,631 | 10,428 | 591 | 8,222 |
| DALE | 16,951 | 3,597 | 614 | 21,162 | 36,149 | 5,110 | 26,272 |
| ELMORE | 28,831 | 5,100 | 417 | 34,348 | 54,454 | 2,510 | 36,858 |
| GENEVA | 11,363 | 1,084 | 104 | 12,551 | 19,870 | 1,611 | 14,162 |
| HENRY | 6,560 | 2,855 | 41 | 9,456 | 12,871 | 1,045 | 10,501 |
| HOUSTON | 34,770 | 9,267 | 596 | 44,633 | 69,912 | 6,929 | 51,562 |
| LEE | 51,447 | 14,970 | 3,087 | 69,504 | 94,403 | 181 | 69,685 |
| LOWNDES | 2,259 | 6,538 | 27 | 8,824 | 9,544 | 1,055 | 9,879 |
| MACON | 1,785 | 10,510 | 110 | 12,405 | 17,786 | 3,541 | 15,946 |
| MONTGOMERY | 62,078 | 58,244 | 1,883 | 122,205 | 165,693 | 3,932 | 126,137 |
| PIKE | 10,336 | 5,627 | 147 | 16,110 | 22,465 | 738 | 16,848 |
| RANDOLPH | 9,901 | 2,376 | 77 | 12,354 | 17,154 | 2,345 | 14,699 |
| RUSSELL | 13,242 | 9,493 | 830 | 23,565 | 36,690 | 3,904 | 27,469 |
| TALLAPOOSA | 17,313 | 5,280 | 137 | 22,730 | 31,477 | 2,954 | 25,684 |
| **TOTAL** | **379,415** | **171,468** | **9,776** | **560,659** | **810,159** | **55,530** | **616,189** |

% of Blacks to total active & inactive     171,468 / (560,659 + 55,530)  =         27.83%

EXHIBIT IV

**REPORT ON
OPERATION OF THE JURY SELECTION PLAN**
COMPLETED PURSUANT TO 28 U.S.C. § 1863

| DISTRICT | MIDDLE DISTRICT OF ALABAMA | |
|---|---|---|
| DIVISION | NORTHERN | Master Wheel is Maintained For Division At Large, Check Here ☒ |
| DISTRICT NUMBER | | DATE COMPLETED |
| 1127 | | 4/9/02 |

**PART I  GENERAL INFORMATION:**

1. This master jury wheel was last filled 2/12/01

2. The number of names then placed in the wheel was 0,1,9,6,0,1,4,1 — *master Wheel*

3. Source of Names Was:
   a) Voter registration ☒
   b) Use of actual voters
   c) Other (Specify) Specified by: State of Alabama

5. No. of jury divisions established in district by Jury Selection Plan ...............

**PART II  SAMPLING OF RETURNED QUESTIONNAIRES:**

A. (1) Date of drawing from master wheel   3/26/01     (2) No. of names drawn   2,5,0,0,0

(3) Dates on which initial mailing completed   10,01,01     (4) No. of forms mailed   2,5,0,0,0

B. (5) Date of sampling from returned forms   1,12,02

Number of qualification forms thus far:
(6) Completed and returned   1,4,3,1,4
(7) Returned undeliverable by P.O.   3,7,6,1
(8) Not yet returned   5,9,1,0

(9) Analysis of sample of completed and returned questionnaire forms:

Total no. of forms in sample   1,4,3,2,4

| Race | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| White | 4019 | 28.06 | 4702 | 32.82 | 135 | .94 | 8856 | 61.87 |
| Black | 793 | 5.54 | 1306 | 10.51 | 25 | .25 | 2215 | 15.30 |
| American Indian | 71 | .15 | 9 | .13 | 1 | .01 | 41 | .26 |
| Asian | 19 | .13 | 38 | .27 | 1 | .01 | 58 | .40 |
| Other | 43 | .30 | 27 | .19 | 0 | 0 | 70 | .49 |
| Unknown | 2735 | 19.09 | 57 | | 295 | 1.29 | 2967 | 20.64 |
| Total (by column) | 7630 | 53.27 | 6335 | 44.23 | 359 | 2.51 | 14324 | 100% |

| Ethnicity | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| Hispanic | 27 | .19 | 39 | .27 | 0 | 0 | 66 | .46 |
| Non-Hispanic | 3011 | 21 | 3626 | 25.31 | 108 | .108 | 6745 | 47.09 |
| Unknown | 4592 | 32.06 | 2670 | 18.64 | 251 | .251 | 7513 | 52.45 |
| Total (by column) | 7630 | 53.27 | 6335 | 44.23 | 359 | .359 | 14324 | 100% |

**PART III  SAMPLING OF QUALIFIED JURY WHEEL:**

(If this part is reported because of a change in rules, attach an explanation of changes)

(1) Date sample was taken   01,17,02     (2) Number of names in wheel   9,9,8,6,0,4

(3) Analysis of sample:   Total no. of names in sample   0,9,8,6,0

| Race | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| White | 3391 | 34.39 | 4003 | 40.60 | 96 | .97 | 7490 | 75.96 |
| Black | 684 | 6.94 | 1330 | 13.49 | 31 | .31 | 2045 | 20.74 |
| American Indian | 18 | .18 | 16 | .16 | 2 | .02 | 36 | .37 |
| Asian | 19 | .19 | 32 | .32 | 1 | .01 | 52 | .53 |
| Other | 36 | .37 | 22 | .22 | 0 | 0 | 58 | .59 |
| Unknown | 26 | .26 | 27 | .27 | 126 | 1.28 | 179 | 1.82 |
| Total (by column) | 4174 | 42.33 | 5430 | 55.07 | 256 | 2.60 | 9860 | 100% |

| Ethnicity | Male | % | Female | % | Unknown | % | Total in Sample | Percent of Sample |
|---|---|---|---|---|---|---|---|---|
| Hispanic | 24 | .24 | 30 | .30 | 0 | 0 | 54 | .55 |
| Non-Hispanic | 2474 | 25.09 | 3049 | 30.92 | 80 | .81 | 5603 | 56.83 |
| Unknown | 1676 | 17.00 | 2351 | 23.84 | 176 | 1.78 | 4203 | 42.63 |
| Total (by column) | 4174 | 42.33 | 5430 | 55.07 | 256 | 2.60 | 9860 | 100% |

*See reprographics on Reverse Side*

## Source List Race/Gender Report
## EXHIBIT V

### Qualified List

Date: 02/23/06
Time: 5:11 pm

| Category | Male | % | Female | % | Unknown | % | Total | % |
|---|---|---|---|---|---|---|---|---|
| **RACE** | | | | | | | | |
| Black: | 2,010 | 7.21% | 3614 | 12.97% | 278 | 1.00% | 5902 | 21.18% |
| White: | 9,208 | 33.05% | 11038 | 39.62% | 682 | 2.45% | 20928 | 75.12% |
| American Indian: | 38 | 0.14% | 33 | 0.12% | 5 | 0.02% | 76 | 0.27% |
| Native Hawaiian/Pac Is.: | 4 | 0.01% | 7 | 0.03% | 1 | 0.00% | 12 | 0.04% |
| Asian: | 49 | 0.18% | 65 | 0.23% | 5 | 0.02% | 119 | 0.43% |
| Multi-Race: | 73 | 0.26% | 91 | 0.33% | 3 | 0.01% | 167 | 0.60% |
| Other: | 58 | 0.21% | 38 | 0.14% | 8 | 0.03% | 104 | 0.37% |
| Unknown: | 191 | 0.69% | 332 | 1.19% | 29 | 0.10% | 552 | 1.98% |
| Total | 11631 | 41.75% | 15218 | 54.62% | 1011 | 3.63% | 27860 | |
| | | | | | | | | |
| **ETHNICITY** | | | | | | | | |
| Hispanic: | 66 | 0.24% | 116 | 0.42% | 5 | 0.02% | 187 | 0.67% |
| Non-Hispanic: | 7070 | 25.38% | 9812 | 35.22% | 97 | 0.35% | 16979 | 60.94% |
| Unknown: | 4495 | 16.13% | 5290 | 18.99% | 909 | 3.26% | 10694 | 38.38% |
| Total: | 11631 | 41.75% | 15218 | 54.62% | 1011 | 3.63% | 27360 | |

Page 1 of 1

U.S. vs. SIEGELMAN, ET AL

EXHIBIT VI
Page 1 of 2

15% SELECTION PROCESS
FROM
THE DEFERRED MAINTENANCE POOL
2001 JURY WHEEL

| | pool # | Total Summons | SEE NOTE #1 Added to New Pool | % | SEE NOTE #2 Total Summons Less Added to New Pool | % |
|---|---|---|---|---|---|---|
| 1 | 201010601 | 80 | 0 | 0.0% | 80 | 100.0% |
| 2 | 201010701 | 120 | 0 | 0.0% | 120 | 100.0% |
| 3 | 201010703 | 150 | 0 | 0.0% | 150 | 100.0% |
| 4 | 201010803 | 75 | 0 | 0.0% | 75 | 100.0% |
| 5 | 201010901 | 140 | 0 | 0.0% | 140 | 100.0% |
| 6 | 201010903 | 80 | 0 | 0.0% | 80 | 100.0% |
| 7 | 201011001 | 80 | 0 | 0.0% | 80 | 100.0% |
| 8 | 201011002 | 140 | 0 | 0.0% | 140 | 100.0% |
| 9 | 201011103 | 50 | 0 | 0.0% | 50 | 100.0% |
| 10 | 201011104 | 60 | 0 | 0.0% | 60 | 100.0% |
| 11 | 201011201 | 150 | 0 | 0.0% | 150 | 100.0% |
| 12 | 201020101 | 105 | 2 | 1.9% | 103 | 98.1% |
| 13 | 201020102 | 150 | 14 | 9.3% | 136 | 90.7% |
| 14 | 201020202 | 100 | 9 | 9.0% | 91 | 91.0% |
| 15 | 201020203 | 200 | 19 | 9.5% | 181 | 90.5% |
| 16 | 201020204 | 50 | 2 | 4.0% | 48 | 96.0% |
| 17 | 201020403 | 100 | 9 | 9.0% | 91 | 91.0% |
| 18 | 201020405 | 150 | 14 | 9.3% | 136 | 90.7% |
| 19 | 201020501 | 100 | 9 | 9.0% | 91 | 91.0% |
| 20 | 201020502 | 200 | 19 | 9.5% | 181 | 90.5% |
| 21 | 201020601 | 80 | 6 | 7.5% | 74 | 92.5% |
| 22 | 201020702 | 150 | 14 | 9.3% | 136 | 90.7% |
| 23 | 201020802 | 100 | 9 | 9.0% | 91 | 91.0% |
| 24 | 201020803 | 60 | 4 | 6.7% | 56 | 93.3% |
| 25 | 201020901 | 200 | 19 | 9.5% | 181 | 90.5% |
| 26 | 201020903 | 100 | 9 | 9.0% | 91 | 91.0% |
| 27 | 201021001 | 100 | 9 | 9.0% | 91 | 91.0% |
| 28 | 201021002 | 105 | 9 | 8.6% | 96 | 91.4% |
| 29 | 201021004 | 300 | 29 | 9.7% | 271 | 90.3% |
| 30 | 201021103 | 100 | 9 | 9.0% | 91 | 91.0% |
| 31 | 201021201 | 100 | 9 | 9.0% | 91 | 91.0% |
| 32 | 201021202 | 250 | 24 | 9.6% | 226 | 90.4% |
| 33 | 201030104 | 100 | 9 | 9.0% | 91 | 91.0% |
| 34 | 201030105 | 125 | 10 | 8.0% | 115 | 92.0% |
| 35 | 201030106 | 150 | 14 | 9.3% | 136 | 90.7% |
| 36 | 201030301 | 200 | 19 | 9.5% | 181 | 90.5% |
| 37 | 201030302 | 100 | 9 | 9.0% | 91 | 91.0% |
| 38 | 201030401 | 80 | 6 | 7.5% | 74 | 92.5% |
| 39 | 201030405 | 60 | 4 | 6.7% | 56 | 93.3% |
| 40 | 201030501 | 150 | 14 | 9.3% | 136 | 90.7% |
| 41 | 201030502 | 75 | 6 | 8.0% | 69 | 92.0% |
| 42 | 201030504 | 150 | 14 | 9.3% | 136 | 90.7% |
| 43 | 201030601 | 200 | 19 | 9.5% | 181 | 90.5% |
| 44 | 201030602 | 120 | 10 | 8.3% | 110 | 91.7% |
| 45 | 201030701 | 125 | 10 | 8.0% | 115 | 92.0% |
| 46 | 201030702 | 200 | 19 | 9.5% | 181 | 90.5% |
| 47 | 201030801 | 200 | 19 | 9.5% | 181 | 90.5% |
| 48 | 201030802 | 150 | 14 | 9.3% | 136 | 90.7% |
| Total | | 6,110 | 443 | 7.3% | 5,667 | 92.7% |
| Average | | 127 | 9 | 7.3% | 118 | 92.7% |

NOTE # 1: The "Added to New Pool" category is those jurors selecte
as part of the 15% selection process for deferred jurors

NOTE # 2: The last column represents the 85% selection from the non-deferre
population of jurors

<u>U.S. vs. SIEGELMAN, ET AL</u>

EXHIBIT VI
Page 2 of 2

15% SELECTION PROCESS
FROM
THE DEFERRED MAINTENANCE POOL
2001 JURY WHEEL

| pool # | | Total Summons | SEE NOTE #1 | | | SEE NOTE #2 | |
|---|---|---|---|---|---|---|---|
| | | | Added to New Poo | % | | Total Summons Less Added to New Pool | % |
| 49 | 201030903 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 50 | 201030904 | 200 | 13 | 6.5% | | 187 | 93.5% |
| 51 | 201031001 | 101 | 6 | 5.9% | | 95 | 94.1% |
| 52 | 201031002 | 200 | 14 | 7.0% | | 186 | 93.0% |
| 53 | 201031101 | 60 | 4 | 6.7% | | 56 | 93.3% |
| 54 | 201031102 | 59 | 3 | 5.1% | | 56 | 94.9% |
| 55 | 201031202 | 202 | 18 | 8.9% | | 184 | 91.1% |
| 56 | 201031205 | 105 | 0 | 0.0% | | 105 | 100.0% |
| 57 | 201040102 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 58 | 201040104 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 59 | 201040107 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 60 | 201040201 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 61 | 201040303 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 62 | 201040304 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 63 | 201040404 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 64 | 201040501 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 65 | 201040601 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 66 | 201040602 | 60 | 4 | 6.7% | | 56 | 93.3% |
| 67 | 201040604 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 68 | 201040701 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 69 | 201040702 | 150 | 14 | 9.3% | | 136 | 90.7% |
| 70 | 201040801 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 71 | 201040901 | 220 | 20 | 9.1% | | 200 | 90.9% |
| 72 | 201040902 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 73 | 201041001 | 250 | 24 | 9.6% | | 226 | 90.4% |
| 74 | 201041103 | 150 | 14 | 9.3% | | 136 | 90.7% |
| 75 | 201041104 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 76 | 201041201 | 201 | 19 | 9.5% | | 182 | 90.5% |
| 77 | 201050101 | 60 | 4 | 6.7% | | 56 | 93.3% |
| 78 | 201050102 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 79 | 201050105 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 80 | 201050106 | 150 | 14 | 9.3% | | 136 | 90.7% |
| 81 | 201050108 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 82 | 201050301 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 83 | 201050302 | 150 | 14 | 9.3% | | 136 | 90.7% |
| 84 | 201050305 | 100 | 9 | 9.0% | | 91 | 91.0% |
| 85 | 201050403 | 200 | 19 | 9.5% | | 181 | 90.5% |
| 86 | 201050501 | 200 | 29 | 14.5% | | 171 | 85.5% |
| 87 | 201050502 | 100 | 14 | 14.0% | | 86 | 86.0% |
| 88 | 201050601 | 225 | 47 | 20.9% | | 178 | 79.1% |
| 89 | 201050602 | 200 | 49 | 24.5% | | 151 | 75.5% |
| 90 | 201050701 | 125 | 30 | 24.0% | | 95 | 76.0% |
| 91 | 201050801 | 200 | 49 | 24.5% | | 151 | 75.5% |
| 92 | 201050806 | 200 | 29 | 14.5% | | 171 | 85.5% |
| Totals | | 6,868 | 741 | 10.8% | | 6,127 | 89.2% |
| Average per Pool | | 156 | 17 | 10.8% | | 139 | 89.2% |

<u>NOTE # 1:</u> The "Added to New Pool" category is those jurors selecteo
as part of the 15% selection process for deferred jurors

<u>NOTE # 2:</u> The last column represents the 85% selection from the non-deferre
population of jurors

The following table looks at the distribution of the "Change Deferral Record" commands during the life of the 2001 wheel.

# Frequencies

| Level | Count | Prob |
|-------|-------|------|
| 2002/02/12 | 1 | 0.00046 |
| 2002/02/20 | 1 | 0.00046 |
| 2002/03/01 | 1 | 0.00046 |
| 2002/04/08 | 3 | 0.00138 |
| 2003/08/04 | 291 | 0.13392 |
| 2003/08/07 | 2 | 0.00092 |
| 2003/09/15 | 1 | 0.00046 |
| 2003/10/10 | 15 | 0.00690 |
| 2003/10/14 | 5 | 0.00230 |
| 2003/10/30 | 60 | 0.02761 |
| 2003/11/03 | 2 | 0.00092 |
| 2004/03/18 | 710 | 0.32674 |
| 2004/11/02 | 1 | 0.00046 |
| 2005/03/25 | 1080 | 0.49701 |
| Total | 2173 | 1.00000 |

N Missing
     0
   14 Levels

U.S. vs. SIEGELMAN, ET AL                                EXHIBIT VIII

ANALYSIS OF EXCESS DEFERREDS
2001 JURY WHEEL
POOLS 49 - 92

| Pool Number | Total Summons | Total Deferred Per Gundlach | | Total Deferred After Adjustments | | 15% | | Excess Deferreds Over 15% | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | # | % | |
| 49 | 100 | 25 | 25.00% | 25 | 25.00% | 15 | 15.00% | 10 | 10.00% | |
| 50 | 200 | 45 | 22.50% | 45 | 22.50% | 30 | 15.00% | 15 | 7.50% | |
| 51 | 101 | 25 | 24.75% | 25 | 24.75% | 15 | 15.00% | 10 | 9.75% | |
| 52 | 200 | 41 | 20.50% | 41 | 20.50% | 30 | 15.00% | 11 | 5.50% | |
| 53 | 60 | 15 | 25.00% | 13 | 21.67% | 9 | 15.00% | 4 | 6.67% | Pattern 1 |
| 54 | 60 | 5 | 8.33% | 4 | 6.67% | 9 | 15.00% | (5) | -8.33% | |
| 55 | 202 | 43 | 21.29% | 42 | 20.79% | 30 | 15.00% | 12 | 5.79% | |
| 56 | 105 | 16 | 15.24% | 14 | 13.33% | 16 | 15.00% | (2) | -1.67% | |
| 57 | 200 | 36 | 18.00% | 29 | 14.50% | 30 | 15.00% | (1) | -0.50% | |
| 58 | 100 | 17 | 17.00% | 13 | 13.00% | 15 | 15.00% | (2) | -2.00% | |
| 59 | 200 | 25 | 12.50% | 23 | 11.50% | 30 | 15.00% | (7) | -3.50% | |
| 60 | 200 | 32 | 16.00% | 27 | 13.50% | 30 | 15.00% | (3) | -1.50% | |
| 61 | 100 | 14 | 14.00% | 13 | 13.00% | 15 | 15.00% | (2) | -2.00% | |
| 62 | 200 | 25 | 12.50% | 23 | 11.50% | 30 | 15.00% | (7) | -3.50% | |
| 63 | 199 | 26 | 13.07% | 22 | 11.06% | 30 | 15.00% | (8) | -3.94% | Pattern 2 |
| 64 | 100 | 19 | 19.00% | 19 | 19.00% | 15 | 15.00% | 4 | 4.00% | |
| 65 | 200 | 44 | 22.00% | 41 | 20.50% | 30 | 15.00% | 11 | 5.50% | |
| 66 | 60 | 15 | 25.00% | 11 | 18.33% | 9 | 15.00% | 2 | 3.33% | |
| 67 | 100 | 21 | 21.00% | 17 | 17.00% | 15 | 15.00% | 2 | 2.00% | |
| 68 | 200 | 42 | 21.00% | 36 | 18.00% | 30 | 15.00% | 6 | 3.00% | |
| 69 | 150 | 40 | 26.67% | 33 | 22.00% | 23 | 15.00% | 11 | 7.00% | |
| 70 | 200 | 39 | 19.50% | 35 | 17.50% | 30 | 15.00% | 5 | 2.50% | |
| 71 | 220 | 41 | 18.64% | 35 | 15.91% | 33 | 15.00% | 2 | 0.91% | |
| 72 | 100 | 25 | 25.00% | 19 | 19.00% | 15 | 15.00% | 4 | 4.00% | |
| 73 | 250 | 54 | 21.60% | 45 | 18.00% | 38 | 15.00% | 8 | 3.00% | |
| 74 | 150 | 27 | 18.00% | 24 | 16.00% | 23 | 15.00% | 2 | 1.00% | |
| 75 | 100 | 19 | 19.00% | 18 | 18.00% | 15 | 15.00% | 3 | 3.00% | |
| 76 | 201 | 35 | 17.41% | 30 | 14.93% | 30 | 15.00% | (0) | -0.07% | Pattern 3 |
| 77 | 60 | 9 | 15.00% | 7 | 11.67% | 9 | 15.00% | (2) | -3.33% | |
| 78 | 200 | 35 | 17.50% | 28 | 14.00% | 30 | 15.00% | (2) | -1.00% | |
| 79 | 100 | 15 | 15.00% | 15 | 15.00% | 15 | 15.00% | 0 | 0.00% | |
| 80 | 150 | 21 | 14.00% | 19 | 12.67% | 23 | 15.00% | (4) | -2.33% | |
| 81 | 200 | 36 | 18.00% | 28 | 14.00% | 30 | 15.00% | (2) | -1.00% | |
| 82 | 200 | 34 | 17.00% | 27 | 13.50% | 30 | 15.00% | (3) | -1.50% | |
| 83 | 150 | 22 | 14.67% | 19 | 12.67% | 23 | 15.00% | (4) | -2.33% | Pattern 4 |
| 84 | 100 | 18 | 18.00% | 16 | 16.00% | 15 | 15.00% | 1 | 1.00% | |
| 85 | 200 | 39 | 19.50% | 34 | 17.00% | 30 | 15.00% | 4 | 2.00% | |
| 86 | 200 | 53 | 26.50% | 41 | 20.50% | 30 | 15.00% | 11 | 5.50% | |
| 87 | 100 | 22 | 22.00% | 21 | 21.00% | 15 | 15.00% | 6 | 6.00% | |
| 88 | 225 | 60 | 26.67% | 54 | 24.00% | 34 | 15.00% | 20 | 9.00% | |
| 89 | 200 | 66 | 33.00% | 60 | 30.00% | 30 | 15.00% | 30 | 15.00% | |
| 90 | 125 | 44 | 35.20% | 37 | 29.60% | 19 | 15.00% | 18 | 14.60% | |
| 91 | 200 | 59 | 29.50% | 53 | 26.50% | 30 | 15.00% | 23 | 11.50% | |
| 92 | 200 | 50 | 25.00% | 40 | 20.00% | 30 | 15.00% | 10 | 5.00% | Pattern 5 |
| Totals | 6,868 | 1,394 | 20.30% | 1,221 | 17.78% | 1,030 | 15.00% | 191 | 2.78% | |

U.S. vs. SIEGELMAN, et al.

EXHIBIT IX

## ANALYSIS OF DEFERRED MAINTENANCE CHANGES*

| Pool Number | Total Summons | | | | | | | Total Deferred Maintenance Changes | | | | | | | Net Summons w/o Maintenance Changes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Black | | White | | Other | | Total | Black | | White | | Other | | Total | Black | | White | | Other | | Total |
| | # | % | # | % | # | % | # | # | % | # | % | # | % | # | # | % | # | % | # | % | # |
| 49 | 20 | 20.0% | 69 | 69.0% | 11 | 11.0% | 100 | 4 | 25.0% | 11 | 68.8% | 1 | 6.3% | 16 | 16 | 19.0% | 58 | 69.0% | 10 | 11.9% | 84 |
| 50 | 35 | 17.5% | 149 | 74.5% | 16 | 8.0% | 200 | 4 | 12.5% | 26 | 81.3% | 2 | 6.3% | 32 | 31 | 18.5% | 123 | 73.2% | 14 | 8.3% | 168 |
| 51 | 23 | 22.8% | 71 | 70.3% | 7 | 6.9% | 101 | 5 | 27.8% | 12 | 66.7% | 1 | 5.6% | 18 | 18 | 21.7% | 59 | 71.1% | 6 | 7.2% | 83 |
| 52 | 35 | 17.5% | 150 | 75.0% | 15 | 7.5% | 200 | 5 | 18.5% | 21 | 77.8% | 1 | 3.7% | 27 | 30 | 17.3% | 129 | 74.6% | 14 | 8.1% | 173 |
| 53 | 13 | 21.7% | 44 | 73.3% | 3 | 5.0% | 60 | 2 | 22.2% | 7 | 77.8% | 0 | 0.0% | 9 | 11 | 21.6% | 37 | 72.5% | 3 | 5.9% | 51 |
| 54 | 8 | 13.6% | 49 | 83.1% | 2 | 3.4% | 59 | 0 | 0.0% | 1 | 100.0% | 0 | 0.0% | 1 | 8 | 13.8% | 48 | 82.8% | 2 | 3.4% | 58 |
| 55 | 41 | 20.3% | 149 | 73.8% | 12 | 5.9% | 202 | 5 | 22.7% | 17 | 77.3% | 0 | 0.0% | 22 | 36 | 20.0% | 132 | 73.3% | 12 | 6.7% | 180 |
| 56 | 14 | 13.3% | 86 | 81.9% | 5 | 4.8% | 105 | 0 | 0.0% | 7 | 87.5% | 1 | 12.5% | 8 | 14 | 14.4% | 79 | 81.4% | 4 | 4.1% | 97 |
| 57 | 53 | 26.5% | 141 | 70.5% | 6 | 3.0% | 200 | 4 | 40.0% | 5 | 50.0% | 1 | 10.0% | 10 | 49 | 25.8% | 136 | 71.6% | 5 | 2.6% | 190 |
| 58 | 24 | 24.0% | 75 | 75.0% | 1 | 1.0% | 100 | 1 | 25.0% | 3 | 75.0% | 0 | 0.0% | 4 | 23 | 24.0% | 72 | 75.0% | 1 | 1.0% | 96 |
| 59 | 39 | 19.5% | 153 | 76.5% | 8 | 4.0% | 200 | 1 | 25.0% | 3 | 75.0% | 0 | 0.0% | 4 | 38 | 19.4% | 150 | 76.5% | 8 | 4.1% | 196 |
| 60 | 35 | 17.5% | 160 | 80.0% | 5 | 2.5% | 200 | 1 | 12.5% | 6 | 75.0% | 1 | 12.5% | 8 | 34 | 17.7% | 154 | 80.2% | 4 | 2.1% | 192 |
| 61 | 20 | 20.0% | 76 | 76.0% | 4 | 4.0% | 100 | 2 | 50.0% | 2 | 50.0% | 0 | 0.0% | 4 | 18 | 18.8% | 74 | 77.1% | 4 | 4.2% | 96 |
| 62 | 40 | 20.0% | 157 | 78.5% | 3 | 1.5% | 200 | 1 | 33.3% | 2 | 66.7% | 0 | 0.0% | 3 | 39 | 19.8% | 155 | 78.7% | 3 | 1.5% | 197 |
| 63 | 40 | 20.0% | 153 | 76.5% | 7 | 3.5% | 200 | 0 | 0.0% | 3 | 100.0% | 0 | 0.0% | 3 | 40 | 20.3% | 150 | 76.1% | 7 | 3.6% | 197 |
| 64 | 13 | 13.0% | 84 | 84.0% | 3 | 3.0% | 100 | 0 | 0.0% | 10 | 100.0% | 0 | 0.0% | 10 | 13 | 14.4% | 74 | 82.2% | 3 | 3.3% | 90 |
| 65 | 36 | 18.0% | 151 | 75.5% | 13 | 6.5% | 200 | 2 | 8.7% | 19 | 82.6% | 2 | 8.7% | 23 | 34 | 19.2% | 132 | 74.6% | 11 | 6.2% | 177 |
| 66 | 16 | 26.7% | 43 | 71.7% | 1 | 1.7% | 60 | 1 | 14.3% | 5 | 71.4% | 1 | 14.3% | 7 | 15 | 28.3% | 38 | 71.7% | 0 | 0.0% | 53 |
| 67 | 24 | 24.0% | 73 | 73.0% | 3 | 3.0% | 100 | 1 | 10.0% | 8 | 80.0% | 1 | 10.0% | 10 | 23 | 25.6% | 65 | 72.2% | 2 | 2.2% | 90 |
| 68 | 41 | 20.5% | 154 | 77.0% | 5 | 2.5% | 200 | 0 | 0.0% | 16 | 94.1% | 1 | 5.9% | 17 | 41 | 22.4% | 138 | 75.4% | 4 | 2.2% | 183 |
| 69 | 24 | 16.0% | 117 | 78.0% | 9 | 6.0% | 150 | 3 | 15.8% | 14 | 73.7% | 2 | 10.5% | 19 | 21 | 16.0% | 103 | 78.6% | 7 | 5.3% | 131 |
| 70 | 45 | 22.5% | 144 | 72.0% | 11 | 5.5% | 200 | 2 | 12.5% | 14 | 87.5% | 0 | 0.0% | 16 | 43 | 23.4% | 130 | 70.7% | 11 | 6.0% | 184 |
| 71 | 40 | 18.2% | 166 | 75.5% | 14 | 6.4% | 220 | 3 | 20.0% | 12 | 80.0% | 0 | 0.0% | 15 | 37 | 18.0% | 154 | 75.1% | 14 | 6.8% | 205 |
| 72 | 26 | 26.0% | 71 | 71.0% | 3 | 3.0% | 100 | 2 | 15.4% | 11 | 84.6% | 0 | 0.0% | 13 | 24 | 27.6% | 60 | 69.0% | 3 | 3.4% | 87 |
| 73 | 55 | 22.0% | 173 | 69.2% | 22 | 8.8% | 250 | 2 | 10.5% | 16 | 84.2% | 1 | 5.3% | 19 | 53 | 22.9% | 157 | 68.0% | 21 | 9.1% | 231 |
| 74 | 21 | 14.0% | 119 | 79.3% | 10 | 6.7% | 150 | 1 | 10.0% | 8 | 80.0% | 1 | 10.0% | 10 | 20 | 14.3% | 111 | 79.3% | 9 | 6.4% | 140 |
| 75 | 16 | 16.0% | 81 | 81.0% | 3 | 3.0% | 100 | 1 | 9.1% | 9 | 81.8% | 1 | 9.1% | 11 | 15 | 16.9% | 72 | 80.9% | 2 | 2.2% | 89 |
| 76 | 39 | 19.5% | 155 | 77.5% | 6 | 3.0% | 200 | 1 | 7.1% | 12 | 85.7% | 1 | 7.1% | 14 | 38 | 20.4% | 143 | 76.9% | 5 | 2.7% | 186 |
| 77 | 14 | 23.3% | 42 | 70.0% | 4 | 6.7% | 60 | 0 | 0.0% | 3 | 100.0% | 0 | 0.0% | 3 | 14 | 24.6% | 39 | 68.4% | 4 | 7.0% | 57 |
| 78 | 41 | 20.5% | 141 | 70.5% | 18 | 9.0% | 200 | 3 | 27.3% | 8 | 72.7% | 0 | 0.0% | 11 | 38 | 20.1% | 133 | 70.4% | 18 | 9.5% | 189 |
| 79 | 24 | 24.0% | 70 | 70.0% | 6 | 6.0% | 100 | 0 | 0.0% | 7 | 100.0% | 0 | 0.0% | 7 | 24 | 25.8% | 63 | 67.7% | 6 | 6.5% | 93 |
| 80 | 40 | 26.7% | 104 | 69.3% | 6 | 4.0% | 150 | 2 | 28.6% | 5 | 71.4% | 0 | 0.0% | 7 | 38 | 26.6% | 99 | 69.2% | 6 | 4.2% | 143 |
| 81 | 39 | 19.5% | 151 | 75.5% | 10 | 5.0% | 200 | 1 | 10.0% | 9 | 90.0% | 0 | 0.0% | 10 | 38 | 20.0% | 142 | 74.7% | 10 | 5.3% | 190 |
| 82 | 47 | 23.5% | 142 | 71.0% | 11 | 5.5% | 200 | 1 | 9.1% | 10 | 90.9% | 0 | 0.0% | 11 | 46 | 24.3% | 132 | 69.8% | 11 | 5.8% | 189 |
| 83 | 35 | 23.3% | 101 | 67.3% | 14 | 9.3% | 150 | 0 | 0.0% | 5 | 100.0% | 0 | 0.0% | 5 | 35 | 24.1% | 96 | 66.2% | 14 | 9.7% | 145 |
| 84 | 16 | 16.0% | 75 | 75.0% | 9 | 9.0% | 100 | 1 | 11.1% | 8 | 88.9% | 0 | 0.0% | 9 | 15 | 16.5% | 67 | 73.6% | 9 | 9.9% | 91 |
| 85 | 43 | 21.5% | 152 | 76.0% | 5 | 2.5% | 200 | 4 | 23.5% | 12 | 70.6% | 1 | 5.9% | 17 | 39 | 21.3% | 140 | 76.5% | 4 | 2.2% | 183 |
| 86 | 36 | 18.0% | 152 | 76.0% | 12 | 6.0% | 200 | 2 | 16.7% | 8 | 66.7% | 2 | 16.7% | 12 | 34 | 18.1% | 144 | 76.6% | 10 | 5.3% | 188 |
| 87 | 17 | 17.0% | 76 | 76.0% | 7 | 7.0% | 100 | 1 | 12.5% | 7 | 87.5% | 0 | 0.0% | 8 | 16 | 17.4% | 69 | 75.0% | 7 | 7.6% | 92 |
| 88 | 36 | 16.0% | 175 | 77.8% | 14 | 6.2% | 225 | 2 | 10.0% | 17 | 85.0% | 1 | 5.0% | 20 | 34 | 16.6% | 158 | 77.1% | 13 | 6.3% | 205 |
| 89 | 39 | 19.5% | 148 | 74.0% | 13 | 6.5% | 200 | 3 | 10.3% | 24 | 82.8% | 2 | 6.9% | 29 | 36 | 21.1% | 124 | 72.5% | 11 | 6.4% | 171 |
| 90 | 22 | 17.6% | 97 | 77.6% | 6 | 4.8% | 125 | 0 | 0.0% | 17 | 94.4% | 1 | 5.6% | 18 | 22 | 20.6% | 80 | 74.8% | 5 | 4.7% | 107 |
| 91 | 39 | 19.5% | 147 | 73.5% | 14 | 7.0% | 200 | 1 | 4.3% | 20 | 87.0% | 2 | 8.7% | 23 | 38 | 21.5% | 127 | 71.8% | 12 | 6.8% | 177 |
| 92 | 45 | 22.5% | 140 | 70.0% | 15 | 7.5% | 200 | 4 | 22.2% | 13 | 72.2% | 1 | 5.6% | 18 | 41 | 22.5% | 127 | 69.8% | 14 | 7.7% | 182 |
| Totals | 1,349 | 19.9% | 5,057 | 74.7% | 361 | 5.3% | 6,767 | 75 | 13.8% | 442 | 81.1% | 28 | 5.1% | 545 | 1,274 | 20.5% | 4,615 | 74.2% | 333 | 5.4% | 6,222 |

* The changes include those deferreds manually returned to the QJW and those deferreds which were pulled over the 15% limit.

U.S. vs. SIEGELMAN, ET AL

ANALYSIS OF RACIAL COMPOSITION
2001 JURY WHEEL

EXHIBIT X
Page 1 of 2

| | pool # | Black | % | White | % | Blank and Unknown | % | American Indian | % | Asian | % | Other | % | Multi-Race | % | Native Hawaiian | % | Total Summons | Total Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 201010601 | 18 | 22.5% | 62 | 77.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 80 | 100.0% |
| 2 | 201010701 | 25 | 20.8% | 94 | 78.3% | 1 | 0.8% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 120 | 100.0% |
| 3 | 201010703 | 34 | 22.7% | 110 | 73.3% | 1 | 0.7% | 3 | 2.0% | 1 | 0.7% | 1 | 0.7% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 4 | 201010802 | 19 | 25.3% | 54 | 72.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.3% | 1 | 1.3% | 0 | 0.0% | 0.0 | 0.0% | 75 | 100.0% |
| 5 | 201010901 | 37 | 26.4% | 102 | 72.9% | 0 | 0.0% | 1 | 0.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 140 | 100.0% |
| 6 | 201010903 | 10 | 12.5% | 69 | 86.3% | 0 | 0.0% | 0 | 0.0% | 1 | 1.3% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 80 | 100.0% |
| 7 | 201011001 | 11 | 13.8% | 68 | 85.0% | 0 | 0.0% | 1 | 1.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 80 | 100.0% |
| 8 | 201011002 | 28 | 20.0% | 107 | 76.4% | 2 | 1.4% | 1 | 0.7% | 1 | 0.7% | 1 | 0.7% | 0 | 0.0% | 0.0 | 0.0% | 140 | 100.0% |
| 9 | 201011103 | 10 | 20.0% | 38 | 76.0% | 2 | 4.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 50 | 100.0% |
| 10 | 201011104 | 16 | 26.7% | 42 | 70.0% | 1 | 1.7% | 1 | 1.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 60 | 100.0% |
| 11 | 201011201 | 29 | 19.3% | 120 | 80.0% | 1 | 0.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 12 | 201020101 | 23 | 21.9% | 78 | 74.3% | 3 | 2.9% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 105 | 100.0% |
| 13 | 201020102 | 31 | 20.7% | 111 | 74.0% | 6 | 4.0% | 1 | 0.7% | 0 | 0.0% | 1 | 0.7% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 14 | 201020202 | 29 | 29.0% | 71 | 71.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 15 | 201020203 | 53 | 26.5% | 143 | 71.5% | 3 | 1.5% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 16 | 201020204 | 10 | 20.0% | 39 | 78.0% | 1 | 2.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 50 | 100.0% |
| 17 | 201020403 | 22 | 22.0% | 70 | 70.0% | 7 | 7.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 18 | 201020405 | 33 | 22.0% | 117 | 78.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 19 | 201020501 | 20 | 20.0% | 76 | 76.0% | 3 | 3.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 20 | 201020502 | 38 | 19.0% | 155 | 77.5% | 5 | 2.5% | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 21 | 201020601 | 17 | 21.3% | 61 | 76.3% | 1 | 1.3% | 1 | 1.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 80 | 100.0% |
| 22 | 201020702 | 36 | 24.0% | 103 | 68.7% | 10 | 6.7% | 1 | 0.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 23 | 201020802 | 21 | 21.0% | 70 | 70.0% | 7 | 7.0% | 0 | 0.0% | 1 | 1.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 24 | 201020803 | 10 | 16.7% | 43 | 71.7% | 7 | 11.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 60 | 100.0% |
| 25 | 201020901 | 33 | 16.5% | 152 | 76.0% | 10 | 5.0% | 0 | 0.0% | 1 | 0.5% | 4 | 2.0% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 26 | 201020903 | 22 | 22.0% | 75 | 75.0% | 2 | 2.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 27 | 201021001 | 17 | 17.0% | 79 | 79.0% | 4 | 4.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 28 | 201021002 | 13 | 12.4% | 77 | 73.3% | 13 | 12.4% | 0 | 0.0% | 1 | 1.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 105 | 100.0% |
| 29 | 201021004 | 58 | 19.3% | 213 | 71.0% | 26 | 8.7% | 1 | 0.3% | 2 | 0.7% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 300 | 100.0% |
| 30 | 201021103 | 23 | 23.0% | 73 | 73.0% | 4 | 4.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 31 | 201021201 | 17 | 17.0% | 78 | 78.0% | 4 | 4.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 32 | 201021202 | 35 | 14.0% | 195 | 78.0% | 14 | 5.6% | 0 | 0.0% | 5 | 2.0% | 1 | 0.4% | 0 | 0.0% | 0.0 | 0.0% | 250 | 100.0% |
| 33 | 201030104 | 17 | 17.0% | 75 | 75.0% | 8 | 8.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 34 | 201030105 | 24 | 19.2% | 94 | 75.2% | 4 | 3.2% | 0 | 0.0% | 0 | 0.0% | 3 | 2.4% | 0 | 0.0% | 0.0 | 0.0% | 125 | 100.0% |
| 35 | 201030106 | 33 | 22.0% | 103 | 68.7% | 10 | 6.7% | 1 | 0.7% | 1 | 0.7% | 2 | 1.3% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 36 | 201030301 | 39 | 19.5% | 149 | 74.5% | 11 | 5.5% | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 37 | 201030302 | 16 | 16.0% | 75 | 75.0% | 7 | 7.0% | 0 | 0.0% | 0 | 0.0% | 2 | 2.0% | 0 | 0.0% | 0.0 | 0.0% | 100 | 100.0% |
| 38 | 201030401 | 13 | 16.3% | 60 | 75.0% | 5 | 6.3% | 0 | 0.0% | 0 | 0.0% | 2 | 2.5% | 0 | 0.0% | 0.0 | 0.0% | 80 | 100.0% |
| 39 | 201030402 | 22 | 36.7% | 36 | 60.0% | 2 | 3.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 60 | 100.0% |
| 40 | 201030501 | 22 | 14.7% | 118 | 78.7% | 8 | 5.3% | 0 | 0.0% | 1 | 0.7% | 1 | 0.7% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 41 | 201030502 | 8 | 10.7% | 61 | 81.3% | 4 | 5.3% | 1 | 1.3% | 1 | 1.3% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 75 | 100.0% |
| 42 | 201030504 | 30 | 20.0% | 107 | 71.3% | 10 | 6.7% | 1 | 0.7% | 1 | 0.7% | 1 | 0.7% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| 43 | 201030601 | 38 | 19.0% | 146 | 73.0% | 15 | 7.5% | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 44 | 201030602 | 24 | 20.0% | 88 | 73.3% | 8 | 6.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 120 | 100.0% |
| 45 | 201030701 | 23 | 18.4% | 89 | 71.2% | 12 | 9.6% | 0 | 0.0% | 1 | 0.8% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 125 | 100.0% |
| 46 | 201030702 | 39 | 19.5% | 148 | 74.0% | 12 | 6.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 47 | 201030801 | 48 | 24.0% | 136 | 68.0% | 13 | 6.5% | 1 | 0.5% | 0 | 0.0% | 2 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 200 | 100.0% |
| 48 | 201030802 | 31 | 20.7% | 106 | 70.7% | 11 | 7.3% | 1 | 0.7% | 0 | 0.0% | 1 | 0.7% | 0 | 0.0% | 0.0 | 0.0% | 150 | 100.0% |
| Totals | | 1,225 | 20.0% | 4,536 | 74.2% | 278 | 4.5% | 18 | 0.3% | 22 | 0.4% | 31 | 0.5% | 0 | 0.0% | 0 | 0.0% | 6,110 | 100.0% |
| Avg per Pool | | 26 | 20.0% | 95 | 74.2% | 6 | 4.5% | 0 | 0.3% | 0 | 0.4% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 127 | 100.0% |

U.S. vs. SIEGELMAN, ET AL

ANALYSIS OF RACIAL COMPOSITION
2001 JURY WHEEL

EXHIBIT X
Page 2 of 2

| | pool # | Black | % | White | % | Blank and Unknown | % | American Indian | % | Asian | % | Other | % | Multi-Race | % | Native Hawaiian | % | Total Summons | Total Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 49 | 201030903 | 20 | 20.0% | 69 | 69.0% | 6 | 6.0% | 4 | 4.0% | 0 | 0.0% | 1 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 50 | 201030904 | 35 | 17.5% | 149 | 74.5% | 10 | 5.0% | 3 | 1.5% | 2 | 1.0% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 51 | 201031001 | 23 | 22.8% | 71 | 70.3% | 7 | 6.9% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 101 | 100.0% |
| 52 | 201031002 | 35 | 17.5% | 150 | 75.0% | 14 | 7.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 53 | 201031101 | 13 | 21.7% | 44 | 73.3% | 2 | 3.3% | 0 | 0.0% | 1 | 1.7% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 54 | 201031102 | 8 | 13.6% | 49 | 83.1% | 1 | 1.7% | 0 | 0.0% | 1 | 1.7% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 59 | 100.0% |
| 55 | 201031202 | 41 | 20.3% | 149 | 73.8% | 9 | 4.5% | 0 | 0.0% | 2 | 1.0% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 202 | 100.0% |
| 56 | 201031204 | 14 | 13.3% | 86 | 81.9% | 4 | 3.8% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 105 | 100.0% |
| 57 | 201040102 | 53 | 26.5% | 141 | 70.5% | 4 | 2.0% | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 58 | 201040104 | 24 | 24.0% | 75 | 75.0% | 1 | 1.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 59 | 201040107 | 39 | 19.5% | 153 | 76.5% | 3 | 1.5% | 4 | 2.0% | 0 | 0.0% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 60 | 201040201 | 35 | 17.5% | 160 | 80.0% | 3 | 1.5% | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 61 | 201040303 | 20 | 20.0% | 76 | 76.0% | 2 | 2.0% | 0 | 0.0% | 1 | 1.0% | 1 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 62 | 201040304 | 40 | 20.0% | 157 | 78.5% | 2 | 1.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1.0 | 0.5% | 0 | 0.0% | 200 | 100.0% |
| 63 | 201040404 | 40 | 20.0% | 153 | 76.5% | 4 | 2.0% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 1.0 | 0.5% | 1.0 | 0.5% | 200 | 100.0% |
| 64 | 201040501 | 13 | 13.0% | 84 | 84.0% | 1 | 1.0% | 0 | 0.0% | 0 | 0.0% | 2 | 2.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 65 | 201040601 | 36 | 18.0% | 151 | 75.5% | 7 | 3.5% | 2 | 1.0% | 2 | 1.0% | 2 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 66 | 201040602 | 16 | 26.7% | 43 | 71.7% | 1 | 1.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 67 | 201040604 | 24 | 24.0% | 73 | 73.0% | 1 | 1.0% | 0 | 0.0% | 1 | 1.0% | 1 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 68 | 201040701 | 41 | 20.5% | 154 | 77.0% | 4 | 2.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 69 | 201040702 | 24 | 16.0% | 117 | 78.0% | 5 | 3.3% | 0 | 0.0% | 1 | 0.7% | 3 | 2.0% | 0.0 | 0.0% | 0 | 0.0% | 150 | 100.0% |
| 70 | 201040801 | 45 | 22.5% | 144 | 72.0% | 4 | 2.0% | 1 | 0.5% | 1 | 0.5% | 4 | 2.0% | 1.0 | 0.5% | 0 | 0.0% | 200 | 100.0% |
| 71 | 201040901 | 40 | 18.2% | 166 | 75.5% | 11 | 5.0% | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 220 | 100.0% |
| 72 | 201040902 | 26 | 26.0% | 71 | 71.0% | 2 | 2.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 73 | 201041001 | 55 | 22.0% | 173 | 69.2% | 14 | 5.6% | 0 | 0.0% | 2 | 0.8% | 3 | 1.2% | 3.0 | 1.2% | 0 | 0.0% | 250 | 100.0% |
| 74 | 201041103 | 21 | 14.0% | 119 | 79.3% | 8 | 5.3% | 0 | 0.0% | 1 | 0.7% | 1 | 0.7% | 0.0 | 0.0% | 0 | 0.0% | 150 | 100.0% |
| 75 | 201041104 | 16 | 16.0% | 81 | 81.0% | 2 | 2.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 76 | 201041201 | 39 | 19.4% | 155 | 77.1% | 4 | 2.0% | 1 | 0.5% | 0 | 0.0% | 1 | 0.5% | 1.0 | 0.5% | 0 | 0.0% | 201 | 100.0% |
| 77 | 201050101 | 14 | 23.3% | 42 | 70.0% | 3 | 5.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.7% | 0.0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 78 | 201050102 | 41 | 20.5% | 141 | 70.5% | 13 | 6.5% | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 2.0 | 1.0% | 0 | 0.0% | 200 | 100.0% |
| 79 | 201050106 | 24 | 24.0% | 70 | 70.0% | 5 | 5.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 80 | 201050106 | 40 | 26.7% | 104 | 69.3% | 6 | 4.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 150 | 100.0% |
| 81 | 201050108 | 39 | 19.5% | 151 | 75.5% | 7 | 3.5% | 0 | 0.0% | 1 | 0.5% | 1 | 0.5% | 1.0 | 0.5% | 0 | 0.0% | 200 | 100.0% |
| 82 | 201050301 | 47 | 23.5% | 142 | 71.0% | 8 | 4.0% | 0 | 0.0% | 2 | 1.0% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 83 | 201050302 | 35 | 23.3% | 101 | 67.3% | 11 | 7.3% | 0 | 0.0% | 1 | 0.7% | 1 | 0.7% | 1.0 | 0.7% | 0 | 0.0% | 150 | 100.0% |
| 84 | 201050305 | 16 | 16.0% | 75 | 75.0% | 8 | 8.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 85 | 201050403 | 43 | 21.5% | 152 | 76.0% | 4 | 2.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 86 | 201050501 | 36 | 18.0% | 152 | 76.0% | 10 | 5.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0.0 | 0.0% | 1.0 | 0.5% | 200 | 100.0% |
| 87 | 201050502 | 17 | 17.0% | 76 | 76.0% | 6 | 6.0% | 0 | 0.0% | 1 | 1.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 88 | 201050601 | 36 | 16.0% | 175 | 77.8% | 14 | 6.2% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0.0 | 0.0% | 0 | 0.0% | 225 | 100.0% |
| 89 | 201050602 | 39 | 19.5% | 148 | 74.0% | 8 | 4.0% | 1 | 0.5% | 3 | 1.5% | 0 | 0.0% | 1.0 | 0.5% | 0 | 0.0% | 200 | 100.0% |
| 90 | 201050701 | 22 | 17.6% | 97 | 77.6% | 3 | 2.4% | 1 | 0.8% | 0 | 0.0% | 2 | 1.6% | 0.0 | 0.0% | 0 | 0.0% | 125 | 100.0% |
| 91 | 201050801 | 39 | 19.5% | 147 | 73.5% | 12 | 6.0% | 0 | 0.0% | 1 | 0.5% | 1 | 0.5% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 92 | 201050806 | 45 | 22.5% | 140 | 70.0% | 10 | 5.0% | 1 | 0.5% | 2 | 1.0% | 2 | 1.0% | 0.0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| Totals | | 1,369 | 19.9% | 5,126 | 74.6% | 264 | 3.8% | 24 | 0.3% | 36 | 0.5% | 35 | 0.5% | 12 | 0.2% | 2 | 0.0% | 6,868 | 100.0% |
| Average per Pool | | 31 | 19.9% | 117 | 74.6% | 6 | 3.8% | 1 | 0.3% | 1 | 0.5% | 1 | 0.5% | 0 | 0.2% | 0 | 0.0% | 156 | 100.0% |

U.S. vs. SIEGELMAN, et al.                                    EXHIBIT XI
ANALYSIS OF DEFERRED GROUPING

| Pool Number | Total in Pool | Pool Selection Report #s effected | type of effect | Number in Grouping | Not from Deferred Maintenance to this pool | Net Group Total | Notes |
|---|---|---|---|---|---|---|---|
| 201020101 | 105 | 100-102 | all H | 3 | (3) | 0 | |
| 201020102 | 150 | 5-7 | all NP | 3 | 0 | 3 | |
| | | 18-20 | 1 H; 2 NP | 3 | (1) | 2 | |
| | | 34-36 | all H | 3 | (3) | 0 | |
| | | 41-45 | all H | 5 | (5) | 0 | |
| | | 144-148 | 3 H; 2 NP | 5 | (3) | 2 | |
| 201020502 | 200 | 47-49 | all H | 3 | (3) | 0 | |
| | | 78-81 | 3 H; 1 NP | 4 | (3) | 1 | |
| | | 153-155 | all H | 3 | (3) | 0 | |
| | | 195-197 | all NP | 3 | 0 | 3 | |
| 201021004 | 300 | 28-30 | 2 H; 1 NP | 3 | (2) | 1 | |
| | | 44-47 | 3 H; 1 NP | 4 | (3) | 1 | |
| | | 111-113 | all H | 3 | (3) | 0 | |
| | | 142-144 | 2 H; 1 NP | 3 | (2) | 1 | |
| | | 151-154 | 3 H; 1 NP | 4 | (3) | 1 | |
| | | 184-186 | 1 H; 2 NP | 3 | (1) | 2 | |
| | | 200-210 | all NP | 11 | 0 | 11 | pool w/multiple pulls |
| 201030104 | 100 | 56-58 | 2 H; 1 NP | 3 | (2) | 1 | |
| | | 97-100 | all NP | 4 | 0 | 4 | |
| 201040404 | 200 | 11-14 | 2 H; 2 NP | 4 | (2) | 2 | |
| | | 26-28 | 2 H; 1 NP | 3 | (2) | 1 | |
| | | 198-200 | all NP | 3 | 0 | 3 | |
| 201040604 | 100 | 1-3 | all RM | 3 | 0 | 3 | Siegelman GJ |
| | | 25-27 | all H | 3 | (3) | 0 | |
| | | 57-59 | 2 H; 1 NP | 3 | (2) | 1 | |
| 201040901 | 220 | 90-93 | 3 H; 1 NP | 4 | (3) | 1 | |
| | | 103-105 | 1 H; 2 RM | 3 | (1) | 2 | |
| | | 118-130 | 12 NP; 1 RM | 13 | 0 | 13 | pool w/multiple pulls |
| 201041201 | 201 | 4-6 | 1 H; 2 NP | 3 | (1) | 2 | |
| | | 195-201 | 1 H; 4 NP; 2 RM | 7 | (1) | 6 | |
| 201050601 | 225 | 1-3 | 2 H; 1 NP | 3 | (2) | 1 | |
| | | 5-10 | 2 H; 4 NP | 6 | (2) | 4 | net # not in consecutive order on PSR |
| | | 26-29 | all NP | 4 | 0 | 4 | |
| | | 76-78 | 2 H; 1 NP | 3 | (2) | 1 | |
| | | 112-114 | 1 H; 2 NP | 3 | (1) | 2 | |
| | | 135-137 | 1 H; 2 NP | 3 | (1) | 2 | |
| | | 150-161 | all NP | 12 | 0 | 12 | pool w/multiple pulls |

Key:
H = past deferral in participant history
NP = add to new pool; from deferred maintenance to pool
RM = returned manually to QJW before this pool

U.S. vs. SIEGELMAN, et al.                                    EXHIBIT XII
ANALYSIS OF EXCESS DEFERREDS
FOR GRAND JURY POOLS

| Pool Number | Total Summons | Total Deferred | | Total Deferred After Adjustments | | 15% | | Excess Deferreds Over 15% | |
|---|---|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % | # | % |
| 201011103 | 50 | 0 | 0.00% | 0 | 0.00% | 8 | 15.00% | (8) | -15.00% |
| 201020803 | 60 | 4 | 6.67% | 4 | 6.67% | 9 | 15.00% | (5) | -8.33% |
| 201030405 | 60 | 4 | 6.67% | 4 | 6.67% | 9 | 15.00% | (5) | -8.33% |
| 201031102 | 60 | 5 | 8.33% | 4 | 6.67% | 9 | 15.00% | (5) | -8.33% |
| 201040602 | 60 | 15 | 25.00% | 11 | 18.33% | 9 | 15.00% | 2 | 3.33% |
| 201040604 | 100 | 21 | 21.00% | 17 | 17.00% | 15 | 15.00% | 2 | 2.00% |
| 201050101 | 60 | 9 | 15.00% | 7 | 11.67% | 9 | 15.00% | (2) | -3.33% |
| Totals | 450 | 58 | 12.89% | 47 | 10.44% | 68 | 15.00% | (21) | -4.56% |

U.S. vs. SIEGELMAN, et al.                                    EXHIBIT XIII
ANALYSIS OF RACIAL MIX FOR GRAND JURY POOLS

| pool # | Black | % | White | % | Blank and Unknown | % | American Indian | % | Asian | % | Other | % | Total Summons | Total Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201011103 | 10 | 20.0% | 38 | 76.0% | 2 | 4.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 50 | 100.0% |
| 201020803 | 10 | 16.7% | 43 | 71.7% | 7 | 11.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 201030405 | 22 | 36.7% | 36 | 60.0% | 2 | 3.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 201031102 | 8 | 13.6% | 49 | 83.1% | 1 | 1.7% | 0 | 0.0% | 1 | 1.7% | 0 | 0.0% | 59 | 100.0% |
| 201040602 | 16 | 26.7% | 43 | 71.7% | 1 | 1.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 201040604 | 24 | 24.0% | 73 | 73.0% | 1 | 1.0% | 1 | 1.0% | 0 | 0.0% | 1 | 1.0% | 100 | 100.0% |
| 201050101 | 14 | 23.3% | 42 | 70.0% | 3 | 5.0% | 0 | 0.0% | 1 | 1.7% | 0 | 0.0% | 60 | 100.0% |
| Totals | 104 | 23.2% | 324 | 72.2% | 17 | 3.8% | 1 | 0.2% | 2 | 0.4% | 1 | 0.2% | 449 | 100.0% |
| Average per Pool | 15 | 23.2% | 46 | 72.2% | 2 | 3.8% | 0 | 0.2% | 0 | 0.4% | 0 | 0.2% | 64 | 100.0% |

U.S. vs. SIEGELMAN, et al.                    EXHIBIT XIV
ANALYSIS OF DEFERREDS
FOR 2005 WHEEL POOLS

| Pool Number | Total Summons | Total Deferred | | 15% | | Deferred under 15% | |
|---|---|---|---|---|---|---|---|
| | | # | % | # | % | # | % |
| 201050902 | 125 | 0 | 0.00% | 19 | 15.00% | (19) | -15.00% |
| 201051001 | 200 | 2 | 1.00% | 30 | 15.00% | (28) | -14.00% |
| 201051101 | 200 | 7 | 3.50% | 30 | 15.00% | (23) | -11.50% |
| 201051103 | 125 | 7 | 5.60% | 19 | 15.00% | (12) | -9.40% |
| 201051202 | 200 | 1 | 0.50% | 30 | 15.00% | (29) | -14.50% |
| 201051203 | 60 | 4 | 6.67% | 9 | 15.00% | (5) | -8.33% |
| 201060104 | 200 | 17 | 8.50% | 30 | 15.00% | (13) | -6.50% |
| 201060105 | 60 | 2 | 3.33% | 9 | 15.00% | (7) | -11.67% |
| 201060201 | 250 | 23 | 9.20% | 38 | 15.00% | (15) | -5.80% |
| 201060303 | 100 | 3 | 3.00% | 15 | 15.00% | (12) | -12.00% |
| 201060304 | 200 | 11 | 5.50% | 30 | 15.00% | (19) | -9.50% |
| 201060402 | 200 | 19 | 9.50% | 30 | 15.00% | (11) | -5.50% |
| 201060403 | 300 | 28 | 9.33% | 45 | 15.00% | (17) | -5.67% |
| Totals | 2,220 | 124 | 5.59% | 333 | 15.00% | (209) | -9.41% |

U.S. vs. SIEGELMAN, et al.                    EXHIBIT XV

ANALYSIS OF RACIAL MIX FOR 2005 WHEEL POOLS

| Pool # | Black | % | White | % | Blank and Unknown | % | American Indian | % | Asian | % | Other | % | Multi-Race | % | Total Summons | Total Percentage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 201050902 | 25 | 20.0% | 97 | 77.6% | 1 | 0.8% | 0 | 0.0% | 1 | 0.8% | 1 | 0.8% | 0 | 0.0% | 125 | 100.0% |
| 201051001 | 33 | 16.5% | 164 | 82.0% | 2 | 1.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 201051101 | 42 | 21.0% | 151 | 75.5% | 0 | 0.0% | 1 | 0.5% | 2 | 1.0% | 0 | 0.0% | 4 | 2.0% | 200 | 100.0% |
| 201051103 | 22 | 17.6% | 101 | 80.8% | 2 | 1.6% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 125 | 100.0% |
| 201051202 | 42 | 21.0% | 157 | 78.5% | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 200 | 100.0% |
| 201051203 | 17 | 28.3% | 41 | 68.3% | 0 | 0.0% | 2 | 3.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 60 | 100.0% |
| 201060104 | 38 | 19.0% | 154 | 77.0% | 2 | 1.0% | 0 | 0.0% | 2 | 1.0% | 3 | 1.5% | 1 | 0.5% | 200 | 100.0% |
| 201060105 | 21 | 35.0% | 36 | 60.0% | 2 | 3.3% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 1.7% | 60 | 100.0% |
| 201060201 | 55 | 22.0% | 185 | 74.0% | 5 | 2.0% | 2 | 0.8% | 1 | 0.4% | 0 | 0.0% | 2 | 0.8% | 250 | 100.0% |
| 201060303 | 22 | 22.0% | 74 | 74.0% | 4 | 4.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 100 | 100.0% |
| 201060304 | 33 | 16.5% | 157 | 78.5% | 4 | 2.0% | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 3 | 1.5% | 200 | 100.0% |
| 201060402 | 45 | 22.5% | 148 | 74.0% | 3 | 1.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 4 | 2.0% | 200 | 100.0% |
| 201060403 | 57 | 19.0% | 228 | 76.0% | 11 | 3.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 4 | 1.3% | 300 | 100.0% |
| Totals | 452 | 20.4% | 1,693 | 76.3% | 36 | 1.6% | 6 | 0.3% | 9 | 0.4% | 5 | 0.2% | 19 | 0.9% | 2,220 | 100.0% |
| Average per Pool | 35 | 20.4% | 130 | 76.3% | 3 | 1.6% | 0 | 0.3% | 1 | 0.4% | 0 | 0.2% | 1 | 0.9% | 171 | 100.0% |

U.S. vs. SIEGELMAN, et al.                                                EXHIBIT XVI
ANALYSIS OF GUNDLACH CHANGED METHODOLOGY

| Pool Number | | Gundlach Total Summons | Gundlach First Chart | Gundlach Revised Chart | Gundlach Supplemental Chart | Comparison of Revised vs. Supplemental |
|---|---|---|---|---|---|---|
| 49 | 201030903 | 100 | 25.00% | 25.00% | 25.00% | 0.00% |
| 50 | 201030904 | 200 | 22.50% | 22.50% | 22.50% | 0.00% |
| 51 | 201031001 | 101 | 24.00% | 24.00% | 24.75% | 0.75% |
| 52 | 201031002 | 200 | 20.50% | 20.50% | 20.50% | 0.00% |
| 53 | 201031101 | 60 | 21.50% | 25.00% | 36.00% | 11.00% |
| 54 | 201031102 | 60 | 8.50% | 9.50% | 23.00% | 13.50% |
| 55 | 201031202 | 202 | 20.50% | 21.00% | 41.00% | 20.00% |
| 56 | 201031205 | 105 | 14.50% | 15.50% | 37.00% | 21.50% |
| 57 | 201040102 | 200 | 14.50% | 18.00% | 37.50% | 19.50% |
| 58 | 201040104 | 100 | 13.00% | 17.00% | 38.00% | 21.00% |
| 59 | 201040107 | 200 | 11.50% | 12.50% | 38.00% | 25.50% |
| 60 | 201040201 | 200 | 13.50% | 15.50% | 25.00% | 9.50% |
| 61 | 201040303 | 100 | 13.00% | 14.00% | 27.00% | 13.00% |
| 62 | 201040304 | 200 | 11.50% | 12.50% | 25.00% | 12.50% |
| 63 | 201040404 | 199 | 11.00% | 12.75% | 25.00% | 12.25% |
| 64 | 201040501 | 100 | 19.00% | 19.00% | 27.00% | 8.00% |
| 65 | 201040601 | 200 | 20.00% | 22.00% | 32.00% | 10.00% |
| 66 | 201040602 | 60 | 18.50% | 25.00% | 29.00% | 4.00% |
| 67 | 201040604 | 100 | 17.00% | 21.00% | 34.00% | 13.00% |
| 68 | 201040701 | 200 | 18.00% | 21.00% | 32.50% | 11.50% |
| 69 | 201040702 | 150 | 21.50% | 26.50% | 35.00% | 8.50% |
| 70 | 201040801 | 200 | 17.00% | 19.50% | 37.00% | 17.50% |
| 71 | 201040901 | 220 | 16.00% | 18.50% | 35.50% | 17.00% |
| 72 | 201040902 | 100 | 19.00% | 25.00% | 39.00% | 14.00% |
| 73 | 201041001 | 250 | 18.00% | 21.00% | 40.00% | 19.00% |
| 74 | 201041103 | 150 | 16.00% | 18.00% | 34.00% | 16.00% |
| 75 | 201041104 | 100 | 18.00% | 18.50% | 36.00% | 17.50% |
| 76 | 201041201 | 201 | 15.00% | 17.50% | 39.50% | 22.00% |
| 77 | 201050101 | 60 | 11.50% | 15.00% | 39.00% | 24.00% |
| 78 | 201050102 | 200 | 14.00% | 17.50% | 32.50% | 15.00% |
| 79 | 201050105 | 100 | 14.00% | 15.00% | 29.00% | 14.00% |
| 80 | 201050106 | 150 | 12.50% | 14.00% | 35.00% | 21.00% |
| 81 | 201050108 | 200 | 14.00% | 18.00% | 33.50% | 15.50% |
| 82 | 201050301 | 200 | 13.50% | 17.00% | 30.00% | 13.00% |
| 83 | 201050302 | 150 | 12.50% | 15.00% | 28.00% | 13.00% |
| 84 | 201050305 | 100 | 16.00% | 18.00% | 39.00% | 21.00% |
| 85 | 201050403 | 200 | 17.50% | 19.50% | 39.00% | 19.50% |
| 86 | 201050501 | 200 | 20.00% | 26.50% | 41.00% | 14.50% |
| 87 | 201050502 | 100 | 20.00% | 22.00% | 37.00% | 15.00% |
| 88 | 201050601 | 225 | 24.00% | 26.50% | 42.00% | 15.50% |
| 89 | 201050602 | 200 | 29.00% | 32.50% | 45.00% | 12.50% |
| 90 | 201050701 | 125 | 29.00% | 35.00% | 44.00% | 9.00% |
| 91 | 201050801 | 200 | 26.00% | 29.00% | 43.00% | 14.00% |
| 92 | 201050806 | 200 | 20.00% | 25.00% | 41.50% | 16.50% |

# EXHIBIT B

**U.S. vs. SIEGELMAN, et al.**

**ANALYSIS OF DEFERRED and EXCUSED JURORS**
**2001 JURY WHEEL**

| Pool Number | | Total Summons | DEFERRED JURORS | | | EXCUSED JURORS | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | SS&B Total w/ Deferred in History | Gundlach Total w/ Deferred in History | Difference | SS&B Total w/ Excused in History | SS&B Actual Excused after Adjustments | Gundlach Excused | Difference |
| 49 | 201030903 | 100 | 25 | 25 | 0 | 0 | 0 | 0 | 0 |
| 50 | 201030904 | 200 | 45 | 45 | 0 | 1 | 0 | 0 | 0 |
| 51 | 201031001 | 101 | 25 | 25 | 0 | 0 | 0 | 0 | 0 |
| 52 | 201031002 | 200 | 41 | 41 | 0 | 0 | 0 | 0 | 0 |
| 53 | 201031101 | 60 | 13 | 15 | 2 | 9 | 8 | 8 | 0 |
| 54 | 201031102 | 60 | 4 | 5 | 1 | 10 | 10 | 10 | 0 |
| 55 | 201031202 | 202 | 42 | 43 | 1 | 42 | 38 | 40 | 2 |
| 56 | 201031205 | 105 | 14 | 16 | 2 | 24 | 23 | 23 | 0 |
| 57 | 201040102 | 200 | 29 | 36 | 7 | 46 | 40 | 40 | 0 |
| 58 | 201040104 | 100 | 13 | 17 | 4 | 25 | 22 | 23 | 1 |
| 59 | 201040107 | 200 | 23 | 25 | 2 | 54 | 52 | 53 | 1 |
| 60 | 201040201 | 200 | 27 | 32 | 5 | 25 | 21 | 21 | 0 |
| 61 | 201040303 | 100 | 13 | 14 | 1 | 14 | 13 | 13 | 0 |
| 62 | 201040304 | 200 | 23 | 25 | 2 | 29 | 27 | 28 | 1 |
| 63 | 201040404 | 199 | 22 | 26 | 4 | 31 | 27 | 27 | 0 |
| 64 | 201040501 | 100 | 19 | 19 | 0 | 10 | 8 | 8 | 0 |
| 65 | 201040601 | 200 | 41 | 44 | 3 | 26 | 23 | 23 | 0 |
| 66 | 201040602 | 60 | 11 | 15 | 4 | 7 | 5 | 5 | 0 |
| 67 | 201040604 | 100 | 17 | 21 | 4 | 16 | 13 | 14 | 1 |
| 68 | 201040701 | 200 | 36 | 42 | 6 | 31 | 26 | 26 | 0 |
| 69 | 201040702 | 150 | 33 | 40 | 7 | 21 | 16 | 17 | 1 |
| 70 | 201040801 | 200 | 35 | 39 | 4 | 43 | 34 | 38 | 4 |
| 71 | 201040901 | 220 | 35 | 41 | 6 | 45 | 39 | 40 | 1 |
| 72 | 201040902 | 100 | 19 | 25 | 6 | 22 | 18 | 19 | 1 |
| 73 | 201041001 | 250 | 45 | 54 | 9 | 60 | 53 | 53 | 0 |
| 74 | 201041103 | 150 | 24 | 27 | 3 | 28 | 23 | 24 | 1 |
| 75 | 201041104 | 100 | 18 | 19 | 1 | 19 | 18 | 18 | 0 |
| 76 | 201041201 | 201 | 30 | 35 | 5 | 53 | 48 | 50 | 2 |
| 77 | 201050101 | 60 | 7 | 9 | 2 | 20 | 15 | 16 | 1 |
| 78 | 201050102 | 200 | 28 | 35 | 7 | 38 | 31 | 34 | 3 |
| 79 | 201050105 | 100 | 15 | 15 | 0 | 17 | 15 | 16 | 1 |
| 80 | 201050106 | 150 | 19 | 21 | 2 | 38 | 31 | 34 | 3 |
| 81 | 201050108 | 200 | 28 | 36 | 8 | 46 | 36 | 36 | 0 |
| 82 | 201050301 | 200 | 27 | 34 | 7 | 36 | 32 | 32 | 0 |
| 83 | 201050302 | 150 | 19 | 22 | 3 | 27 | 22 | 23 | 1 |
| 84 | 201050305 | 100 | 16 | 18 | 2 | 24 | 22 | 23 | 1 |
| 85 | 201050403 | 200 | 34 | 39 | 5 | 47 | 43 | 45 | 2 |
| 86 | 201050501 | 200 | 41 | 53 | 12 | 52 | 39 | 39 | 0 |
| 87 | 201050502 | 100 | 21 | 22 | 1 | 19 | 18 | 18 | 0 |
| 88 | 201050601 | 225 | 54 | 60 | 6 | 47 | 36 | 39 | 3 |
| 89 | 201050602 | 200 | 60 | 66 | 6 | 46 | 34 | 36 | 2 |
| 90 | 201050701 | 125 | 37 | 44 | 7 | 24 | 18 | 18 | 0 |
| 91 | 201050801 | 200 | 53 | 59 | 6 | 41 | 30 | 34 | 4 |
| 92 | 201050806 | 200 | 40 | 50 | 10 | 49 | 40 | 43 | 3 |
| | | | 1,221 | 1,394 | 173 | 1,262 | 1,067 | 1,107 | 40 |

Excused differences

| Pool | # | participants in question | reason why they shouldn't be counted |
|------|---|--------------------------|--------------------------------------|
| 55 | 201031202 | 100100175<br>100098356 | excuse deleted; served<br>excuse deleted |
| 58 | 201040104 | 100060471 | excuse deleted; served |
| 59 | 201040107 | 100109178 | excuse denied |
| 62 | 201040304 | 100049939 | excuse deleted; served |
| 67 | 201040604 | 100083597 | excuse deleted |
| 69 | 201040702 | 100046480 | excuse deleted |
| 70 | 201040801 | 100056091<br>100021061<br>100083388<br>100022794 | excuse deleted<br>excuse deleted; served<br>excuse deleted; served<br>excuse denied |
| 71 | 201040901 | 100079321 | excuse denied |
| 72 | 201040902 | 100075218 | excuse deleted; served |
| 74 | 201041103 | 100040718 | served |
| 76 | 201041201 | 100023264<br>100073041 | excuse deleted<br>served |
| 77 | 201050101 | 100080873 | excuse deleted; served |
| 78 | 201050102 | 100089114<br>100068928<br>100068202 | excuse deleted; served<br>excuse deleted; served<br>excuse deleted; served |
| 79 | 201050105 | 100079669 | excuse deleted; served |
| 80 | 201050106 | 100074270<br>100044870<br>100034139 | excuse denied<br>excuse deleted; served<br>excuse deleted |
| 83 | 201050302 | 100058467 | excuse deleted; served |
| 84 | 201050305 | 100087406 | excuse deleted; served |
| 85 | 201050403 | 100038935<br>100036278 | excuse deleted<br>excuse deleted |
| 88 | 201050601 | 100092722<br>100050623 | excuse deleted; served<br>excuse denied |

|     |           | 100096150 | excuse deleted; served |
|-----|-----------|-----------|------------------------|
| 89  | 201050602 | 100041723 | excuse deleted; served |
|     |           | 100059844 | excuse deleted; served |
| 91  | 201050801 | 100039899 | excuse deleted; served |
|     |           | 100063892 | excuse deleted |
|     |           | 100105145 | excuse deleted |
|     |           | 100080867 | excuse deleted |
| 92  | 201050806 | 100105366 | excuse denied; served |
|     |           | 100065235 | excuse denied; served |
|     |           | 100105402 | served |