IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 2:05-cr-119-MEF |
| | * | |
| PAUL MICHAEL HAMRICK | * | |

MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT
TO FED. R. CRIM. P. 29 ON COUNTS
ONE, TWO, AND TEN THROUGH FOURTEEN:
THE HONEST GOVERNMENTAL SERVICES CHARGES

The prosecution's proof failed, and the Court cannot submit the honest governmental services charges to the jury unless it invents a new crime. No federal court – in the Eleventh Circuit or anywhere else (including the First Circuit) – holds the evidence here to be an honest services violation. The Court should acquit Mr. Hamrick on the honest services charges in Counts One, Two, and Ten through Fourteen (including the aiding and abetting charges and the supposed charge that he deprived the public of Governor Siegelman's honest governmental services).

There should be no mistake about what the prosecution is asking the Court to do. It is asking the Court to declare the acts its witnesses testified Mr. Hamrick did – which were not the acts charged in the second superseding indictment – to be federal mail and wire fraud. The prosecution has not alleged that these supposed acts violated *any* specific federal or state law or even ethics regulation governing the conduct of public officials. The prosecution nevertheless is asking the Court to declare the conduct to be federal mail and wire fraud five-plus years after it happened. It would raise grave questions of due process for this Court to do so now.[1]

---

[1] It is important to note that the prosecution's proof failed, despite the manner in which it developed the factual record. The prosecution routinely resorted to leading questions, questions

# I. OVERVIEW

The evidence established that Mr. Hamrick did not do four of the five charged "honest governmental services" acts.  If he did the fifth one, he did it as a private citizen.  Private citizens do not owe the State or the public a duty to render honest governmental services.[2]

Mr. Hamrick would be entitled to acquittal even if he had done any of the acts as a public official.  In the Eleventh Circuit, a public official must take a bribe or conceal a material conflict of interest to commit honest services fraud.  There is no evidence -- and the prosecution does not contend -- that Mr. Hamrick did so.

In pretrial filings, the prosecution urged the Court to adopt the First Circuit's honest governmental services standard.  It argued that the First Circuit permits honest services charges not based on bribes or the concealment of a conflict of interest.  The First Circuit standard is incorrect, and the Court should not adopt it.  But it does not matter in this case, because the prosecution's evidence did not meet the First Circuit standard either.  To meet that standard, the prosecution had to show that Mr. Hamrick intended to do more than cultivate a political friendship with Mr. Young.  It had to show that he intended to alter an official act.  The prosecution also had to show Mr. Hamrick intended to deceive the public regarding the charged

---

lacking proper foundation, and other improper questions, and still offered six weeks of confused, contradictory testimony.  There should be serious questions about whether Mr. Bailey and Mr. Young could have rendered even the testimony they gave – which was insufficient – had they been asked proper questions.

[2] It is important to remember that this is an honest governmental services case.  That is, the second superseding indictment charges Mr. Hamrick with violation of a duty to render honest *governmental* services to the public, as opposed to a duty to render honest *commercial* services to a private company or to a state government entity.  The Eleventh Circuit drew a clear distinction between these two kinds of honest services cases in *United States v. deVegter*, 198 F.3d 1324, 1328-30 (11th Cir. 1999).

acts.  The prosecution offered no evidence on either point.

There likewise was no evidence to support a charge that Mr. Hamrick deprived the State or the public of Governor Siegelman's honest services or that he aided and abetted any violation of law by anyone.

## II.  THE CHARGES AND THE EVIDENCE

The second superseding indictment charged that, in order to "assist [Mr. Young] and endeavor to enrich him," Mr. Hamrick used his "official power, action, and influence":

- "[B]etween August 1997 and September 1997," by "[i]nfluencing passage of legislation allowing sale of alcoholic beverages each day of the week, including Sunday, at a motor speedway"

- "[B]etween 11/3/98 and 1/31/99," by "[i]nfluencing the Cherokee County Commission in favor of Clayton 'Lanny' Young's business interests"

- "[B]etween July 1998 and 7/15/99," by "[i]nfluencing a waste disposal business represented by Clayton 'Lanny' Young to continue paying for his services, and influencing regulation of waste disposal fees and taxes at a facility at Emelle, AL"

- "[B]etween 7/1/00 and 11/2/00," by "[i]nfluencing the *de facto* Director of the Alabama Development Office to advance a business represented by Clayton 'Lanny' Young on the list of the companies eligible for industrial tax-free bond issues"

- "[B]etween September 2001 and May 2001," by "[i]nfluencing the award of a construction management contract to a company controlled by Clayton 'Lanny' Young to build warehouses for the Alabama Department of Economic and Community Affairs and the State of Alabama Alcoholic Beverage Control Board."

*Second Superseding Indictment* ¶ 30(g).

## A.  Acts Not Committed

### 1.  Talladega Motor Speedway

There was no evidence that Mr. Hamrick "influence[ed]" the passage of the alcohol sales

3

legislation in order to assist Mr. Young.

### a. Mr. Bailey

Mr. Bailey testified as follows on direct examination:

> Q.  Did Paul Hamrick ever tell you that he knew why Lanny wanted this legislation passed?
>
> A.  Only that Lanny wanted credit for the legislation passing.
>
> Q.  Okay.  And did he tell you – Paul Hamrick tell you who Lanny wanted credit with for the legislation passing?
>
> A.  Associates of the track in Talladega.
>
> Q.  Now, did you have conversations yourself with Lanny about that?
>
> A.  Yes.
>
> Q.  And what, if anything, did Lanny tell you about why he wanted that legislation passed?
>
> A.  He wanted credit with representatives of the track after the legislation passed.
>
> Q.  Now, did there ever come a time when you were in the presence of any members of the track along with Lieutenant Governor Don Siegelman?
>
> A.  Yes.
>
> Q.  And did there come a time when you were in the presence of members of the track with Lieutenant Governor Siegelman when the subject of the Talladega Superspeedway beer legislation came up?
>
> A.  Yes.  And the Governor gave Lanny credit.

*Nick Bailey Direct Testimony*, *May 2, 2006* 34/19 – 35/20.

Mr. Bailey testified as follows on cross-examination:

4

Q.  I thought you told us a couple of days ago Lanny wanted there to be alcohol sales at Talladega on Sunday.

A.  Lanny wanted credit for alcohol sales –

Q.  And because he wanted it –

A.   – at Talladega.

Q.  Because he wanted it, your little conspiracy made sure it got done.  Isn't that what you told us just two days ago?

A.  Lanny wanted it done.

Q.  Okay.  Lanny wanted it done.  And so he said, I wish I could have me a cold one at – at Talladega on Sundays; and – and the Governor says, Lanny, we'll take care of that for you?

MR. FEAGA: Your Honor, we're going to object to him arguing with the witness.  He's asked – answered the question about whether Lanny wanted a beer or whether he wanted the legislation passed.  The witness has answered it.  We object.

MR. DEEN: Okay.  I'll move on to another question.  He's answered that one.

Q.  The – so it wasn't that he cared about having a cold drink of beer or whiskey at Talladega on Sundays.  What he just wanted to do was be able to take credit for it?

A.  That was my understanding, Mr. Deen.

*Nick Bailey Testimony on Cross-Examination*, *May 4, 2006* 173/7 – 175/20.  Mr. Bailey added:

Q.  Okay.  And the whole purpose of that grand plan of the conspiracy was for Lanny to be able to take credit for this being done, right?

A.  Yes, sir.

*Id.* 181/20 – 182/1.

Mr. Bailey did not say that Mr. Hamrick gave Mr. Young credit for the legislation.  He

said that Mr. Hamrick, as the Lieutenant Governor's chief of staff, worked on passing the

legislation because "[i]t was on [Lieutenant Governor Siegelman's] agenda to have beer sales

passed for Talladega." *Id.* 177/2-12.[3]  He said "[i]t wasn't a secret around our office, Mr. Deen,

that it was on [Lieutenant Governor Siegelman's] agenda to pass liquor – beer sales at

Talladega." *Id.* 180/15-20.

### 2. Mr. Young

Mr. Young testified that "Lieutenant Governor Siegelman . . . and his staff . . .

support[ed] making that legislation happen," *Lanny Young Testimony on Direct Examination*,

*May 16, 2006*, 46/19-21, and that Lieutenant Governor Siegelman told a track official that "you

have Mr. Young to thank for getting that passed." *Id.* 48/5-7.  He did not say why they

supported "making the legislation happen," what "support" meant, or why Lieutenant Governor

Siegelman gave him credit for the legislation's passage.[4]

### 2. G.H. Construction

Mr. Bailey decided to award the G.H. Construction management contract to Mr. Young,

without influence from Mr. Hamrick. The evidence showed only that Mr. Bailey and Mr. Young

---

[3] Mr. Bailey did not say what Mr. Hamrick did, except that he "carried out the [Lieutenant] Governor's agenda," and "talked to legislators." Mr. Bailey did not say what Mr. Hamrick said or even to whom he spoke.  *Id.* 178/13 – 180/2.

[4] Mr. Young's only other testimony on the subject was that he "had conversations" with Lt. Governor Siegelman, Mr. Hamrick, and Mr. Bailey about the legislation – but he did not testify to what Mr. Hamrick said in those conversations.  *Lanny Young Testimony on Direct Examination*, *May 16, 2006*, 44/1-12.  He testified that he and a track official met with Lieutenant Governor Siegelman, Mr. Hamrick, and Mr. Bailey about the legislation, *id.* 44/13-23, and were told (he did not say by whom) that "Lieutenant Governor Siegelman . . .  and his staff would support making that legislation happen."  *Id.* 46/12-21.  Mr. Young testified that he asked for "a major favor" regarding the legislation, but he never said what the favor was.  *Id.* 42/18 – 43/17.

told Mr. Hamrick (and others) about the award at some unspecified time, and that Governor

Siegelman, Mr. Hamrick, and "a multitude" of others "signed off" on the award.  There is no

evidence what "signed off" meant in this context.

a. Mr. Bailey

Q.  Did the [G.H. Construction] project get far enough along for
someone to be selected to be the construction manager?

A.  Yes.  Lanny was chosen to be the construction manager.

Q.  Okay.  And was this decision to chose [sic] Lanny as the
construction manager something that was discussed with Governor
Siegelman?

A.  Ultimately.

MR. LEACH: This is all leading, Your Honor.  We object.

THE COURT: Overruled.

Q.  Was the decision to select him discussed with Paul Hamrick?

A.  Ultimately, I made the decision to bring in Lanny Young; but it
was ultimately signed off on by Paul and the Governor.

Q.  Okay.  Now, when – did you discuss your discussion [sic] to
use Lanny as the construction manager with them?

A.  Yes.

Q.   And did they agree to it?

A.  Yes.

Q.  Why did y'all select Lanny to be the construction manager?

MR. DEEN: Excuse me.  That's not – his testimony was he
selected.  He said – that was his testimony.  I object to him putting
words in his mouth.

MR. FEAGA: Thank you.  I'm certainly not trying to do that.  And

7

I apologized if I did.

THE COURT: Objection sustained.

Q.  You said you selected Lanny?

A.  That's correct.  I made that recommendation.  It was signed off on by a multitude of people, including the Governor and Paul.

Q.  Did they know Lanny was – did you talk to the Governor about Lanny, whether or not Lanny was going to be involved?

A.  Yes.

Q.  And did he give you his position on whether or not Lanny should be involved?

A. He was okay.

Q.  Okay.  And what about Paul Hamrick?  Did you talk to Paul Hamrick about whether or not Lanny was going to be involved?

A.  Yes.

Q.  And what was Paul Hamrick's position on it?

A.  It was okay.

*Nick Bailey Testimony on Direct Examination, May 2, 2006* 81/15 – 83/19.

### b. Mr. Young

Q.   How about Paul Hamrick?  Did he know you were going to be involved in [the G.H. Construction] project?

A.  Yes.

Q.  And how do you know he knew?

A.  We spoke about it.

Q.  Do you remember any specific occasions when you talked to Paul Hamrick about it?

A.  Yes, a couple.

Q.  Okay.  Would you tell the ladies and gentlemen of the jury about the first one when you remember talking to Paul Hamrick about the G.H. Construction project?

A.  Nick Bailey and I were riding – coming back from lunch or somewhere together, and Paul called in to – to Nick and asked what we were – were we out doing.  And Nick had told him we were out working on this project to build the state warehouses, and – and it was — Paul said, well, that's a great idea; we need to get a press conference for that.  And, at the time, we had not tied down the property.  And I said, no, Paul, I don't want to do that right now because I don't have the property tied down.  I don't want the owners to know the real intent.  I'm afraid they won't honor the contract to purchase the property and might increase it.

Q.  And do you remember another occasion when you spoke with Paul Hamrick about this project?

A.  The one that I'm sure of, we went to lunch, he – Paul, Nick, myself, and Curtis Kirsch.  And we went to lunch.  An old hotel here in Downtown Montgomery has a little luncheon area, restaurant there.  We went there, and Nick and I and Curtis were talking about it.  Paul was at lunch with us.  And I just remember Paul asking how is that project going, is it on track, something to that effect.

*Id.* 122/12 – 123/23.

### 3.  Waste Management

#### a.  Continue Paying for Young's Services

Lisa Kardell testified she spoke with Mr. Hamrick about Mr. Young's services.  But she said she did so at the National Governor's Association meeting in Washington, D.C. in February 1999.  Mr. Hamrick's debit card and other records established that he did not go to that meeting and was not even in Washington, D.C. when the alleged conversation occurred.

#### b.  Revenue Ruling: Regulation of Waste Disposal Fees and Taxes

Mr. Hamrick had nothing to do with the revenue ruling. Mr. Bailey took some action on

9

it, but Mr. Hamrick did nothing.

<u>Mr. Bailey</u>

Q.  Did there ever come a point in time when you had an occasion to discuss with Mr. Young any interest – business interest he had at the Alabama Department of Revenue?

A.  Yes.

Q.  Would you tell the ladies and gentlemen of the jury about that?

A.  Lanny delivered a report to me in the Governor's office and asked if I would discuss with Jim Hayes at the Department of Revenue a favorable ruling on this request from Waste Management.

Q.  Did you do that?

A.  I did.

Q.  Why?

A.  Because he asked me to.

*                    *                    *                    *

Q.  And when you said you – so he wanted you to contact – what did he want you to do?

A.  He wanted me to contact the Department of Revenue and try to get a favorable ruling on the request from Waste Management.

Q.  And did you do that?

A.  I did.

Q.  Okay.  What, if anything, did you do?

A.  I sent the report to the revenue commissioner, Jim Hayes, and asked him to look at it, that it was important to us.

Q.  Okay.  And who is "us"?

10

A.  Us is the Governor, me, and Paul.

Q.  Okay.  Did you talk about this revenue ruling with the Governor?

A.  Yes.

Q.  Did you talk about it with his chief of staff?

A.  Yes, sir.

Q.  Okay.  Did they know that you were contacting the revenue commissioner?

A.  I don't know that they knew it immediately, but they did know after I had made contact with the revenue commissioner.

*Nick Bailey Testimony on Direct Examination*, *May 2, 2006*, 67/1 – 69/1.

<u>Mr. Young</u>

Q.  Okay.  Now, let me come back to this Revenue ruling.  Did you enter into this agreement with Waste Management to try to get this done?

A.  Yes.  This was an attachment from Walston, Wells & Anderson.

Q.  Did you talk to Nick Bailey about getting it done?

A.  Yes.  I talked about – I had talked – I had been approached by Waste Management probably six or nine months before the actual date of this about the possibility of getting this done.  So I had visited with all three – those three being Don, Nick, and Paul – about the possibilities and what it could do for the State, help the State and help the company.

Q.  Okay.  And it would help you?

A.  And it would help me.

Q.  And did you at some point in time deliver anything to – at the Governor's Office to either Governor Don Siegelman, Paul Hamrick, or Nick Bailey?  Did you ever bring them anything to

11

facilitate getting this done, any one of the three of them?

A.  I'm not sure I understand your question.

Q.  Did you have a proposal of what it is the company wanted?
Did you ever have something in writing, what it was they wanted?

A.  Yes.  I'm sorry.

Q.  Did you ever give that to either Governor Siegelman, Paul
Hamrick, or Nick Bailey?

A.  I gave it to Nick Bailey.

Q.  And where was Nick Bailey when you gave it to him?

A.  In the Governor's Office.

Q.  Would that be in his office in the Governor's Office suite
provided by the State of Alabama?
A.  Yes.

Q.  And what, if anything, did you ask Mr. Bailey to do when you
gave him that proposal?

A.  I asked Nick to – to set up a – if he would set up a meeting
with myself and my attorney with the Revenue Commission
director.

Q.  Okay.  And did he do it?

A.  Yes.

*Lanny Young Testimony on Direct Examination*, *May 17, 2006* 48/17 – 50/17.

<u>4.  "DeFacto" Director of the Alabama Development Office</u>

After identifying Government Exhibit #190C-1, a July 14, 2000 check from Blount

Parrish & Company to Tillman, Young, L.L.C., (*Lanny Young Testimony on Direct Examination,*

*May 17, 2006*, 92/7-18), Mr. Young testified:

Q.  Okay.  On or after the date that you received this check from

12

Mr. Blount, did you take any action on behalf of Mr. Blount?

A. I did.

Q. And what, if any, action did you take on behalf of Mr. Blount as a result of this check?

A. I called Mr. Hamrick and asked if he could assist in getting some bonds financed for Mr. Blount.

*                    *                    *                    *

Q. And I asked you what action you took. And would you answer that question again? What action did you take as a result of getting this check?

A. I called Mr. Hamrick and asked him if he could assist in getting Mr. Blount's bonds financed.

Q. Okay. And –

A. Or funded. I'm sorry. I'll make a correction.

Q. And what, if anything, did Mr. Paul Hamrick say to you when you called him and asked him if he would do that?

A. He said that he would talk to Henry Mabry and Ken Funderburk and see what could be done.

Q. And who was Henry Mabry at the time you had this conversation with Paul Hamrick?

A. He was the Governor's finance director.

Q. And who was – did you say Funderburk?

A. Ken Funderburk.

Q. Who was Ken Funderburk at the time you had this conversation with Paul Hamrick?

*                    *                    *                    *

Q. Do you know where Ken Funderburk worked at the time that

13

you had this conversation with Mr. – Mr. Hamrick?

A.  At that time, I do not know where he worked.

Q.  Okay.  At some time prior to the time that you had this conversation with Mr. Hamrick, do you know where Mr. Funderburk worked?

A.  Yes.

Q.  Where was that?

A.  He was the Alabama Development Office director.  ADO as it's called.

*Lanny Young Testimony on Direct Examination, May 17, 2006*, 93/15 – 94/1; 95/15 – 96/13; 97/6-16.  Over objection, the prosecution played a recording of a July 27, 2000 Young-Blount conversation.  Mr. Young said "tell you what I talked to Hamrick yesterday, last night, talk to him this morning and he said he's having Funderburk call you."  *Transcript, Government Exhibit #150* at p. 1.[5]  Mr. Young said Mr. Hamrick said "I'm having Funderburk call Bill and tell him we want these things funded."  *Id*. at p. 4.  Messrs. Young and Blount acknowledged correctly that Mr. Funderburk was no longer director of the Alabama Development Office. *Id.* at p. 4. There was no evidence that Mr. Hamrick contacted Dr. Mabry.

Among other things, neither Mr. Young's testimony nor the tape established:

● Who the "de facto director" of the Alabama Development Office was

● Whether Mr. Hamrick ever spoke with or in any other manner "influenc[ed]" that person

● What the term "de facto director" means

_____

[5]  Mr. Hamrick maintains his position that the objections were proper and the Court should not have permit the playing of the tape and should not have admitted the transcript.

- Whether Mr. Hamrick "influenc[ed]" Mr. Funderburk in any way. Mr. Young quotes Mr. Hamrick as having said "I'm having Funderburk call Bill and tell him we want these things funded." Through multiple layers of hearsay, that testimony establishes – at best -- only what Mr. Hamrick asked Mr. Funderburk to tell Mr. Blount. It indicates that the decision that "we want these things funded" already had been made. It does not establish that "want[ing] these things funded" required any influence by Mr. Hamrick on anyone, including Mr. Funderburk.

### B.  Act Done When Private – Cherokee County

The second superseding indictment charged that Mr. Hamrick's acts regarding Cherokee County began in November 1998, *Second Superseding Indictment*, ¶ 30(g), when he was a private citizen. *Id.* ¶ 1(d). Mr. Young testified that the Cherokee County Commission made its decision on these matters in December 1998, when Mr. Hamrick still was a private citizen. *Id.*

Q. Was Governor Siegelman successful in his race for Governor in 1998?

A. He was.

Q. I want to ask you if, at that time in your life, you had any business interests in Cherokee County, Alabama.

A. I did.

Q. What business did you have that was in Cherokee County, Alabama?

A. Well, we had a landfill at the time –

Q. Okay.

A. – and in the – in the process of selling the landfill at that time.

*                        *                        *                        *

A. . . . . [W]e had – had sold it to USA Waste, which is a predecessor for the – then acquired Waste Management, became USA Waste Management. We had actually closed the transaction, the sale. That had paid the initial purchase price.

15

\*                    \*                    \*                    \*

Q.  Did the contract have any additional payment incentives in it?

A.  Yes.

Q.  And what were the additional payment incentives that were in the contract that you had already closed?

A.  There were some payments in there that would be given to us once tonnage reached a certain average.  I'm not sure if that was monthly average or quarterly average or exactly how that was calculated.  There was a payment if the service area was expanded to receive waste from more counties. . . .

\*                    \*                    \*                    \*

Q.  So you were going to get extra money if the Cherokee County – well, who had to approve that?

A.  The Cherokee County Commission.

Q.  And if they would approve an increased service area for this landfill, you would make more money?

A.  Yes.

Q.  Was there any other provisions in there that would allow you to make more money?

A.  There was a change in the way the royalty fees would be paid to the County.

\*                    \*                    \*                    \*

Q.  Now, how about Paul Hamrick?  Do you ask Paul Hamrick to help you with that?

A.  I asked him to call the landfill, yes.

Q.  And do you know whether he did or not?

A.  He did.

16

   *      *      *      *

Q. . . . . Do you have any recollection of exactly when the Cherokee County Commission approved the greater service area and the rate reduction for the landfill you were selling to Waste Management?

A.  I believe it was their November of '98 meeting.

Q.  If the records reflect it was December, you wouldn't quarrel with that?

A.  I would not.

Q.  If they reflect it was "on or just before December the 7th, 1998, would you quarrel with that?

A.  No.

*Lanny Young Testimony on Direct Examination*, *May 17, 2006*, 5/13 – 6/2; 6/8-14; 6/20 – 7/9; 7/16 – 8/4 ; 11/8-12; 20/19 – 21/10.  If the conduct began no earlier than November 3, 1998, and the Cherokee County Commission made its decision in December 1998, Mr. Hamrick was a private citizen when he made these supposed "calls."

### III.  <u>THE LAW</u>

Honest governmental services law is clear on the following points:

- A private person cannot deprive the State or the public of his own honest governmental services

- In the Eleventh Circuit, a public official violates his honest governmental services duty by taking a bribe or concealing a material conflict of interest

- In the Eleventh Circuit, private person may deprive the public of a public official's honest governmental services duty only by paying a bribe or by helping to conceal a material conflict of interest.

These points are dispositive and compel Mr. Hamrick's acquittal.  To avoid that result, the prosecution urged the Court to adopt the First Circuit's reasoning in the *United States v. Sawyer*

17

line of cases.[6]  The First Circuit's reasoning is erroneous.  Its standard does not supply the clarity about a public official's duty that due process demands.  But it does not matter here, because the prosecution's evidence does not meet the First Circuit's standard.

A brief review of the history of the honest services doctrine provides the perspective necessary to frame the debate in this case.

## A.  Background

### 1.  Development of the Honest Services Doctrine Before 1987

Before 1987, the honest services doctrine was judge-made, and developed unevenly across the circuits.[7]  The circuits, relying on a 1909 amendment to the mail fraud statute,[8] agreed generally that a deprivation of honest services could constitute mail or wire fraud.[9]  Over time, they came to agree generally that such deprivations fell into four categories: (1) government

---

[6]  *See, e.g., United States' Response To Defendant Hamrick's Motion In Limine To Bar Evidence And Argument Regarding Alleged Payments Made By Mr. Young To Mr. Hamrick* at 5-7.  The *Sawyer* line of cases consists of *United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) (*Sawyer* I); *United States v. Woodward*, 149 F.3d 46 (1st Cir. 1998), *cert. denied* 525 U.S. 1138 (1999); and *United States v. Sawyer*, 239 F.3d 31 (1st Cir. 2001) (*Sawyer* II).

[7]  *See, e.g., United States v. Brumley*, 116 F.3d 728, 733 (5th Cir. 1997) (collecting cases showing uneven development of the doctrine before 1987).

[8]  *Act of Mar. 4, 1909, ch. 321, § 215, 35 Stat. 1130.*  The circuits believed this act expanded the mail fraud statute's scope beyond deprivations of money or property.  *See, e.g., United States v. Clapps*, 732 F.2d 1148, 1152 (3d Cir. 1984).

[9]  *See, e.g., United States v. Clapps*, 732 F.2d 1148, 1152-53 (3d Cir. 1984); *United States v. Bohunus*, 628 F.2d 1167, 1172 (9th Cir. 1980); *United States v. Barber*, 688 F.2d 778 (4th Cir.), *cert. denied*, 459 U.S. 829 (1982); *United States v. Isaacs*, 493 F.2d 1124, 1150 (7th Cir. 1974); *United States v. States*, 488 F.2d 761, 764-67 (8th Cir. 1973); *Bradford v. United States*, 129 F.2d 274, 276 (5th Cir.), *cert. denied*, 317 U.S. 683 (1942).

officials who defraud the public of their own honest services;[10] (2) elected officials and campaign workers who falsify votes and thus defraud the electorate of its right to an honest election;[11] (3) private actors who violate fiduciary duties to private employers by, for example, taking kickbacks;[12] and (4) private actors who deprive others of intangible rights like privacy.[13]

### 2. Pre-1987 Disagreement Over the Source of the Honest Services Duty

But, within that general agreement, there was considerable disagreement about what the doctrine actually forbade.[14]  The circuits' disagreement principally was over what the source of the duty to render honest services must be.  Must the defendant's duty to render honest services

---

[10]  *See, e.g., United States v. Holzer*, 816 F.2d 304 (7th Cir. 1987) (county judge); *United States v. Silvano*, 812 F.2d 754 (1st Cir. 1987) (city budget director); *United States v. Diggs*, 613 F.2d 988 (D.C. Cir. 1979) (Congressman); *United States v. Barber*, 668 F.2d 778 (4th Cir.) (alcoholic beverage control commissioner), *cert. denied* 459 U.S. 829 (1982); *see generally McNally v. United States* 483 U.S. 350, 362-63 & n.1 (1987) (Stevens, J. dissenting) (collecting cases).  This set of cases included some in which private persons were convicted of conspiring with a public official to deprive the public of the public official's honest services.  *See, e.g., United States v. Lovett,* 811 F.2d 979 (7th Cir. 1987) (bribing mayor); *United States v. Rauhoff*, 525 F.2d 1170 (7th Cir. 1975) (bribing Secretary of State); *United States v. Faser*, 303 F. Supp. 380 (E.D. La. 1969) (scheme to bribe state officials).

[11]  *See, e.g., United States v. Girdner*, 754 F.2d 877 (10th Cir. 1985) (candidate for state legislature); *United States v. Odom*, 736 F.2d 104, 116 n.13 (4th Cir. 1984) (sheriff); *United States v. Clapps*, 732 F.2d 1148, 1153 (3d Cir.) (party chairman), *cert. denied* 469 U.S. 1085 (1984); *United States v. States*, 488 F.2d 761 (8th Cir. 1973) (candidates for city office), *cert. denied* 417 U.S. 909 (1974); *see generally McNally v. United States*, 450 U.S. 350, 363-64 & n. 2 (1987) (Stevens, J. dissenting) (collecting cases).

[12]  *See, e.g., United States v. Boffa*, 688 F.2d 919, 930-31 (3d Cir. 1982); *United States v. Curry*, 681 F.2d 406 (5th Cir. 1982); *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980); *see generally McNally v. United States*, 450 U.S. 350, 363-64 & n. 3 (1987) (Stevens, J. dissenting) (collecting cases).

[13]  *See, e.g., United States v. Condolon*, 600 F.2d 7 (4th Cir. 1979); *United States v. Louderman*, 576 F.2d 1383 (9th Cir.), *cert. denied* 439 U.S. 896 (1978); *see generally McNally v. United States*, 450 U.S. 350, 363-64 & n. 3 (1987) (Stevens, J. dissenting) (collecting cases).

[14]  *Brumley*, 116 F.3d at 733 (listing cases applying the doctrine differently).

be rooted in state law (and, if so, what portions of state law), or could the federal courts impose

upon a defendant the obligation to render honest services to a state, even if state law did not

impose that duty?  The *en banc* United States Court of Appeals for the Fifth Circuit explained

the nature of this pre-1987 disagreement as follows in *United States v. Brumley*, 116 F.3d 728,

733 (5th Cir. 1997):

> A close look at these [pre-1987] cases uncovers two uncertainties regarding the
> draw by this federal statute upon state law, specifically in defining the statutory
> element of honest services.  First, must the services be owed under state law?
> Second must the breach of a duty to provide services rooted in state law violate
> the criminal law of the state?

### 3.  McNally and Congress's Response

This debate briefly was put on hold when, in 1987, in *McNally v. United States*, 483 U.S.

350, 358 (1987), the United States Supreme Court held that the circuits' original premise was

wrong.  The Supreme Court held that the 1909 amendment to the mail fraud statute did not

extend its scope beyond deprivations of money or property.  *Id.*  There was no longer a basis for

honest services charges of any kind.  Congress quickly responded to *McNally* by enacting, in

1988, 18 U.S.C. § 1346, which defines "scheme or artifice to defraud" in §§ 1341 and 1343 to

include "a scheme or artifice to deprive another of the intangible right of honest services."

### 4.  Source of Duty Debate under § 1346

Congress's action resurrected the source-of-duty debate.  That debate now occurs in the

context of statutory interpretation of § 1346 instead of application of the pre-1987 judge-made

doctrine.[15]

---

[15]  The circuits disagree about whether "honest services" means precisely the same thing
under § 1346 as it meant under the pre-1987 judge-made doctrine.  *See, e.g., United States v.
Brumley*, 116 F.3d at 733 ("Congress could not have intended to bless each and every pre-

The crux of the debate is whether – if federal courts need not find a duty to render honest services rooted in existing state law, but may impose such a duty themselves – § 1346 is unconstitutionally vague.  Can a defendant ever know what duty a federal court might decide to impose upon him?  Judge Posner, writing for the Seventh Circuit, explained:

> It can be argued that tying the concept of fraud in the mail fraud statute to state law and to federal statutes expressly creating fiduciary duties would allay the persistent concerns about the breadth and vagueness of the statute.  Against this it can be argued that a uniform albeit judge-made federal concept of fiduciary duty might do the trick as well or better – but the riposte is that a century of interpretation of the statute has failed to still the doubts of those who think it dangerously vague.

*United States v. Martin*, 195 F.3d 961, 967 (7th Cir. 1999).

For example, the Fifth Circuit, in *Brumley*, held that – at least for prosecutions of state officials for breaching a duty of honest services to the public – the duty must be rooted in existing state law:

> We find nothing to suggest that Congress was attempting to garner to the federal government the right to impose a federal vision of appropriate services – to establish, in other words, an ethical regime for state employees.  Such a taking of power would sorely tax separation of powers and erode our federalist structure.  Under the most natural reading of the statute, a federal prosecutor must prove that conduct of a state official breached a duty respecting the provision of services owed to the official's employer under state law.  Stated directly, the official must act or fail to act contrary to the requirements of his job under state law.  This means that if the official does all that is required under state law, alleging that the services were not otherwise done "honestly" does not charge a violation of the mail fraud statute.  The statute contemplates that there must first be a breach of a state-owed duty.

*United States v. Brumley*, 116 F.3d at 734.

The Third Circuit, in *United States v. Murphy*, 323 F.3d 102 (3d Cir. 2003) did not

---

*McNally* lower court 'honest services' opinion"); *United States v. Frost*, 125 F.3d 346, 364 (6th Cir. 1997) ("§1346 has restored the mail fraud statute to its pre-*McNally* scope").

require that the definition and the duty be rooted in state law.  But it did require that the defendant's actions violate "a clearly established fiduciary relationship or legal duty in either federal or state law."  *Id.* at 117.

The Seventh Circuit, as Judge Posner noted in *Martin*, opts for a judge-made standard. Its decisions make clear that "honest services," for public officials, means that they not take bribes or kickbacks.  In *United States v. Bloom*, 149 F.3d 649, 655 (7th Cir. 1998), the Seventh Circuit noted that "[i]n almost all of the intangible rights cases this circuit has decided (before *McNally* or since § 1346), the defendant used his office for private gain, as by accepting a bribe in exchange for official action."  *See also, e.g., United States v. Genova*, 333 F.3d 750 (7th Cir. 2003) (upholding mail fraud convictions of city mayor and city prosecutor who engaged in kickback scheme involving payment by the city for legal services provided by prosecutor's law firm).

Despite their differences about the proper source and the precise nature of the definition of "honest services," the courts agree that the definition must be clear enough for a defendant to know that his conduct violates it – or § 1346 will be unconstitutionally vague as applied to him. The Northern District of Illinois, in *United States v. Warner*, 292 F.Supp.2d 1051, 1062-63 (N.D. Ill. 2003) put it well.  After noting the "vagueness concerns" raised by the Fifth Circuit in *Brumley* and the Seventh Circuit in *Martin*, the court held that a defendant must have "fair warning that his conduct . . . violate[s] § 1346."  *Id.*

The Eleventh Circuit opts for a judge-made definition.  *See United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) ("the nature and interpretation of the duty owed is a question of federal law").  But it is very precise about what the definition is – and that it is

22

different for private citizens than it is for public officials. *DeVegter* explained:

> In this case, it is not alleged that [the defendant] deprived the *public* of honest *governmental* services. Rather, the indictment alleges that he deprived *Fulton County* of honest *commercial* services by providing corrupted financial advice. Thus, the § 1346 violation charged in this case concerns the defrauding of honest services in the private sector.
>
> \*            \*            \*            \*
>
> The meaning of the "intangible right of honest services" has different implications, however, when applied to public official malfeasance and private sector misconduct. Public officials inherently owe a duty to the public to make governmental decisions in the public's best interest. "If the official instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest – the official has defrauded the public of his honest services."
>
> \*            \*            \*
>
> On the other hand, such a strict duty of loyalty ordinarily is not part of private sector relationships. Most private sector interactions do not involve duties of, or rights to, the "honest services" of either party. Relationships may be accompanied by obligations of good faith and fair dealing, even in arms-length transactions. These and similar duties are quite unlike, however, the duty of loyalty and fidelity to purpose required of public officials. For example, "employee loyalty is not an end in itself, it is a means to obtain and preserve pecuniary benefits for the employer. An employee's undisclosed conflict of interest does not necessarily pose the threat of economic harm to the employer." A public official's undisclosed conflict of interest, in contrast, does by itself harm the constituent in the end for which the official serves – honest government in the public's best interest. The "intangible right of honest services" must be given an analogous interpretation in the private sector. Therefore, for a private sector defendant to have violated the victim's right to honest services, it is not enough to prove the defendant's breach of loyalty alone. Rather, as is always true in a breach of loyalty by a public official, the breach of loyalty by a private sector defendant must in each case contravene – by inherently harming – the purpose of the parties' relationship. . . . Thus, a private sector violation of § 1346 honest services fraud involves a breach of fiduciary duty and reasonably foreseeable economic harm.

198 F.3d at 1328 (& n.3) – 1330 (11th Cir. 1999) (citations omitted). The *deVegter* formulation

of a public official's duty was taken from *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997).

## B.  Private Citizens and Honest Governmental Services

A proper understanding of *Lopez-Lukis* and *deVegter*, in the light of cases from other circuits addressing honest governmental services charges against private citizens, compels the conclusion that no such charge is proper.  The two post-*McNally* federal courts that have addressed the question have squarely held that private citizens do not owe the State or the public a duty to render honest *governmental* services.  *United States v. Murphy*, 323 F.3d 102, 113-18 (3d Cir. 2003); *United States v. Warner*, 292 F. Supp.2d 1051, 1063 (N.D. Ill. 2003).  A federal district court in the Second Circuit has indicated that it views the law the same way.

The *Murphy* defendant was a county Republican party chairman who effectively controlled decisions by the county commission regarding county contracts.  The prosecution alleged that he solicited bribes in exchange for his decisions and influence regarding those contracts, and that he thus violated his duty of honest governmental services to the public.  The Third Circuit held that, as a private citizen, he owed no such duty:

> [T]he Government cannot identify any clearly established fiduciary relationship or legal duty in either federal or state law between Murphy and Passaic County or its citizens.  In other words, it cannot point to an established "right" of honest services that Murphy owed to the County or its citizens[.][16]. . . Without any legal basis for determining whether Passaic County or its citizens had a right to Murphy's honest services, we conclude that it was improper for the District Court to allow the jury to conjure such a duty out of a fog of assumptions.

---

[16]     The Third Circuit rejected the notion that the general New Jersey Bribery Act imposed such a duty.  323 F.3d at 117.  "We cannot endorse this methodology because all criminal activity would breach a duty to the public not to break the law that could then form the basis for a mail fraud conviction."  *Id.*

*Id.* at 117.

The *Warner* defendant was a "close confidant of a high-ranking Illinois Secretary of State Office official." 292 F. Supp. at 1053. He performed a number of tasks for the Secretary of State Office, including serving on a transition team. *Id.* But he remained a private citizen. The prosecution alleged that his influence was such that he controlled various decisions by the Secretary of State Office. It charged him with violating his duty to render honest governmental services to the public by soliciting bribes in exchange for his exercise of that control. *Id.* at 1052-56. The Northern District of Illinois dismissed that portion of the indictment, holding that the defendant owed no such duty:

> Given the concerns expressed in this and other Circuits regarding [§ 1346's vagueness in light of the source-of-duty debate], the court reluctantly concludes that Warner cannot be charged with defrauding the public of his own honest services because he was a private citizen who did not owe such a fiduciary duty to the citizens of Illinois or to the SOS Office. . . . [T]he court finds that there is insufficient basis for treating public and private individuals the same way for purposes of "honest services" mail fraud.

292 F. Supp.2d at 1063.

Both *Murphy*, 323 F.3d at 113-18, and *Warner*, 292 F. Supp. at 1059-60, rejected a pre-*McNally* Second Circuit opinion, *United States v. Margiotta*, 688 F.2d 108 (2d Cir. 1982). The Second Circuit had held that a county Republican party chairman who allegedly exercised a "vise-like grip over" and "stranglehold on" government functions, dictating everything relating to hiring, salaries, and promotions, and controlling lucrative insurance matters, could be charged with pre-*McNally*, judge-made honest services fraud, for depriving the public of his honest governmental services. 688 F.2d at 124-28. The *Margiotta* court held that the jury could "infer[]" a duty of honest services, rooted in "federal public policy" because the defendant had

de facto control over county government decisions.  *Id.*

The Northern District of Illinois in *Warner* put the question as "whether a *Margiotta* theory of mail fraud remains viable" after *McNally*.  292 F. Supp.2d at 1058.  It held that such a theory is *not* viable, given the circuits' expressed need to root a private citizen's duty in something more substantial than an "infer[ence]" rooted in "federal public policy" based on a de facto relationship.  "The court is not persuaded . . . that such general agency principles are sufficient to charge Warner, a private individual, with defrauding the public of his 'honest services.'" 292 F. Supp. at 1059.  It quoted the *Margiotta* dissent with approval, for the proposition that "there is 'no logical rationale for treating private party officials in the same manner as public officials since such a loose interpretation of the mail fraud statute creates catch-all political crime which has no use but misuse.'" *Id.* at 1059-60.

The Third Circuit in *Murphy* reached the same conclusion.  After noting that the *Margiotta* panel "approved a gestalt approach" that "allowed the jury to derive a fiduciary duty" based on whether others relied on the defendant because of his "special relationship" with the government and whether he had de facto control of governmental decisions, 323 F.3d at 112, the Third Circuit held that a private person's post-*McNally* honest services duty must have more substantial roots.  While it declined the defendant's request to hold that the duty must be rooted in existing state law, the Third Circuit held that it must be rooted in *some* law – that "either state or federal law [must] clearly establish[] a fiduciary relationship."  323 F.3d at 117.  Because the prosecution could not point to any such duty, the honest services charge could not stand.  *Id.*

The Eleventh Circuit has not squarely addressed *Margiotta*'s continuing viability after *McNally.*  The footnote in *deVegter* quoted above (198 F.3d at 1328 n.3) made passing reference

26

to *Margiotta* without mentioning it by name or discussing it.  In distinguishing between public

sector and private sector honest services fraud, the Eleventh Circuit said:

> Public sector honest services fraud falls into two categories.  First, "a public
> official owes a fiduciary duty to the public, and misuse of his office for private
> gain is a fraud."  *McNally*, 483 U.S. at 355, 107 S. Ct. 2875.  Second, "an
> individual without formal office may be held to be a public fiduciary if others rely
> on him because of a special relationship in the government and he in fact makes
> governmental decisions."  *Id.* (quotation omitted).

The Eleventh Circuit's citations for this footnote were to the portion of *McNally* that summarized

the circuit court's holding in that case.  The Supreme Court noted that the circuit court had relied

on *Margiotta* to hold that one of the defendants – a private citizen who allegedly had de facto

control over the governmental decision at issue – could be charged with pre-*McNally,* judge-

made honest services fraud.  483 U.S. at 355.[17]  The Supreme Court did *not* hold that *Margiotta*

---

[17] This portion of the Supreme Court's opinion in *McNally*, including the quotes in the
*deVegter* footnote, reads in its entirety:

> In affirming the substantive mail fraud conviction, the court relied
> on a line of decisions from the Courts of Appeals holding that the
> mail fraud statute proscribes the scheme to defraud citizens of their
> intangible rights to honest and impartial government.  *See, e.g.,*
> *United States v. Mandel*, 591 F.2d 1347 (4th Cir. 1979), *aff'd in*
> *relevant part*, 602 F.2d 653 (en banc), cert. denied, 445 U.S. 961,
> 100 S. Ct. 1647, 64 L.Ed.2d 236 (1980).  Under these cases, a
> public official owes a fiduciary duty to the public, and misuse of
> his office for private gain is a fraud.  Also, an individual without
> formal office may be held to be a public fiduciary if others rely on
> him "'because of a special relationship in the government'" and he
> in fact makes governmental decisions.  790 F.2d at 1296 (quoting
> *United States v. Margiotta*, 688 F.2d 108, 122 (2d Cir. 1982), cert.
> denied 461 U.S. 913, 103 S. Ct. 1891, 77 L.Ed.2d 282 (1983)).
> The Court of Appeals held that Hunt was such a fiduciary because
> he "substantially participated in governmental affairs and
> exercised significant, if not exclusive, control over awarding the
> workmen's compensation insurance carrier contract to Wombwell
> and the payment of monetary kick-backs to Seton."  790 F.2d at

remained good law after *McNally*. Indeed, *McNally* reversed the circuit court decision, including the portion that relied on *Margiotta*. 483 U.S. at 355.

Under these circumstances, Mr. Hamrick respectfully submits that a *Margiotta* theory no longer is viable in the Eleventh Circuit either. The *deVegter* footnote does not reflect studied consideration of the issue. The issue has never been squarely presented to the Eleventh Circuit. And the rest of the *deVegter* opinion is consistent with the rulings in *Murphy* and *Warner*. That is, *deVegter* drew a distinction between public actors and private actors for purposes of honest services fraud, and imposed more stringent requirements on the prosecution when dealing with private actors.

More recently, in *United States v. Adler*, 274 F. Supp.2d 583, 587 (S.D.N.Y. 2003), held that *Margiotta* is no longer good law in the Second Circuit or anywhere else:

> The problem presented by prosecution for fraud of intangible rights is serious and has been, long before *McNally* or *Handakas* or *Rybicki*.[18] This Court agrees that *Margiotta* was wrongly decided and is no longer good law in this Circuit or anyplace, as found by the Third Circuit in *Murphy*. Mr. Adler was not a person who owed a duty to the public and neither was *Margiotta*. His sole obligations were to the Democratic party members, in connection with the recruiting and nominating of candidates, the collection of contributions to fund campaigns, and resolving issues of party platform.

---

1296. We granted certiorari, 479 U.S. 1005, 107 S. Ct. 642, 93 L.Ed.2d 698 (1986), and now reverse.

[18] The court here referenced the decisions in *McNally v. United States*, 483 U.S. 350 (1987), *United States v. Handakas*, 286 F.3d 92 (2d Cir. 2002), and *United States v. Rybicki*, 287 F.3d 257 (2d Cir. 2002). It cited those opinions in an earlier portion of its opinion that discussed the continuing difficulty under § 1346 of defining the honest services duty with sufficient precision so that the statute is not unconstitutionally vague as applied. *Handakas*, for example, held that the statute was unconstitutionally vague as applied to the operator of a construction company that violated New York wage rate contract provisions for public improvements, holding that there was no duty of "honest services" between that operator and the city. The definition of the duty likewise is of critical importance to this case.

In the end, however, it does not matter whether *Margiotta* remains viable in the Eleventh Circuit or not. There is no evidence that Mr. Hamrick, when he was a private citizen, had the "special relationship" or "de facto control" over governmental decisions that the defendants in *Margiotta*, *Murphy*, and *Warner* allegedly had.

Moreover, the language in *Lopez-Lukis* and *deVegter* made clear the Eleventh Circuit's view that honest governmental services cases are about public officials and their official acts. *DeVegter* described honest governmental services fraud as "public official malfeasance" and said that a violation occurs when a public official, who "inherently owe[s] a duty to the public to make governmental decisions in the public's best interest, . . . instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest[.]" *Lopez-Lukis* used the same language:

> When a government officer decides how to vote in an official endeavor – as when a legislator decides how to vote on an issue – his constituents have a right to have their best interests form the basis of that decision. If the official instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest – the official has defrauded the public of his honest services.

102 F.3d at 1169.

That language simply does not apply to private persons. Whatever Mr. Hamrick did between November 3, 1998 and December 7, 1998 with respect to Cherokee County, he did it as a private citizen. He could not have deprived the public of his own honest governmental services in doing it. He is entitled to a judgment of acquittal on that charge.

### C.  Eleventh Circuit: Honest Governmental Services and Public Officials

*Lopez-Lukis* in 1997 and *deVegter* in 1999 were the Eleventh Circuit's seminal cases on a public official's honest governmental services duty. They are very precise. The public official

violates his honest services duty by (1) taking a bribe or (2) concealing a material conflict of interest.

*DeVegter*'s reiteration of the *Lopez-Lukis* rule is particularly important here. After *Lopez-Lukis*, but before *deVegter*, the United States Supreme Court decided *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999). The Court there cabined the federal definition of bribery (in 18 U.S.C. § 201), holding that it must involve a specific payment linked to a specific act. A gift given simply because of "official acts in general" or because of an official's position is not illegal. The Court based its decision on the requirement in § 201 that a bribe must be given "for or because of any official act performed or to be performed" by the public official:

> It seems to us that this means "for or because of some particular act of whatever identity" – just as the question "do you like any composer?" normally means "Do you like some particular composer?" It is linguistically possible, of course, for the phrase to mean "for or because of official acts in general, without specification as to which one" – just as the question "Do you like any composer?" could mean "Do you like all composers, no matter what their names or music?" But the former seems to us the more natural meaning, especially given the complex structure of the provision before us here . . . . The insistence upon an "official act," carefully defined, seems pregnant with the requirement that some particular official act be identified and proved.

526 U.S. at 406.

For the Eleventh Circuit's judge-made definition of "honest services" to have the clarity the Constitution requires, "bribe" must have a precise definition. As the Eleventh Circuit has opted not to root its definition in state law, the only other logical source of that definition is the federal bribery prohibition in 18 U.S.C. § 201.

That is especially so here. The prosecution does not contend that Mr. Hamrick's conduct violated any state or federal statute or regulation specifically regulating the conduct of public officials. It simply contends that he committed honest services fraud. "Honest services" in this

context must mean something as applied to Mr. Hamrick – and Mr. Hamrick was entitled to some standard by which to judge his conduct when he dealt with Mr. Young. That standard was the "takes a bribe" standard of *Lopez-Lukis* and *deVegter*. To apply any other rule Mr. Hamrick now would render § 1346 unconstitutionally vague as applied to him. He could not possibly have known that, in 2006, a court would suddenly declare his conduct – which no one contends amounted to taking a bribe – was suddenly an honest services violation.

In response to these arguments, the prosecution, in its pretrial filings, "adopt[ed],"[19] and urged this Court to adopt, the First Circuit's honest governmental services standard set forth in the *Sawyer* line of cases. *United States' Response To Defendant Hamrick's Motion In Limine To Bar Evidence And Argument Regarding Alleged Payments Made By Mr. Young To Mr. Hamrick* at 5-7. The prosecution pointed out that the First Circuit there permitted the honest services convictions of a lobbyist and a legislator without evidence of specific payments for specific acts. *Id.* It noted that *Sawyer* I held that "while Sawyer may not have provided the legislators with direct kickbacks or commissions arising out of the specific official action, he may have intended the legislators generally to treat preferentially [his company's] interests, knowing that the free meals, entertainment, and golf would continue so long as favorable official acts were, at some point, taken." *Id.* at 6 (quoting *Sawyer* I, 85 F.3d at 730). It noted *Woodward*'s holding that *Sawyer* I "expanded [honest services fraud] from quid pro quo bribery to include a more generalized pattern of gratuities to coax 'ongoing favorable official action.'" *Id.* (quoting

---

[19]    *United States' Response to Defendant Hamrick's Motion In Limine To Bar Evidence And Argument That Mr. Hamrick Deprived The State Of Alabama Or The Public Of Governor Siegelman's Honest Governmental Services During The Period When Mr. Hamrick Was A Private Citizen* at 9 (Doc. 322).

*Woodward*, 149 F.3d at 55).  It noted *Sawyer* II's rejection of the *Sun-Diamond* definition of "bribe" for honest services cases.  *Id.* at 6-7 (quoting *Sawyer* II, 239 F.3d at 40 n. 8).

But the prosecution omitted two key aspects of these holdings.  First, it omitted the requirement that the "generalized pattern of gratuities" be intended to "alter [the public official's] official acts."  *Sawyer* I, 85 F.3d at 741.  *Sawyer* I held that such proof is required, to the point of requiring a specific jury instruction to that effect:

> The practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive.  The government does not argue, and we do not believe, that payments for entertainment, lodging, golf, sports events, and the like would constitute violations of the . . . mail and wire fraud statutes . . . if the aim of the lobbyist were simply to cultivate a business or political "friendship" with the legislator.  It may well be that all such hospitality should be flatly prohibited by law, but if Sawyer had this limited intent – to cultivate friendship rather than to influence an official act – the federal statutes here involved would not be violated.
>
> The charge to the jury in this case followed the conventional formula for prosecutions involving political corruption.  But where the difference between lawful and unlawful turns primarily on intent, and the lawful conduct is itself most unattractive, we think the jury needs to be told specifically that the defendant has not . . . committed honest services fraud . . . if his intent was limited to the cultivation of business or political friendship.  Only if instead or in addition, there is an intent to cause the recipient to alter her official acts may the jury find a theft of honest services[.]

85 F.3d at 741.

Mr. Young testified at various points about his intent, always to the effect of the following colloquy:

> Q.  Why are you supporting Don Siegelman becoming Governor of the State of Alabama?
>
> A.  I want him to become governor so he can support and do things that would benefit me in business.
>
> Q.  And you said you had talked with him about that during the 1998 campaign; is

that right?

A.  I did.

Q.  Did he agree that he would do that when he got in office?

A.  He did.

Q.  How about Paul Hamrick?  Did you talk to him about it, and did he agree that he would do that when and if they got into office?

A.  He did.

*Lanny Young Testimony on Direct Examination*, *May 16, 2006* 129/14 – 130/5.  Nothing in Mr. Young's testimony about his intent – even if it could properly be imputed to Mr. Hamrick, which it cannot – indicates that he intended to "alter" official action.  Black's Law Dictionary (6th ed. 1990) defines "alter" as follows:

> To make a change in; to modify; to vary in some degree; to change some of the elements or ingredients or details without substituting an entirely new thing or destroying the identity of the thing affected.  To change partially.  To change in one or more respects, but without destruction of existence or identity of the thing changed; to increase or diminish.

There is no evidence that Mr. Young intended to change or modify Mr. Hamrick's official action, or that Mr. Hamrick intended that they be changed or modified.  There is no evidence that Mr. Hamrick did anything differently than he otherwise would have done because Mr. Young asked.

Second, the prosecution failed to offer any evidence whatsoever that Mr. Hamrick intended to deceive the public about the payments from Mr. Young or vice-versa.  This is a required element in the *Sawyer* formulation:

> To establish mail fraud – in cases involving honest services fraud and otherwise – the alleged scheme must involve deception in the deprivation of money, property, or the right to honest services . . . . [A] demonstrated intent to deceive is required.

&ast;    &ast;    &ast;    &ast;

> At first blush, it may appear that bribery of a public official necessarily incorporates a finding that the offender intended to "trick" or "deceive" the public into thinking that the official was acting independently when, in fact, the official was actually motivated by the bribe.  While we have little doubt that bribes are usually given in secret, bribery and gratuity statutes generally, as here, do not *require* a separate element of deception.  Ostensibly, a person could offer an illegal bribe to a public official and not be concerned with its secrecy.  Thus, the evidence presented must permit a finding that [the lobbyist] not only gave the unlawful gifts or gratuities with the intent to deprive the public of honest services, but that he also intended to deceive the public about that conduct.

85 F.3d at 732-33 (citations omitted).

### D.  <u>No Deprivation of Governor Siegelman's Honest Services</u>

In its response to Mr. Hamrick's motion to dismiss, the prosecution effectively conceded that it could not charge him with depriving the public of his own honest governmental services during the period he was a private citizen: "[a private] defendant may not owe an independent duty to the State or citizenry."  *Response* at 6.  The prosecution tried to argue, instead, that the second superseding indictment actually charges Mr. Hamrick with depriving the public of *Governor Siegelman's* honest governmental services during this period: "the second superceding indictment properly charges, <u>inter alia</u>, that Defendant Hamrick, even when no longer officially being paid by the State of Alabama, intended to and did engage in a scheme to deprive the State of the honest services of Defendant Siegelman, who at all times charged in the second superceding indictment was a public official."  *Id.* at 7.

For a number of reasons, this is a wholly improper theory in this case.  It contradicts the plain language of the indictment.  Neither the facts alleged in the indictment nor the facts proven at trial support that charge.  The Court should reject it if the prosecution attempts to argue it in opposition to this Rule 29 motion.

34

1. <u>Plain Language</u>

The first problem is that the second superseding indictment does not say that.    It charges

Mr. Hamrick and Governor Siegelman with "devis[ing] a scheme and artifice to defraud the

State of Alabama of its right to the honest and faithful ***services of themselves as public officials***

***and employees of the State of Alabama.***"  *Second Superseding Indictment* ¶¶ 28, 61 (emphasis

supplied).  It alleges that they did so "through their official powers, action, and influence."

There is no way to read the phrases "services of themselves" and "their official powers, action,

and influence" other than to charge Mr. Hamrick with depriving the public of his own honest

governmental services.  This Court already has read them that way.

> Counts Ten through Twelve, in which Siegelman and Hamrick are named, charge
> them with aiding and abetting each other to commit honest services mail fraud as
> part of their scheme *to defraud and deprive the State of Alabama to its right to*
> *honest and faithful services from themselves as public officials* in connection with
> governmental regulation of specified activities, allocation of bond funding and
> construction contracting, in violation of 18 U.S.C. §§ 2, 1341 & 1346.  (Indict. at
> ¶ 61-63).
>
> Counts Thirteen and Fourteen, in which Siegelman and Hamrick are named,
> charge them with aiding and abetting each other to commit honest services mail[20]
> fraud concerning performance of their scheme *to defraud and deprive the State of*
> *Alabama of its right to honest and faithful services from themselves as public*
> *officials.*

 *United States v. Scrushy*, 2006 WL 278251 *2-3 (M.D. Ala. February 2, 2006) (emphasis

supplied).  The words "of themselves" do not mean "of Governor Siegelman."  The word "their"

does not mean "Governor Siegelman's."

---

[20]    The second superseding indictment actually appears to allege
honest services wire fraud, as opposed to mail fraud, in Counts
Thirteen and Fourteen, but that makes no substantive difference to
this analysis.

2.  <u>Allegations And Proof Do Not Support The Charge</u>

As Mr. Hamrick noted in his motion to dismiss (p. 5, n. 4), some courts have held that private persons may commit honest governmental services fraud by depriving the public of a public official's honest services.  But those cases are about private persons who bribe (or pay illegal gratuities) to public officials or help them conceal material conflicts of interest.[21]  The prosecution does not contend that Mr. Hamrick did such a thing.  The second superseding indictment alleges that Mr. Hamrick received money (at some unspecified time) from Lanny Young, ¶ 30(f), and that he and Governor Siegelman "assist[ed]" Mr. Young "through their official power, actions, and influence," ¶ 30(g).  The proof at trial, as set forth above, was presented on the same theory.

Undersigned counsel is aware of no case, and the prosecution has cited none, in which a private person – or a public official – has been charged with depriving the public of another

---

[21]     As Mr. Hamrick noted in his motion (p. 5, n. 4), in *United States v. Lovett*, 811 F.2d 979 (7th Cir. 1987), the defendant was charged with bribing a mayor; in *United States v. Rauhoff*, 525 F.2d 1170 (7th Cir. 1975), the defendant was charged with bribing a Secretary of State.  The cases the prosecution cites in its response also involve bribes or failure to disclose material conflicts of interest.  In *United States v. Hasner*, 340 F.3d 1261 (11th Cir. 2003), a private consultant to a county housing authority paid the chairman of the authority a secret "commission" on a real estate project that required the authority's approval.  The Eleventh Circuit found that "a reasonable jury" could have found that the consultant was aware of and participated in the chairman's failure to disclose the commission before taking official action with respect to the project.  *Id.* at 1272.  In *United States v. Lopez-Lukis*, 102 F.3d 1164 (11th Cir. 1997), a lobbyist paid a county commissioner for her votes in favor of his clients' interests and for persuading other county commissioners to so vote.  *Id.* at 1165-66.  The two *Sawyer* cases from the First Circuit also involved a private lobbyist's payments to legislators.

public official's honest services on such facts.  It is difficult to conceive how Mr. Hamrick can

be so charged.  The prosecution cannot charge him simply with taking money as a private citizen

to influence Governor Siegelman's actions as, generally, that is not illegal.  It is the daily

business of lobbyists.  Moreover, the second superseding indictment's contention that Mr.

Hamrick exercised "official power, actions, [or] influence," *id.* ¶ 30(g), while a private citizen

makes no sense.  Private citizens do not have official power and cannot take official actions or

exert official influence.

### E.  <u>No Evidence of Aiding and Abetting</u>

To prove an aiding and abetting offense, the prosecution must offer proof that "a

substantive offense was committed, that the defendant associated himself with the criminal

venture, and that he committed some act which furthered the crime."  *Bazemore v. United States*,

138 F.3d 947, 949 (11th Cir. 1998).  The evidence set forth above established that neither Mr.

Hamrick nor Governor Siegelman did the charged acts with respect to Talladega, G.H.

Construction, the "de facto" ADO director, or "influencing" Waste Management to keep using

Mr. Young. Whatever happened with respect to the revenue ruling, Mr. Hamrick had no part in

it.   With respect to the fifth act – the calls to Cherokee County – there is no evidence that "a

substantive offense was committed" by Governor Siegelman or anyone else, much less that Mr.

Hamrick did anything to aid and abet Governor Siegelman (or anyone else).

### IV.  <u>CONCLUSION</u>

For at least the foregoing reasons, Mr. Hamrick respectfully requests a judgment of

acquittal on the honest services charges (all of them) in Counts One, Two, and Ten through

Fourteen.

Respectfully submitted,


s/T. Jefferson Deen, III
T. Jefferson Deen, III
T. Jefferson Deen, III, P.C.
P.O. Box 2705
Mobile, Alabama 36652
Phone: (251) 433-5860
Fax:    (251) 433-0703
E-mail: TJeffDeen@deenlawpc.com


s/Michel Nicrosi
Michel Nicrosi
Miller, Hamilton, Snider & Odom, L.L.C.
P.O. Box 46
Mobile, Alabama 36601-0046
Phone: (251) 432-1414
Fax:    (251) 433-4106
E-mail: michelnicrosi@mhsolaw.com


## CERTIFICATE OF SERVICE

I certify that on June 8, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.


s/Michel Nicrosi
Michel Nicrosi
Miller, Hamilton, Snider & Odom, L.L.C.
P.O. Box 46
Mobile, Alabama 36601-0046
Phone: (251) 432-1414
Fax:    (251) 433-4106
E-mail: michelnicrosi@mhsolaw.com