## IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **Case No. 2:05-cr-119-MEF** |
| | * | |
| **PAUL MICHAEL HAMRICK** | * | |

### SUPPLEMENTAL BRIEF IN SUPPORT OF
### MOTION FOR JUDGMENT OF ACQUITTAL PURSUANT
### TO FED. R. CRIM. P. 29 ON COUNTS
### ONE, TWO, AND TEN THROUGH FOURTEEN:
### THE HONEST GOVERNMENTAL SERVICES CHARGES

The record compels Mr. Hamrick's acquittal on the honest services charges for many reasons.[1] Most importantly, the evidence shows he did not do what the second superseding indictment says he did. He did nothing at all on Talladega, G.H. Construction, Waste Management, or the ADO bond issue. If he did anything on Cherokee County, he did it as a private citizen.[2]

The public-official honest services issue that occupied much of the Rule 29 honest services arguments is a secondary issue for Mr. Hamrick. It would arise only if the evidence

---

[1]    The record also compels his acquittal on the 18 U.S.C. § 1512(b)(3) obstruction of justice charges in Counts One, Two, and Fifteen, as well as the RICO charges in Counts One and Two. Mr. Hamrick filed separate Rule 29 motions addressing those charges and maintains his position therein.

[2]    Mr. Perrine's argument that, when he was Governor Siegelman's campaign aide, Mr. Hamrick was hoping to hold office has no evidentiary support. There is no evidence about the circumstances under which and the reasons for which Mr. Hamrick became Governor Siegelman's Chief of Staff. Campaign aides do not automatically ascend to public office, and not all of them want to. There is no evidence about Mr. Hamrick's plans, hopes, or expectations when he was working on Governor Siegelman's campaign.

were different – that is, if he had done one of the charged acts as a public official. But even if it had properly arisen, the law would compel its resolution in Mr. Hamrick's favor.

Mr. Hamrick made his position on that issue clear in his Rule 29 motion and at oral argument. He submits this supplemental brief to address more fully a question the Court asked during the argument – whether the "agreement" that Mr. Bailey and Mr. Young testified about amounts to a *quid pro quo*. It does not.

Mr. Hamrick submits this brief also to make two additional points about the prosecution's new position based on the *Sawyer* cases. First, if the Eleventh Circuit meant to adopt *Sawyer*, it would have adopted the very specific jury instruction that *Sawyer* requires in non-quid pro quo cases. It has not. Second, undersigned counsel has been unable to locate, in the Eleventh Circuit or elsewhere, another public official honest services case prosecuted on a *Sawyer* theory.

## I. THE "AGREEMENT" IS NOT A QUID PRO QUO

### A. The Eleventh Circuit Public Official Honest Services Standard

The Eleventh Circuit, departing from better-reasoned decisions in other circuits,[3] holds

---

[3]     *See, e.g., United States v. Brumley*, 116 F.3d 728, 733-34 (5th Cir. 1997) (honest services prosecution of public official only permissible if state official has violated state law); *United States v. Murphy*, 323 F.3d 102, 117 (3d Cir. 2003) (honest services prosecution of public official only permissible upon violation of "a clearly established fiduciary relationship or legal duty in either federal or state law"). Mr. Hamrick maintains his position that *Brumley* set the proper standard, and that he cannot be prosecuted without proof (which no one contends exists here) that he violated state law. If, for any reason, the Court is not inclined to follow *Brumley*, he contends that *Murphy*'s "clearly established fiduciary relationship or legal duty in either federal or state law" is the proper standard. Mr. Hamrick maintains these positions, but

that the nature and scope of a state public official's honest services duty is a matter of federal common law, to be set and enforced by federal judges.[4]  *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) set the Eleventh Circuit standard:

> When a government officer decides how to proceed in an official endeavor – as when a legislator decides how to vote on an issue – his constituents have a right to have their best interests form the basis of that decision.  If the official instead secretly makes his decision based on his own personal interests – as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest – the official has defrauded the public of his honest services.

This case involves alleged payments from Mr. Young to Mr. Hamrick and thus is about the "takes a bribe" component.

## B.  A Bribe Requires A Quid Pro Quo

At oral argument on the Rule 29 motion the prosecution conceded that the Alabama bribery statute, Ala. Code § 13A-10-61(a)(2), requires a quid pro quo.  Likewise, in *United States v. Sun-Diamond Growers*, 526 U.S. 398 (1999), the United States Supreme Court held that federal bribery (under 18 U.S.C. § 201) requires a quid pro quo.

> Bribery requires intent "to influence" an official act or "to be influenced" in an official act . . . .  In other words, for bribery there must be a *quid pro quo* – a specific intent to give or receive something *in exchange for* an official act.

*Id.* at 404-05.  The Latin phrase "quid pro quo" literally means "something for something,"

---

argues the Eleventh Circuit standard in this brief, on the understanding that the Court will follow the Eleventh Circuit precedent in deciding this question (should a decision on it for any reason be necessary with respect to Mr. Hamrick, which it is not).

[4]    *See United States v. deVegter*, 198 F.3d 1324, 1329 (11th Cir. 1999) ("the nature and interpretation of the duty owed is a question of federal law"); *see also Castro v. United States*, 248 F. Supp.2d 1170, 1188-89 (S.D. Fla. 2003) (summarizing circuit split over source of duty).

*American Heritage Dictionary of the English Language* (4th ed. 2000), and has been used in the English language since the 16th Century to mean "an equal exchange or substitution." *Id.*; *American Heritage Dictionary of Idioms* (1997).

Justice Scalia, writing for the majority in *Sun-Diamond*, made clear that the payment must be made "in exchange for" a *specific* official act. He stated that one of the issues before the Court was whether the gratuity portion of 18 U.S.C. § 201, "unlike the bribery [portion], did not require any connection between respondent's intent and a specific official act." 526 U.S. at 405. As Mr. Hamrick has noted in previous pleadings, the Court, per Justice Scalia, held that an illegal gratuity likewise requires a link between the payment and a specific act – that the payment be made "for or because of" a specific official act.[5]

---

[5]     The Court held that the only difference between a bribe and a gratuity for these purposes is that a bribe must be made "in exchange" for the specific official act, while a gratuity need be made only "for or because of" the specific official act. The oft-quoted language is as follows:

> [F]or bribery there must be a *quid pro quo* – a specific intent to give or receive something of value *in exchange for* an official act. An illegal gratuity, on the other hand, may constitute merely a reward for some future act that the public official will take (and may already have determined to take), or for a past act that he has already taken.

>                    *              *              *              *

> The Independent Counsel asserts that [the gratuity portion of 18 U.S.C. § 201] "reaches any effort to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be *in a position to act favorably* to the giver's interests." The Solicitor General contends that [the gratuity portion of § 201]

State courts interpreting state bribery statutes have held likewise, including the following:

> *People v. Pic'l*, 31 Cal. 3d 731, 739 n.3, 183 Cal. Rptr. 685, 646 P.2d 847 (1982) ("a conviction may be sustained if it is proved beyond a reasonable doubt that the bribe was offered for the purpose of obtaining the quid pro quo")

> *Scaccia v. State Ethics Commission*, 431 Mass. 351, 356, 727 N.E.2d 824, 829 (Mass. 2000) ("Bribery also typically involves a quid pro quo, in which the giver corruptly intends to influence an official act through a 'gift,' and that 'gift' motivates an official to perform an official act. In effect what is contemplated is

---

> requires only a showing that a "gift was motivated, at least in part, by the recipient's *capacity to exercise governmental power or influence* in the donor's favor" without necessarily showing that it was connected to a particular official act.

> In our view, this interpretation does not fit comfortably with the statutory text, which prohibits only gratuities given or received "for or because of *any official act* performed or to be performed" (emphasis added). It seems to us that this means "for or because of some particular act of whatever identity" – just as the question "do you like any composer?" normally means "Do you like some particular composer?" It is linguistically possible, of course, for the phrase to mean "for or because of official acts in general, without specification as to which one" – just as the question "Do you like any composer?" could mean "Do you like all composers, no matter what their names or music?" But the former seems to us the more natural meaning, especially given the complex structure of the provision before us here . . . . The insistence upon an "official act," carefully defined, seems pregnant with the requirement that some particular official act be identified and proved.

526 U.S. at 406.

an exchange, involving a two way nexus").[6]

*Winn v. State*, 722 N.E.2d 345, 347 (Ind. App. 1999) ("[a]n essential element to the offense of bribery is a quid pro quo")

## C. <u>The Second Superseding Indictment</u>

The prosecution pled the honest services case as a public official bribery case – though it did not charge that Mr. Hamrick violated 18 U.S.C. § 201, Ala. Code §13A-10-61(a)(2), or any other federal or state bribery statute. The second superseding indictment alleges that:

> [Governor Siegelman and Mr. Hamrick] engaged in a course of conduct with Clayton "Lanny" Young establishing an agreement and understanding by which Clayton "Lanny" Young could obtain official acts in exchange for money, property, and other things of value.

*Second Superseding Indictment* ¶ 30(a). The "official acts" the second superseding indictment says that Mr. Young obtained related to Talladega, G.H. Construction, Waste Management, the ADO bond issue, and Cherokee County. *Id.* ¶ 30(g).

The second superseding indictment did not charge that Mr. Hamrick accepted gratuities – payments for or because of specific past or future acts. It did not charge that he accepted payments made, to use the Independent Counsel's language in *Sun-Diamond* (see footnote 5 to this supplemental brief), "to buy favor or generalized goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be in a position to act favorably to the giver's interests."

---

[6]     The Massachusetts court drew the same distinction between a bribe and a gratuity that the *Sun-Diamond* Court drew: "A gratuity, in violation of the statute, in contrast, can either be provided to the official as a reward for past action, to influence an official regarding a present action, or to induce an official to undertake a future action." *Id.*

### D.  **Mr. Young's Testimony: "Agreement" Not A Quid Pro Quo**

Mr. Young admitted he did not make payments to Mr. Hamrick in exchange for specific acts.  For example, with respect to the $25,000, he testified:

> Q.  Now, you never asked Paul to do anything in return for helping him get the lease on his car, did you?
>
> A.  Did I ask him to do anything specifically for this check?
>
> Q.  You never asked him to do anything in return for the car, the lease of the car?
>
> A.  I did not ask for anything specifically at that time I wrote this check, no, sir.
>
> *                    *                    *                    *
>
> Q.  Now, do you recall being asked by Mr. Long [in a November 12, 2001 interview with law enforcement], Did you ask him to do anything for you in return for the $25,000?  And did you say no?
>
> A.  That's correct.

*Lanny Young Testimony on Cross-Examination*, *May 17, 2006* 246/8-16; 248/21 – 249/1.

Instead, Mr. Young testified that his payments to Mr. Hamrick were part of the "agreement" he said he had with Governor Siegelman, Mr. Hamrick, and Mr. Bailey.  Mr. Young's testimony makes clear that the supposed "agreement" involved only payments made to buy "generalized favor or goodwill from an official who either has been, is, or may at some unknown, unspecified later time, be in a position to act favorably to the giver's interests."   Here are several examples:

> Q.  Mr. Young, during the race for lieutenant governor in '94, did you ever have conversations with Governor Siegelman about your expectations in return for the money and the property that you were giving to his campaign?
>
> MR. KILBORN: Your Honor, it's leading.  He can ask him what was said without putting words in his mouth.

7

THE COURT: Overruled.[7]

Q. Did you ever have conversations with him about that?

A. I did.

Q. What, if anything, did you and he discuss?

A. We discussed that if he would become lieutenant governor, there would be things that he could do for me, for my business, or for me in the future.

Q. Okay. Did you have conversations like that with Paul Hamrick during this time frame?

A. I did.

Q. How about with Nick Bailey?

A. I did.

*Young Testimony on Direct Examination*, *May 16, 2006* 38/20 – 39/22.

Q. Okay. Now why would you be giving Paul Hamrick these things?

A. This is just what I was doing to keep our agreement going that when I needed something, just like the agreement with the – with the racetrack. When I went to ask for something, I wanted to make sure that it was done.

Q. Okay. And you said there was an agreement on this. Did you talk to Paul Hamrick about this on occasion?

A. No. It was not something we talked about.

Q. All right. Well, how do you know that you had an agreement?

---

[7]    As Mr. Hamrick has said on a number of occasions, the record is replete with leading questions, questions based on an improper foundation, and other improper questions. Mr. Hamrick here reiterates his position that the defense's objections (all of which were good for all defendants) should have been granted and that the failure to grant them is an additional basis for a Rule 29 acquittal in this case.

A.  Well, I knew I had an agreement when the – the first time that I considered something was major that I asked them to do for me, that they did it.  To me, that solidified that understanding or unspoken agreement, if you will, that we had.

*Young Testimony on Direct Examination, May 16, 2006* 64/8 – 65/3.[8]

Q.  Let's go back to 1994 when you were making these contributions.  What did they tell you?

THE COURT: Let's identify the "they" on it.

Q.  What did Paul Hamrick tell you?

A.  Just on different occasions, if we win this, we're going to become governor, we're going to be able to help you, we're going to – I don't know – sponsor a race car, those types of things, talking.

Q.  Now, when you say governor in respect to lieutenant governor, do people call the lieutenant governor, governor, too?

A.  I did.

Q.  Is that what you're talking about?

A.  Yes.

Q.  So you're saying Mr. Hamrick told you that when he – when Lieutenant Governor Siegelman – when Governor Siegelman became lieutenant governor, they were going to take care of things that you needed and that they were going to take care of them for you?

MR. KILBORN: Object to that, Your Honor, as leading.  I'd like a sidebar.

---

[8]    The fact that Mr. Young gave diametrically opposed testimony in a short space of time on the same day – he had conversations with Mr. Hamrick about it *and* he never had conversations with Mr. Hamrick about it – is sufficient reason, standing alone, to compel a rational juror to have reasonable doubt, and thus to warrant Mr. Hamrick's acquittal pursuant to Fed. R. Crim. P. 29 on the honest services charges in Counts One, Two, and Ten through Fourteen. Mr. Hamrick hereby so moves.

THE COURT: Overruled.

Q.  What did he tell you when he was telling you – asking you for these things that you testified that you gave him?

A.  That if they – if Governor Siegelman got into office, that they would be in a position to do things to help me personally, further my business interests.

Q.  Okay.  And did they?

A.  Yes, they did.

Q.  Did you continue to give them things?

A.  I did.

*Young Testimony on Direct Examination, May 16, 2006*, 65/12 – 67/4.

Q.  Why are you willing to write checks of that magnitude and size [up to $25,000.00 to the 1998 Siegelman campaign] when asked by either Mr. Bailey, Mr. Hamrick, or Mr. Siegelman – excuse me – Governor Siegelman?

A.  I'm certainly hoping that Governor Siegelman – Lieutenant Governor Siegelman will become Governor Siegelman and he'll be able to support and help me with current and future business.

*Young Testimony on Direct Examination, May 16, 2006* 123/15-23.

Q.  Did you have conversations – I asked you why you were willing to do that. And what I want to know is, did you have conversations with Mr. Bailey, similar to the one that you had in 1994 with him, in 1998?

A.  Yes.

Q.  And tell the ladies and gentlemen of the jury the gist of those conversations.

A.  The gist of those conversations in '98 would be that if Don were to be governor, that there would be more and better things from that position that he could do to benefit me.

Q.  Okay.  And is that why you were willing to give those checks?

A.  Yes.

Q.  Did you have the same type of conversation with Mr. Hamrick?

A.  The same type of conversation?  Yes.

Q.  Did you have the same type of conversation with Mr. Siegelman?

A.  I did.

Q.  Did you have these conversations with them on more than one occasion?

A.  We did.

*Young Testimony on Direct Examination, May 16, 2006* 125/9 – 126/9.

Q.  Why are you willing to pay $20,900 in salary to [Nick Bailey] for working in Don – Governor Siegelman's campaign?

A.  It was just part of everything else to support the campaign and support – support Don becoming governor of Alabama.

Q.  Why are you supporting Don Siegelman becoming Governor of the State of Alabama?

A.  I want him to become governor so he can support and do things that would benefit me in business.

Q.  And you said you had talked with him about that during the 1998 campaign; is that right?

A.  I did.

Q.  Did he agree that he would do that when he got in office?

A.  He did.

Q.  How about Paul Hamrick?  Did you talk to him about it, and did he agree that he would do that when and if they got into office?

A.  He did.

Q.  And how about Nick Bailey?

A.  He did.

*Young Testimony on Direct Examination, May 16, 2006* 129/8 – 130/7.

Q.  And why was Lanny Young giving $30,000 to the Siegelman for Governor campaign on August (sic) the 1st, 1998?

A.  I was hoping that Don Siegelman would be elected governor.

Q.  And why did you want Don Siegelman to be elected governor?

A.  So he could support my business – business or anything else I needed him to do.

Q.  All right.  And did you have reason for believing that he would support your business or anything else you wanted if he got elected governor?

A.  I did .

Q.  And was that based on conversations you had with Paul Hamrick?

MR. LEACH: Your Honor, this is cumulative evidence.  We've been over this four times.

MR. FEAGA: Your Honor –

MR. LEACH: Counsel tries to bring in towards the latest testimony, but it is exactly the same line of testimony.  Judge, we're going to be here till Christmastime.  We ask that counsel be directed to stop with the charts and stop with the cumulative evidence.

THE COURT: Overruled.

MR. DEEN: Objection to leading, Your Honor.  He's – he's asked him a series of questions, then he says did you talk to Hamrick about it, and I object.  That's just leading.

MR. FEAGA: Well, they wanted me to say – I'm sorry, Your Honor.

THE COURT: Overruled.  Let's move on.

MR. FEAGA: Yes, sir.

Q.  Did you talk to Paul Hamrick about the expectation that you had when you were making this $30,000 in contributions to six different PACs?

A.  We talked about things that – that could happen if – should he become governor of Alabama, yes.

MR. DEEN: The question, Judge, is what – when he made the contributions to the PACs, did he then sit down with Hamrick and say, I'm going to make these contributions.  And that's the witness is saying –

MR. FEAGA: Your Honor, he's making a speaking objection.

THE COURT: Counsel, state your objection.

MR. DEEN: Mr. Feaga is leading the witness, and the witness is not being responsive to his specific question.

THE COURT: Overrruled as to leading.  Is there any other objection, Mr. Deen?

MR. DEEN: No.

THE COURT: All right.  Move on.

Q.  Tell the ladies and gentlemen of the jury what the agreement you had with Paul Hamrick was that would make you willing to give $30,000 when called on October the 1st, 1998, to help Governor Siegelman get elected governor.

A.  The agreement would have been that I would give whatever money was needed for campaign, personal use, or whatever; and if he became in a position to help me further my business or personal interests, he would do so.

Q.  And did he do it?

A.  Yes.

Q.  Did you have the same agreement with Nick Bailey?

A.  I did.

Q.  Did you have the same agreement with Governor Don Siegelman?

A.  I did.

Q.  Did Mr. Bailey and Mr. Siegelman do things to help you as promised in the

agreement?

A. They did.

*Young Testimony on Direct Examination, May 16, 2006* 140/9 – 144/8.

Q. Now, when Mr. Hamrick asked you for $25,000 so he could get himself a BMW, why did you give it to him?

A. I gave it to him because it was just part of what we talked about yesterday. I'd ask them for things, and – and they would ask me for things, and I did it when they asked.

Q. Why did you do it when they asked?

MR. DEEN: Your Honor, I object to the "they."

Q. Why did you do it when Paul Hamrick asked?

A. I did it when Paul asked because I wanted to – to make sure that when I went to Paul and wanted something, that he knew that – that when he asked me for something, I had done it for him.

Q. Okay. Is this part of the agreement that you had with him that you testified about earlier yesterday?

A. It is.

*Young Testimony on Direct Examination, May 17, 2006* 23/18 – 24/14.

Q. Now, you never asked Paul to do anything in return for helping him get the lease on his car, did you?

A. Did I ask him to do anything specifically for this check?

Q. You never asked him to do anything for the car, the lease of the car?

A. I did not ask for anything specifically at the time I wrote this check, no, sir.

14

*Young Testimony on Cross-Examination, May 17, 2006* 246/8-16.

> Q.  And what is it about the Governor asking you to get with Nick about the details of purchasing a motorcycle that caused you to do it?
>
> A.  The Governor had asked me to do something, and I was going to do it because I was sure there would be a time that I would be back over there asking him to do something for me.
>
> Q.  Is that part of the agreement you talked about earlier through all of this testimony?
>
> A.  It is.

*Young Testimony on Direct Examination, May 17, 2006* 185/23 – 186/10.

> Q.  Why were you giving cash to Paul on these last four exhibits?
>
> A.  He had asked for it.
>
> Q.  And why would you give cash to Paul Hamrick just because he asked for it?
>
> A.  Because if I needed to ask Paul for something, I expected him to do something for me.
>
> Q.  Well, what is it that made you think that he would do something for you?
>
> A.  Because he had in the past.
>
> Q.  You testified at length over the last probably eight hours about conversations you had with Paul Hamrick concerning you giving him things and him doing things for you.  I want to ask you again, why were you giving things to Paul Hamrick when he asked you for them?
>
> A.  I was giving things to Paul because of our agreement that he would ask me for something and I would give it to him; if I asked him for something, I expected him to do it for me.
>
> Q.  Had he agreed to do it for you?
>
> A.  Yes.

Q.  Was that your agreement?

A.  Yes.

*Young Testimony on Direct Examination, May 17, 2006* 211/18 – 212/21.

## II.  <u>ADDITIONAL POINTS ABOUT THE PROSECUTION'S NEW *SAWYER* POSITION</u>

Faced with this testimony, the prosecution now argues that it is not "required" to prove a quid pro quo.  Mr. Hamrick respectfully contends that the prosecution simply is wrong.  It pled this case as a quid pro quo case.  Its proof failed, and Mr. Hamrick should be acquitted.

The briefs and arguments covered the *Sawyer* issue.  Mr. Hamrick's position is that the *Sawyer* formulation is wrong, and does not comport with Eleventh Circuit precedent.  His position also is that it does not matter, because the prosecution's proof did not meet even the *Sawyer* standard.  That is, there is no evidence that he intended to alter any of his official acts (even if he had done the alleged official acts, which he did not) or that he intended to deceive the public.  Mr. Hamrick's two additional points are as follows.

### A.  <u>Jury Instruction</u>

The prosecution's argument that the Eleventh Circuit follows *Sawyer* is wrong.  Among other things, *Sawyer* requires a very specific jury instruction in honest services cases not based on a quid pro quo:

> The practice of using hospitality, including lavish hospitality, to cultivate business or political relationships is longstanding and pervasive.  The government does not argue, and we do not believe, that payments for entertainment, lodging, golf, sports events, and the like would constitute violations of the . . . mail and wire fraud statutes . . . if the aim of the lobbyist were simply to cultivate a business or political "friendship" with the legislator.  It may well be that all such hospitality should be flatly prohibited by law, but if Sawyer had this limited intent – to cultivate friendship rather than to influence an official act – the federal statutes here involved would not be violated.

16

The charge to the jury in this case followed the conventional formula for
prosecutions involving political corruption.  But where the difference between
lawful and unlawful turns primarily on intent, and the lawful conduct is itself
most unattractive, we think the jury needs to be told specifically that the
defendant has not . . . committed honest services fraud . . . if his intent was limited
to the cultivation of business or political friendship.  Only if instead or in
addition, there is an intent to cause the recipient to alter her official acts may the
jury find a theft of honest services[.]

*Sawyer* I, 85 F.3d 713, 741 (1st Cir. 1996).   The Eleventh Circuit has not made this instruction

part of its pattern instruction on honest services charges.  The portion of the pattern instruction

dealing with a public official's duty in honest services cases reads:

**Mail Fraud**
**Depriving Another Of Intangible Right**
**Of Honest Services**
**18 USC §§ 1341 and 1346**

Title 18, United States Code, Sections 1341 and 1346, make it a Federal crime or
offense for anyone to [use the United States mails] [transmit something by private
or commercial interstate carrier] in carrying out a scheme to fraudulently deprive
another of an intangible right of honest services.

The Defendant can be found guilty of that offense only if all of the following facts
are proved beyond a reasonable doubt:

First:          That the Defendant knowingly devised or participated in a
                scheme to fraudulently deprive [the public] [another] of the
                intangible right of honest services, as charged;

Second:         That the Defendant did so willfully with an intent to
                defraud; and

Third:          That the Defendant used [the United States Postal Service
                by mailing or by causing to be mailed] [a private or
                commercial interstate carrier by depositing or causing to be
                deposited with such carrier] some matter or thing for the
                purpose of executing the scheme to defraud.

*          *          *          *

The word "scheme" includes any plan or course of action intended to deceive or cheat someone; and to act with "intent to defraud" means to act knowingly and with the specific intent to deceive someone, ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to one's self.

To "deprive another of the intangible right of honest services" means to violate, or to cause [a public official or employee] [an employee or agent of another person] to violate, the employee's or agent's duty to provide honest services to the employer.

[Public officials and public employees inherently owe a duty to the public to act in the public's best interest.  If, instead, the [official] [employee] acts or makes [his] [her] decision based on the official's own personal interests - - such as accepting a bribe, taking a kickback or receiving personal benefit from an undisclosed conflict of interest - - the official has defrauded the public of the official's honest services even though the public agency involved may not suffer any monetary loss in the transaction.]

## B. <u>Other Cases</u>

Undersigned counsel has been unable to locate any reported Eleventh Circuit case prosecuted on a *Sawyer* theory.  Indeed, *Lopez-Lukis* was a quid pro quo bribery case, and the other reported Eleventh Circuit cases involving payments to public officials that undersigned counsel has located appear to be so:

*United States v. Paradies*, 98 F.3d 1266, 1271-72 (11th Cir. 1996) (concessionaires at Atlanta airport paid bribes to Atlanta City Council member to reduce rent for their concessions at airport)

*United States v. Castro*, 89 F.3d 1443, 1447-48 (11th Cir. 1996) (judge in Dade County accepting kickbacks in exchange for appointments of lawyers as special assistant public defenders)

*United States v. Italiano*, 894 F.2d 1280, 1281-82 (11th Cir. 1990) (bribes to Hillsborough County, Florida county commissioners in exchange for the award of cable television franchises)

This is true with respect to the reported cases in other circuits, other than the *Sawyer* cases, that undersigned counsel has been able to locate:

*United States v. Sedoma*, 332 F.3d 20, 22 (1st Cir. 2003) (Tiverton, MA police officer paid to provide confidential police information to drug ring)

*United States v. Boots*, 80 F.3d 580, 592-93 (1st Cir. 1996) (bribes paid to Native American reservation police chief by tobacco smuggling ring)

*United States v. Grandmaison*, 77 F.3d 555, 557-58 (1st Cir. 1996) (Nashua, New Hampshire alderman bribed colleagues for votes leading to the selection of his construction firm for lucrative construction project)

*United States v. Bucuvalas,* 970 F.3d 937, 939 (1st Cir. 1992) (among other mail fraud violations, "Bucuvalas and his co-conspirators [who operated adult entertainment establishments] bribed licensing board members and police officers to avoid accountability for infractions which might otherwise have resulted in license suspensions or revocations")

*United States v. Potter*, 2005 WL 2367677 *2-3 (D.R.I. 2005) (dog track owner paid bribe to Speaker of Rhode Island House of Representatives for favorable legislative action on coin-operated gambling machines and video lottery terminals at dog track, as well as unfavorable legislative action toward Native American tribe proposal for casino gambling)

*United States v. Lenoci*, 377 F.2d 246, 248-49 (2d Cir. 2004) (developer provided free landscaping and other services for personal residences of mayor and official at state of Connecticut's Office of Community and Economic Development; in exchange, mayor wrote a letter in support of development and state official advanced $6.5 million in state development funds to project)

*United States v. Alkins*, 925 F.2d 541, 544-45 (2d Cir. 1991) (DMV officials processing applications for driver's licenses and other licenses, absent proper documentation, in exchange for cash payments)

*United States v. Quinn*, 359 F.3d 666, 671-72 (4th Cir. 2004) (bribes to Department of Treasury officials for contracts)

*United States v. Barber*, 668 F.2d 778, 781 (4th Cir.) (alcoholic beverage control commissioner charged with "soliciting and accepting thousands of dollars in bribes from certain liquor companies" as well as helping himself to free liquor), *cert. denied* 459 U.S. 829 (1982)

*United States v. Holzer*, 816 F.2d 304, 308 (7th Cir. 1987) ("systematic and long-continued receipt of bribes" by county trial judge from lawyers appearing before him)

*United States v. Lovett*, 811 F.2d 979, 981 (7th Cir. 1987) (bribe from cable television company to mayor for cable rights in town – offer of 5% ownership in the company)

*United States v. Rauhoff*, 525 F.2d 1170, 1171-72 (7th Cir. 1975) (bribes to Illinois Secretary of State "in order to procure and retain contracts for the production of Illinois license plates")

*United States v. Madeoy*, 912 F.2d 1486, 1488 (D.C. Cir. 1988) (bribes to public officials to obtain FHA-insured loans)

### III. <u>CONCLUSION</u>

Mr. Hamrick respectfully requests that the Court consider the above arguments as reasons – in addition to the reasons he set forth in his written Rule 29 motions and at Rule 29 oral argument – to grant him a judgment of acquittal.

Respectfully submitted,

s/T. Jefferson Deen, III
T. Jefferson Deen, III
T. Jefferson Deen, III, P.C.
P.O. Box 2705
Mobile, Alabama 36652
Phone: (251) 433-5860
Fax:    (251) 433-0703
E-mail: TJeffDeen@deenlawpc.com

s/Michel Nicrosi
Michel Nicrosi
Miller, Hamilton, Snider & Odom, L.L.C.
P.O. Box 46
Mobile, Alabama 36601-0046
Phone: (251) 432-1414
Fax:    (251) 433-4106
E-mail: michelnicrosi@mhsolaw.com

**CERTIFICATE OF SERVICE**

I certify that on June 12, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

s/Michel Nicrosi
Michel Nicrosi
Miller, Hamilton, Snider & Odom, L.L.C.
P.O. Box 46
Mobile, Alabama 36601-0046
Phone: (251) 432-1414
Fax:    (251) 433-4106
E-mail: michelnicrosi@mhsolaw.com